# No. 22-__

# United States Court Of Appeals

## FOR THE NINTH CIRCUIT

CHASOM BROWN, ET AL.

*Plaintiffs-Petitioners,*

v.

GOOGLE, LLC,

*Defendant-Respondent.*

_____

*Petition for Review of Order Granting in Part and Denying in Part Certification of Class from the United States District Court for the Northern District of California,*

*Docket No. 4:20-cv-03664-YGR, The Honorable Yvonne Gonzalez Rogers*

## PETITION FOR PERMISSION TO APPEAL PURSUANT TO RULE 23(F) FROM ORDER GRANTING IN PART AND DENYING IN PART CLASS CERTIFICATION

David Boies
333 Main Street
Armonk, NY 10504
914-749-8200
dboies@bsfllp.com

Mark Mao
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
415-293-6800
mmao@bsfllp.com
BOIES SCHILLER FLEXNER LLP

Bill Carmody
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019
212-336-8330
bcarmody@susmangodfrey.com
SUSMAN GODFREY LLP

John A. Yanchunis
201 N. Franklin Street, 7th Fl.
Tampa, FL 33602
813-223-5505
MORGAN & MORGAN

*Attorneys for Plaintiffs-Petitioners*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

I.    QUESTIONS PRESENTED ............................................................1

II.    INTRODUCTION ..........................................................................1

III.   ARGUMENTS AND AUTHORITIES ..........................................5

       A.    The Order erred by ignoring the "explicit consent" requirement in Google's form contract. ................................5

       B.    The Order erroneously assumed that implied consent is an affirmative defense to breach of contract claims. ................9

       C.    The Order also erred by assuming implied consent is available where there is no actual choice. ...........................11

IV.   CONCLUSION............................................................................13

STATEMENT OF RELATED CASES.................................................16

CERTIFICATE OF COMPLIANCE....................................................17

CERTIFICATE OF SERVICE .............................................................18

ADDENDUM ......................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Chamberlan v. Ford Motor Co.*,
402 F.3d 952 (9th Cir. 2005) ...................................................5

*Gene And Gene LLC v. BioPay LLC*,
541 F.3d 318 (5th Cir. 2008) ...................................................7

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
672 F.3d 482 (7th Cir. 2012) ...................................................3

*Microsoft Corp v. Baker*,
137 S. Ct. 1702 (2017)...............................................................5

*Opperman v. Path, Inc.*,
2016 WL 3844326 (N.D. Cal. July 15, 2016) ......................9

*People v. Carbonie*,
48 Cal. App. 3d 679 (Ct. App. 1975)..................................4, 6

*Rose v. Bank of Am., N.A.*,
304 P.3d 181 (Cal. 2013)..........................................................9

*Smilow v. Southwestern Bell Mobile Systems*,
323 F.3d 32 (1st Cir. 2003) ...................................................11

*Tebbets v. Fidelity & Cas. Co. of New York*,
99 P. 501 (Cal. 1909) ................................................................6

*True Health Chiropractic, Inc. v. McKesson Corp.*,
896 F.3d 923 (9th Cir. 2018) ............................................5, 7, 8

*United States v. Staves*,
383 F.3d 977 (9th Cir. 2004) .............................................6, 12

*Watkins v. L.M. Berry & Co.*,
704 F.2d 577 (11th Cir. 1983) ..............................................12

**Other Authorities**

Judicial Council of Cal. Civil Jury Instructions 330-38 (2022) ...............................9

Restatement (Second) of Contracts § 211...............................................................10

Under Federal Rule of Civil Procedure Rule 23(f), Plaintiffs Chasom Brown et al. ("Plaintiffs") respectfully petition for permission to appeal an order of the district court denying in part Plaintiffs' motion for class certification.

## I.    QUESTIONS PRESENTED

1.  Did the district court err by concluding that "implied consent" is an available affirmative defense despite Google's form contract requiring "explicit consent"?

2.  Did the district court err by concluding that implied consent is a defense to a breach of contract claim?

3.  Did the district court err by assuming that implied consent is a defense where class members have no way to stop Google's data collection?

## II.    INTRODUCTION

This appeal raises a simple, but critical legal question: Can "implied consent" be raised as a defense when the relevant contract requires "explicit consent?" The district court denied certification of a Rule 23(b)(3) class by answering this question in the affirmative—yet offered no analysis or reasoning for its decision. That decision was manifestly erroneous, warranting review under Rule 23(f).

Google offers consumers a special browser mode called "Incognito"—which is Google's "private browsing" mode. The district court in denying Google's motion to dismiss (Koh, J.) found that "a reasonable user, reading Google's contract with Plaintiffs as a whole, could easily conclude that Google promised Plaintiffs that using 'private browsing mode' would prevent Google from collecting Plaintiffs' data." Dkt. 363 at 21. In breach of that contractual promise, Google collected users' private browsing data, even while users were signed out of their Google accounts

1

and browsing non-Google websites. Google also used the data to make billions of dollars in advertising revenues. That Google collects and monetizes this private data is undisputed. *E.g.*, Google's Opposition ("Opp'n"), Dkt. 665 at 1-2, 24.

Google employees have admitted that Google's collection and use of private browsing data violates Google's commitment to users. Employees internally describe Incognito as "not truly private" and "effectively a lie," recognizing that users suffer from "common misconceptions" about "how Incognito works" and "private browsing more generally," including that it "hides browsing activity from Google." Plaintiffs' Motion ("Mot.") at 2, Dkt. 643-2; Mot. Exs. 1 at -67, 2 at -26, 4 at -65, 5 at -43, 9 at -82. "Normal people have no chance." Mot. Ex. 6 at -75. At the class certification hearing, Google's counsel even conceded that *at least* "tens of millions" of putative class members did not understand Google's disclosures. Oct. 11 Tr. 14:11-20.

Plaintiffs moved for class certification of their seven claims under Rule 23(b)(2) and Rule 23(b)(3), and alternatively for issue certification under Rule 23(c)(4).[1] Those claims are: breach of contract, intrusion upon seclusion, invasion

---

[1] *See* Mot. at 25 (requesting (c)(4) certification in the alternative to (b)(3) and/or (b)(2) certification; *see also* Plaintiffs' Reply, Dkt. 750-2 at 15 (same). Google did not address the (c)(4) request in its opposition, and the district court did not expressly rule on (c)(4). Plaintiffs also respectfully seek permission to appeal that implicit denial. Plaintiffs identified numerous issues in their Motion that are appropriate for (c)(4) certification, including "the appropriate measure of damages." Mot. at 25. The district court found that Plaintiffs' damages expert reliably quantified aggregate classwide actual damages and Google's unjust enrichment. Order at 8. At a

of privacy, and claims for violation of the Federal Wiretap Act, California Invasion of Privacy Act ("CIPA"), California's Comprehensive Computer Data Access and Fraud Act ("CDAFA"), and California's Unfair Competition Law § 17200. The court certified every claim for injunctive relief but denied (b)(3) certification on all claims. *See* Case 4:20-cv-03664-YGR at Dkt. 803 (N.D. Cal. Dec. 12, 2022) (the "Order").

The Order's sole basis for denying (b)(3) certification was that individualized issues would predominate as to one issue: implied consent. The Order agreed with Google that some unspecified and unidentified class members may ultimately be found to have impliedly consented to Google's collection and use of private browsing data if they were exposed to third-party sources like "media and academic reports" that (purportedly) addressed Google's collection and use of the data. Order at 30-32.

That denial of (b)(3) certification was manifestly erroneous as a matter of law for three reasons, each triggering appropriate review under Rule 23(f).

---

minimum, those findings warrant certification of those damages issues, where a jury can decide, based on common evidence, the aggregate amount of damages, including the amount by which Google was unjustly enriched. The district court should have certified at least those damages issues under Rule 23(c)(4). *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 492 (7th Cir. 2012) (under Rule 23(f), reversing denial of both (b)(2) and (c)(4) certification). Certifying those damages issues for class treatment would enable class members to pursue their own claims for damages without requiring them to relitigate these common issues and thereby serve the interests of litigation efficiency.

*First*, even for the two claims where implied consent is generally available as an affirmative defense (Federal Wiretap Act and CIPA),[2] implied consent is not available here because Google contractually agreed in its form contract to seek "explicit consent" from class members before reducing their privacy rights, and Google has not presented evidence that a single class member either actually gave "explicit consent" or waived that "explicit consent" requirement. The Order *entirely ignored* this "explicit consent" requirement. There is no way to reconcile Google's position on "*implied* consent" with Google's contractual commitment to require "*explicit* consent" before collecting and using class members' private browsing data. For this reason, reversal is warranted as to all claims.

*Second*, the Order adopted Google's mistaken argument that implied consent is an affirmative defense to all seven claims, including breach of contract. It is not. The district court was thus led astray by Google into considering class members' subjective "knowledge and expectations" regarding private browsing, in violation of blackletter contract law. That warrants reversal at least as to the breach of contract claim.

*Third*, even if there were no "explicit consent" requirement in the form contract (there is) and even if implied consent were an available defense for all seven claims (it is not), implied consent by any class member cannot possibly be proven

---

[2] As explained in Section II.B, *infra*, the Order erred by adopting Google's incorrect assertion that implied consent is a defense to all seven claims.

here because there is no actual choice. Users have no way to avoid the data collection at issue.

## III. ARGUMENTS AND AUTHORITIES

This Court reviews orders denying class certification for abuse of discretion. *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 928 (9th Cir. 2018). "A district court abuses its discretion when it applies the wrong legal standard." *Id.* Under Rule 23(f), this court has "unfettered discretion" to grant review of an order denying class certification and may do so "on the basis of any consideration." *Microsoft Corp v. Baker*, 137 S. Ct. 1702, 1709-10 (2017). Review is "most appropriate" when, *inter alia*, "the district court's class certification decision is manifestly erroneous." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005). Here, the district court abused its discretion by applying the wrong legal standard—implied consent—to claims that should be governed by explicit consent. That error was manifestly erroneous for three independent reasons, each warranting review under Rule 23(f).

### A. The Order erred by ignoring the "explicit consent" requirement in Google's form contract.

In Google's form contract used by Google throughout the class period, Google expressly agreed to an "explicit consent" standard: "We [Google] will not reduce your rights under this Privacy Policy *without your explicit consent*." Dkt. 83-1 at 12

5

(emphasis added).[3] Google has not presented any evidence that a single class member either gave "explicit consent" or waived this "explicit consent" requirement.[4] Because of this "explicit consent" requirement, evidence relating to implied consent—such as what "users knew or did not know" from third-party "sources of information" like "media and academic reports"—is irrelevant to all seven claims, including the Federal Wiretap Act and CIPA claims, which are the only claims where implied consent is generally available. Order at 31-32.[5] Google's contractual promise not to collect and use class members' private browsing data unless it first obtained "explicit consent" contradicts its so-called implied consent defense for those two claims. When an affirmative defense constitutes a "personal right for the benefit of the individual," it "may be waived" by contract, *Tebbets v. Fidelity & Cas. Co. of New York*, 99 P. 501, 502 (Cal. 1909), as Google did here.

The Order erred by *entirely ignoring* the "explicit consent" requirement. While the Order briefly acknowledged Plaintiffs' argument that "Google waived any implied consent defense in its form contract," Order at 31, the Order never mentioned the "explicit consent" requirement, let alone grapple with it. That is

---

[3] Google does not dispute that the contract at issue is a form contract. Plaintiffs' Reply at 2. *See also* Plaintiffs' Trial Plan, Dkt. 643-4 at 6-8 (summarizing the form contract).

[4] *See generally* Opp'n; Plaintiffs' Reply at 3-4.

[5] *See United States v. Staves*, 383 F.3d 977, 981 (9th Cir. 2004) (Federal Wiretap Act); *People v. Carbonie*, 48 Cal. App. 3d 679, 685 (Ct. App. 1975) (CIPA).

because there is no way to reconcile the Order's holding on "*implied* consent" with Google's contractual commitment to require "*explicit* consent" before collecting and using the data in question.

Google also failed in its efforts to reconcile the two, offering just one nonsensical sentence in its opposition brief: "[A] user's implied consent—i.e., their choice to use a service while aware of the conduct—is neither an action by Google nor an instance of reducing the user's rights." Opp'n at 15. That response makes no sense. Google is of course reducing users' rights without their "*explicit* consent" by arguing that users *impliedly* consented to a practice forbidden by the contract.

Rather than address the form contract's "explicit consent" requirement, the Order grounded its implied consent holding on a case that had nothing to do with implied consent. *See* Order at 28-30 (discussing *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 926 (9th Cir. 2018)). The word "implied" appears nowhere in that decision because that case addressed a claim for unsolicited fax advertisements under the Telephone Consumer Protection Act of 1991 ("TCPA"), a statute that requires "express" consent. *Id.* at 926.[6]

But *True Health* is instructive for express consent, and that analysis supports Plaintiffs' position here. For one subclass, individualized issues predominated where the defendant presented evidence of "individual oral or email communications" with

---

[6] The same is true for the only other case the Order cited within its implied consent analysis (at 30)—*Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008)—which is another TCPA case where only express consent mattered.

some class members who explicitly requested that the faxes in question be sent to them. Here, by contrast, Google has presented no evidence of any "individual . . . communications" between Google and a single class member, much less communications where *any* class member "explicitly" consented to the challenged practice (as required by the form contract). At the class certification hearing, the district court recognized that Google's "circumstantial" evidence (e.g., academic reports) is not "like what existed in the *True Health* decision." Oct. 11 Tr. 17:11-18:3. But the Order took a left turn. In doing so, the Order also overlooked the portion of *True Health* directly on point here. For another subclass, predominance was satisfied because, as to those class members, the defendant's express consent defense turned on "software-licensing agreements" where "there is little or no variation," meaning that "[c]onsent, or lack thereof, is ascertainable by simply examining" those agreements. 896 F.3d at 932. Here, Plaintiffs' predominance evidence is even stronger because the claims turn on the language in Google's form contract, which is the same for all class members.

The Order's failure to grapple with the contract and correctly apply Ninth Circuit precedent led to a manifestly erroneous outcome. During the class certification hearing, the district court challenged Google's counsel to identify "any case where there is ***evidence proffered of some non-party to a contract that can be used to modify a contract*** between two parties." Oct. 11 Tr. 7:17-8:20 (emphasis added). Google's counsel could not do so, let alone identify a case where the contract in question had an "explicit consent" requirement. By ignoring that requirement, the Order diverged even further from precedent.

**B.    The Order erroneously assumed that implied consent is an affirmative defense to breach of contract claims.**

Even if there were no "explicit consent" requirement in the form contract, reversal is warranted for at least Plaintiffs' contract claim because implied consent is not a defense to breach of contract. The district court was led astray by Google's argument that for "all seven of plaintiffs' claims, . . . the affirmative defense of implied consent raises individualized issues that defeat predominance." Order at 28. ***Implied consent is not an affirmative defense to breach of contract.*** *See e.g.*, Judicial Council of Cal. Civil Jury Instructions 330-38 (2022) (listing affirmative defenses to breach of contract and omitting implied consent).[7] Google did not cite any authority which held or even suggested that implied consent is a defense to breach of contract. Instead, Google pointed to the initial motion to dismiss ruling in this case, ***which was decided before Plaintiffs amended their complaint to add the breach of contract claim***. *See* Opp'n at 12 (citing Dkt. 113 at 14). Yet the Order took Google at its word, and clearly erred as a matter of law when it assumed that implied consent is an available defense for all seven claims. The Order ultimately

---

[7] Nor is it a defense to the CDAFA claim, for which Google must have "permission" to collect the data. Cal. Penal Code 502(c)(2). Implied consent is also irrelevant to the intrusion upon seclusion and invasion of privacy claims. *See Opperman v. Path, Inc.*, 2016 WL 3844326, at *11 (N.D. Cal. July 15, 2016) (rejecting argument that "an individual inquiry will be required into the subjective expectations of each class member"). And the UCL "borrows" violations of other laws, which means that claim turns on the same common evidence underlying the other claims. *Rose v. Bank of Am., N.A.*, 304 P.3d 181, 185 (Cal. 2013).

based its denial of (b)(3) certification on that incorrect assumption. *See* Order at 32 (also citing Dkt. 113 at 14).

That faulty assumption led the district court down the wrong path and to irrelevant evidence. Form contracts are "interpreted wherever reasonable as treating alike all those similarly situated, ***without regard to their knowledge*** or understanding of the standard terms of the writing." Restatement (Second) of Contracts § 211(2) (emphasis added). "[C]ourts in construing and applying a standardized contract seek to effectuate the reasonable expectations of the average member of the public who accepts it. ***The result may be to give the advantage of a restrictive reading to some sophisticated customers who contracted with knowledge of an ambiguity or dispute***." Restatement (Second) of Contracts § 211 cmt. e (emphasis added).[8]

Here, in violation of these established principles of contract law, the Order relied on evidence relating to "individual, and subjective, interactions of what certain class members knew, read, saw, or encountered," "the sources of information to which each class member was exposed," individualized "expectations," and "individualized assessment into class members' experience." Order at 30-32.

At least two Circuit Courts have used Rule 23(f) to vacate class certification denials in analogous circumstances. In *Gillis v. Respond Power, LLC*, the Third

---

[8] California courts apply the Restatement (Second) of Contracts § 211. *E.g.*, *Williams v. Apple, Inc.*, 338 F.R.D. 629, 638 (N.D. Cal. 2021) (citing *Ellena v. Dep't of Ins.*, 230 Cal. App. 4th 198, 213 (Ct. App. 2014)).

Circuit vacated the district court's denial of class certification, reasoning that "*[i]n the context of standard form contracts, . . . extrinsic evidence of individual understandings is especially irrelevant*." 677 F. App'x 752, 756 (3d Cir. 2017) (emphasis added). Similarly, in *Smilow v. Southwestern Bell Mobile Systems*, the First Circuit reversed a decertification order, holding that individualized issues regarding affirmative defenses did not predominate because "[t]he case turns on interpretation of the form contract." 323 F.3d 32, 42 (1st Cir. 2003). As to Plaintiffs' contract claim, reversal is warranted for the same reason: the claim turns on the objective meaning of promises made in the form contract. "[S]ettled contract law and Ninth Circuit precedent preclude [media reports] from defeating predominance." *Williams*, 338 F.R.D. at 644 (citing Restatement § 211).

By ignoring blackletter contract law, the Order turned on its head the maxim that claims arising from "form contracts" are "often particularly appropriate for class treatment." 1 Newberg on Class Actions § 3:24 (5th ed.). If implied consent were a defense to breach of contract, and defendants could evade their express contractual promises based on "what certain class members knew, read, saw, or encountered" (Order at 32), any news article written by "some non-party" would effectively shield defendants from monetary liability. Order at 32; Oct. 11 Tr. 7:17-21.

### C. The Order also erred by assuming implied consent is available where there is no actual choice.

Alternatively, even if there were no "explicit consent" requirement in the form contract, and even for the state and federal wiretap claims where implied consent

11

can be a defense,[9] implied consent is still unavailable here because class members have no actual choice.

Class members had no way to stop Google from collecting and profiting from their private browsing information during their visits to non-Google websites. Google has not and cannot identify any setting or feature (or combination thereof) that will completely block Google's collection of that private browsing data. Mot. Ex. 93, Dkt. 750-4 at 155:12-156:21; Hochman Rebuttal, Dkt. 643-9 § V.E & ¶ 121; *see also* Plaintiffs' Reply at 7. Google is also precluded from contesting the presence of Google tracking beacons on any non-Google website. Dkt. 288-1 at 1-2. The upshot is that Google captured data from anyone who browsed the internet in one of the private browsing modes at issue,[10] even while signed out of their Google accounts and even during their visits to non-Google websites.

Implying consent under these circumstances cannot be squared with the well-settled principle that "[c]onsent under [the Federal Wiretap Act] is not to be cavalierly implied." *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 581 (11th Cir. 1983). Nor with this Court's holding that "***foreseeability*** of monitoring is insufficient to infer consent"; rather, "the circumstances must indicate that a party to the communication knew that interception was likely ***and agreed to the monitoring***."

---

[9] *See supra* n.5 and accompanying text.

[10] Those modes include Chrome Incognito as well as the private browsing modes for Safari, Edge, and Internet Explorer. *See* Mot. at 1.

12

*United States v. Staves*, 383 F.3d 977, 981 (9th Cir. 2004) (emphasis added). At best, Google's evidence goes to awareness, not agreement, and choice is a prerequisite for any agreement.

The Order's implications for other areas of law are dire. The only way for class members to avoid Google's collection of this data is to avoid the internet entirely. Google's omnipresence should not grant Google a free pass to collect and profit from whatever data it wants, particularly where Google has expressly promised not to collect this data and, moreover, not to reduce users' privacy rights without their "explicit consent."

## IV.    CONCLUSION

Plaintiffs respectfully ask this Court to grant this Rule 23(f) petition to appeal.

/s/ *John A. Yanchunis*
John A. Yanchunis
jyanchunis@forthepeople.com
MORGAN & MORGAN
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505

David Boies
dboies@bsfllp.com
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
914-749-8200

Mark C. Mao, CA Bar No. 236165
mmao@bsfllp.com
Beko Richardson, CA Bar No. 238027
brichardson@bsfllp.com

13

Erika Nyborg-Burch
Enyborg-burch@bsfllp.com
BOIES SCHILLER FLEXNER LLP
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6800
Fax: (415) 293-6899

James Lee
jlee@bsfllp.com
Rossana Baeza
rbaeza@bsfllp.com
BOIES SCHILLER FLEXNER LLP
100 SE 2nd St., 28th Floor
Miami, FL 33131
Tel.: (305) 539-8400
Fax: (303) 539-1307

Amanda K. Bonn, CA Bar No. 270891
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA. 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

Bill Carmody
bcarmody@susmangodfrey.com
Shawn J. Rabin
srabin@susmangodfrey.com
Steven M. Shepard
sshepard@susmangodfrey.com
Alexander Frawley
afrawley@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY  10019
Tel.: (212) 336-8330

Ryan J. McGee

rmcgee@forthepeople.com
MORGAN & MORGAN
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
Tel.: (813) 223-5505

Michael F. Ram CA Bar No. 104805
mram@forthepeople.com
MORGAN & MORGAN
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Tel: (415) 358-6913

*Attorneys for Plaintiff-Petitioner*

## STATEMENT OF RELATED CASES

This case is related to *Calhoun v. Google, LLC*, Case No. 4:20-cv-05146-YGR (N.D. Cal.). The plaintiffs in that case filed a Notice of Appeal on December 20, 2022. Dkt. 941.

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this petition complies with the requirements of Ninth Circuit Rule 5-2(b). The total word count of this document is 3,239 words, excluding the items exempted by FRAP 32(f). The petition's type size and typeface comply with FRAP 32(a)(5) and (6).

Dated: December 23, 2022                    /s/  *John A. Yanchunis*
                                            John A. Yanchunis

**CERTIFICATE OF SERVICE**

I certify that on December 23, 2022, I electronically filed the foregoing Petition For Permission To Appeal Pursuant To Rule 23(f) From Order Granting In Part And Denying In Part Class Certification with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system.

I certify that I served the foregoing on this date by email to the following unregistered case participants:

Andrew H. Schapiro
andrewschapiro@quinnemanuel.com
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Tel: (312) 705-7400
Fax: (312) 705-7401

Stephen A. Broome
(CA Bar No. 314605)
sb@quinnemanuel.com
Viola Trebicka (CA Bar No. 269526)
violatrebicka@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Tel: (213) 443-3000
Fax: (213) 443-3100

Diane M. Doolittle
(CA Bar No. 142046)
dianedoolittle@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Tel: (650) 801-5000
Fax: (650) 801-5100

Jomaire A. Crawford
jomairecrawford@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Josef Ansorge
josefansorge@quinnemanuel.com
1300 I Street NW, Suite 900
Washington D.C., 20005
Tel: (202) 538-8000
Fax: (202) 538-8100

Jonathan Tse (CA Bar No. 305468)
jonathantse@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Tel: (415) 875-6600
Fax: (415) 875-6700

QUINN EMANUEL URQUHART & SULLIVAN, LLP

*Attorneys for Defendant-Respondent, Google, LLC*

DATED: December 23, 2022          */s/ John A. Yanchunis*
                                 John A. Yanchunis

                                 *Attorney for Plaintiff-Petitioner*

## ADDENDUM

<u>Exhibit 1</u>: Order granting in part and denying in part motion for class certification, December 12, 2022


<u>Exhibit 2</u>: Transcript of class certification hearing, October 11, 2022

# EXHIBIT 1

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

**CHASOM BROWN, ET AL.**

Plaintiffs,

v.

**GOOGLE, LLC,**

Defendant.

CASE NO.  20-cv-3664-YGR

**ORDER GRANTING IN PART MOTION FOR CLASS CERTIFICATION; GRANTING IN PART *DAUBERT* MOTIONS; AND DENYING MOTION TO STRIKE GOOGLE'S NON-RETAINED EXPERTS**

Re: Dkt. Nos. 609, 662, 663, 664, 703, 705

Plaintiffs Chasom Brown, William Byatt, Jeremy Davis, Christopher Castillo, and Monique Trujillo bring this action against defendant Google, LLC, alleging seven counts based on Google's alleged data collection practices: (1) violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et. seq.*, also known as the Electronic Communications Privacy Act ("ECPA"); (2) violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631 and 632; (3) violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502 *et. seq.*; (4) invasion of privacy; (5) intrusion upon seclusion; (6) breach of contract; (7) violation of California's Unfair Competition Law ("UCL").

Pending before the Court are plaintiffs' Motion for Class Certification, the parties' corresponding *Daubert* motions, plaintiffs' Motion to Strike Google's Non-Retained Experts, and several administrative motions to seal.[1] Having carefully considered the parties' briefing, the admissible evidence, the record in this case, and upon further consideration after oral argument which occurred on October 11, 2022, plaintiffs' motion for class certification is **GRANTED IN**

---

[1] *See* Dkt. Nos. 609, 662, 663, 664, 703 and 705; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

As to the administrative motions to seal, these motions are **DENIED** to the extent the information is referenced and included in this Order. The specific motions will be addressed by separate court order.

United States District Court
Northern District of California

**PART**. Many of Google's arguments hinge on the general proposition that Google's customer base is too big for class treatment. The notion that Google is too big to be held accountable does not persuade. The Court finds certification for injunctive relief only appropriate. Moreover, the *Daubert* motions are **GRANTED IN PART** and plaintiffs' Motion to Strike is **DENIED**.

## I.   BACKGROUND

The Court incorporates the background provided in Judge Koh's 31-page order denying Google's motion to dismiss. (Dkt. No. 363, at 1-8.) In sum, plaintiffs allege that Google surreptitiously intercepts and collects users' data even while users are in a private browsing mode. (Dkt. 395-2, Third Amended Complaint, ("TAC") at ¶ 1.) The at-issue data includes: (i) "[t]he 'GET request' sent from the user's computer to the website"; (ii) "[t]he IP address of the user's connection to the internet"; (iii) "[i]nformation identifying the browser software that the user is using, including any 'fingerprint' data"; (iv) "[a]ny 'user-ID' issued by the website to the user, if available"; (v) "[g]eolocation of the user, if available"; and (vi) "[i]nformation contained in 'Google cookies,' which were saved by the user's web browser on the user's device at any time prior." (TAC at ¶ 63(a)-(f).)

## II.   LEGAL STANDARDS

### A.   *Daubert* Motions

Federal Rule of Evidence 702 permits opinion testimony by an expert as long as the witness is qualified and based upon that qualification, the witness's opinion is relevant and reliable. An expert witness may be qualified by "knowledge, skill, experience, training, or education" as to the subject matter of the opinion. Fed. R. Evid. 702. The proponent of expert testimony has the burden of proving admissibility in accordance with Rule 702. *Id.*, Advisory Committee Notes (2000 amendments). At the class certification stage, "the relevant inquiry is a tailored *Daubert* analysis which scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence." *Rai v. Santa Clara Valley Transportation Auth.*, 308 F.R.D. 245, 264 (N.D. Cal. 2015); *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985–86 (9th Cir. 2020). For scientific opinions, they must be based on scientifically valid principles. *Daubert*, 509 U.S. at 589. Experts assist the fact finder in their own evaluation of

2

the evidence by providing the fact finder with opinions based upon verifiable, scientific, or other objective analysis. *Id.* at 589–90.

## B. Class Certification

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted). The rigorous analysis that a court must conduct requires "judging the persuasiveness of the evidence presented" for and against certification and "resolv[ing] any factual disputes necessary to determine whether" the requirements of Rule 23 have been satisfied. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982–83 (9th Cir. 2011). A "district court must consider the merits if they overlap with the Rule 23(a) requirements." *Id.* (citations omitted).

The party moving for certification first must show that the four requirements of Rule 23(a) are met. Specifically, Rule 23(a) requires a showing that: (1) the class is so numerous that joinder of all members is impracticable; (2) common questions of law or fact as to the class exist; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). The moving party must then show that the class can be certified based on at least one of the grounds in Rule 23(b). *See* Fed. R. Civ. P. 23(b). Relevant here, certification under Rule 23(b)(3) is appropriate only if "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(2) permits certification of a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

///

///

United States District Court
Northern District of California

III.    **DISCUSSION**

### A.    *Daubert* Motions

The Court addresses the parties' various *Daubert* motions as they inform the Court's analysis of the plaintiffs' motion for class certification. Four such motions are pending: (1) Google's Motion to Exclude Opinions of Plaintiffs' Damages Expert Michael J. Lasinski (Dkt. No. 661-3); (2) Google's Motion to Exclude Opinions of Plaintiffs' Expert David Nelson (Dkt. No. 663); (3) Google's Motion to Exclude Opinions of Plaintiffs' Expert Bruce Schneier (Dkt. No. 661-4); and (4) Plaintiffs' Motion to Exclude Portions of Rebuttal Expert Report of Konstantinos Psounis (Dkt. No. 702-1). The Court addresses each motion in turn.

#### 1.    *Daubert as to Michael J. Lasinski*

Google moves to exclude the testimony of plaintiffs' damages expert, Michael Lasinski, under Federal Rule of Evidence 702 and *Daubert*. (Dkt. No. 661-3.) Lasinski is a Senior Managing Director at Ankura Consulting Group ("Ankura") and head of the Intellectual Property Group. (Dkt. No. 608-9, Lasinski Report ¶ 2.) He has twenty-seven years of experience assisting clients in understanding and evaluating the financial aspects of intellectual property. (*Id.*) Lasinski received his Bachelor of Science degree in Electrical Engineering and a Master of Business Administration from the University of Michigan. (*Id.* ¶ 6.) As assigned, he assessed the feasibility of identifying and quantifying various measures of monetary relief tied to plaintiffs' claims, including unjust enrichment, actual damages (restitution), and statutory damages. (*Id.* ¶ 12.) To do so, he relied on his review of discovery produced by Google, deposition testimony, publicly available materials, deposition testimony of Google personnel, plaintiffs' experts' reports, as well as other materials listed in Appendix B of his report. (*Id.* ¶ 17.)

Lasinski offers an opinion on a methodology for determining three types of damages: (a) unjust enrichment, (b) restitution damages, and (c) statutory damages, and asserts eight opinions, summarized as follows: (1) discovery in this case can be used to quantify relief on a class-wide basis; (2) Google's ChromeGuard analysis provides a reliable basis for quantifying certain relief; (3) Google's internal analyses of the financial impact to Google because of third-party cookie blocking can be adjusted to reliably quantify Google's unjust enrichment; (4) calculation of unjust

4

enrichment can be determined under a range of potential liability scenarios; (5) restitution damages can be determined as a function of the payments necessary to incentivize an individual to knowingly relinquish the choice to keep certain browsing private and allow a company to track all online activity; (6) an appropriate damages rate can be applied in calculating statutory damages; (7) these statutory rates can be readily updated to cover subsequent periods through the date of trial; and (8) that his analyses can be readily used as common proof in part because they can be adjusted to calculate and assess unjust enrichment, actual damages, and statutory damages for different time periods. (*Id.* ¶ 1.)

The Court starts with a high-level summary of the disputed parts of Lasinski's models before addressing the parties' arguments.

*a.*   <u>Overview of the Methods</u>

**i.**   **Unjust Enrichment Model**

In opining on the methodology for determining classwide unjust enrichment damages, Lasinski looks to Google's internal analyses that describe the financial impact to Google of blocking third-party cookies by default in Chrome Incognito mode ("ChromeGuard"). (*Id.* ¶ 52.) He segments his analyses by product area (Display Ads, YouTube ads, and Search Ads), private browsing mode (incognito mode or other browsing modes), revenue source (personalization or conversion tracking), and the scope of conversion tracking (conversion tracking from traffic with third-party cookies or conversion tracking from all traffic). (*Id.* ¶ 60.) In doing so, he calculates unjust enrichment damages from Google's U.S. revenues from Display Ads, Search Ads, and YouTube Ads in three scenarios. (*Id.* ¶¶ 133-36.)

In Scenario One, Lasinski arrives at the unjust enrichment amount by calculating: (a) all of Google's U.S. Display Ads shown to users in private browsing mode, (b) U.S. search revenue attributable to conversion from all private browsing traffic, and (c) U.S. YouTube Ads revenue attributable to personalization from third-party cookies and conversion from all private browsing traffic. (*Id.* ¶¶ 133-35.) By using this approach, Lasinski calculates a damages amount of $3.87 billion. (*Id.* ¶ 136.)

///

5

United States District Court
Northern District of California

In Scenario Two, he arrives at the unjust enrichment amount by calculating Google's Display, Search, and YouTube revenue that is attributable to personalization from third-party cookies and conversion from all private browsing traffic. Here, he calculates a damages amount of $3.61 billion. (*Id.* ¶¶ 133-36.)

In Scenario Three, he arrives at the unjust enrichment amount by calculating Google's Display, Search, and YouTube that is attributable to personalization and conversion from third-party cookies. With this model, he calculates a damages amount of $567.4 million. (*Id.*)

Lasinski explains that such segmentation is intended to assist the trier of fact in determining Google's unjust enrichment under a range of liability scenarios. (*Id.* ¶ 133.)

### ii.    Restitution Model

Next, Lasinski opines on a methodology for calculating classwide restitution damages. Here, he uses the payment amount necessary to incentivize individuals to knowingly relinquish their online privacy as a base rate. He then takes that rate and multiplies it by the number of unique monthly private browsing instances ("UMPBI"). (*Id.* ¶ 184.)[2] In doing so, Lasinski calculates a restitution damages amount of approximately $9.1 billion. (*Id.* at Fig. 72.)

In arriving at the base rate, Lasinski analyzed payments that Google made or considered making to users for their data, users' willingness to pay to prevent data collection, and research organizations' willingness to pay for data collection. (*Id.* ¶ 140.) Lasinski explains that the most reliable input comes from Google itself. (*Id.* ¶ 165.) Since 2012, Google has used a market research company called Ipsos to collect information on how users use the Internet. (*Id.* ¶ 143.) Through Ipsos, Google conducts what are known as Screenwise Panel studies. (*Id.*) These studies allow selected participants to get paid if they voluntarily link their devices and allow Google to collect certain information about the users' online activities.  (*Id.*) Some examples of the data collected through the Screenwise Panel studies include: the content and advertising shown on devices, interactions with that content and advertising, webpages, information you type into your devices, cookies, and device information. (*Id.* ¶ 144, Fig. 57.)

---

2  "[A] single UMPBI represents one or more pageloads in Incognito mode or an Other Private Browsing Mode on a single device during a one-month period." (Lasinski Report ¶ 139.)

United States District Court
Northern District of California

As part of the Screenwise Panel, participants are paid a baseline minimum of $3 per month per device. This base rate does not decrease based on one's browsing activity, but it can increase based on other factors. (*Id.* ¶¶ 149-50.) To calculate damages, Lasinski uses this $3 rate that Google pays survey participants as an input. (*Id.* ¶ 183.) He then multiplies that by the number of UMPBI during the class period for both classes. (*Id.* ¶ 184.)

### iii.     Statutory Damages Model

Third, in opining on a methodology for calculating statutory damages on a classwide basis, Lasinski used data and internal documents produced by Google which quantified incognito traffic. This quantified traffic was then used to calculate the four bases that Lasinski offers as common proof of calculating statutory damages: (1) the total number of individual pageloads in the relevant browsers; (2) the total UMPBI with one UMPBI referring to a specific browse that used a private browsing mode at least once a month; (3) calculation of UMPBI based on the peak UMPBI for one month; and (4) the total number of class members for each of the classes. (*Id.* ¶¶ 185-195.) Lasinski opines that all four bases would allow the Court to calculate statutory damages and can be used as common proof because they can be adjusted to account for different time periods and subclasses. (*Id.* ¶ 198.)

### iv.     Damages Allocation Method

Finally, Lasinski opines on two methods to allocate individual damages. The first method includes taking the aggregate damages number and dividing it by the total number of UMPBI during the class period. Awards would be distributed to class members based on the number of UMPBI attributable to each class member.[3] The second method includes calculating individual damages on a *per capita* basis based on the number of class members. (*Id.* ¶ 197.)

### b.     *Overview of Parties' Contentions*

Google moves to exclude Lasinski's opinions and methodologies for computing damages on the grounds that: (1) Lasinski fails to account for uninjured users who consented to the at-issue

---

[3] Based on Lasinski's calculations, the Court calculates an average UMPBI of about .725 per class member. (*See id.* at Figs. 74 and 75.)

data collection; (2) his primary input for calculating class-wide restitution damages is speculative and unreliable; (3) his restitution opinions fail to account for variability in user benefit from personalization and valuation of privacy; (4) his failure to deduct costs from the unjust enrichment analysis is contrary to the law and has no basis in the facts; (5) all of his unjust enrichment scenarios are flawed and unreliable; (6) his proposed methods for apportioning damages ignore individual differences and are not efficient or feasible for distributing damages; and (7) his opinions on calculating statutory damages are unreliable.

Plaintiffs oppose arguing: (1) Lasinski's damages calculations are based on assumptions consistent with their theory of the case; (2) his actual damages calculations are based on the same key input Google used in the Screenwise Panel study; (3) Google documents and testimony confirm that incremental costs do not exist for private browsing traffic; (4) Lasinski's method for calculating statutory damages are sound and simply lead to penalties Google does not like; and (5) Lasinski is not required to adopt Google's preferred method of apportioning damages.

i.    **Assumption of Harm to Every Class Member**[4]

First, Google argues that all of Lasinski's opinions should be excluded because he fails to account for uninjured class members.

A plaintiff seeking certification under Rule 23(b)(3) must show that damages are capable of measurement on a class-wide basis, and such calculations "need not be exact." *Comcast*, 569 U.S. at 35. Under *Comcast*, a plaintiff must show that its proposed damages model is consistent with its theory of liability in the case. *Id.*

As an initial matter, Google's arguments "reflect[] a merits dispute about the scope of [its] liability, and is not appropriate for resolution at the class certification stage of this proceeding." *See Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137 (9th Cir. 2016). Relatedly, Lasinski's methodology is consistent with plaintiffs' class definition and theory of liability. Google's disagreement with Lasinski's assumption is no reason to exclude his opinions. *Perez v.*

---

[4]  The Court notes that both parties used part of their *Daubert* briefing to argue the merits of their consent arguments. Counsel is aware of the legal standard under *Daubert* and should know that such argument is wholly inappropriate. The parties are warned that future conduct will result in the briefing being stricken and/or sanctions.

United States District Court
Northern District of California

*Rash Curtis & Assocs.*, 2019 WL 1491694, at *3 (N.D. Cal. Apr. 4, 2019) ("any arguments that [an expert] based his opinions on an improper assumption go to the weight, not the admissibility of the testimony.")

Accordingly, the motion is **DENIED** on this ground.

### ii. $3 Input for Calculating Restitution Damages

Second, Google argues that Lasinski's restitution opinion should be excluded because the $3 input that he uses is speculative and unreliable. Google does not persuade. The $3 rate is derived from looking at what Google actually pays Screenwise participants for agreeing to allow Google to collect their browsing data. In arriving at this number, Lasinski acknowledged that the full scope of the data collected in the Screenwise studies differs in some respects from the at-issue data and accounted for that in using the baseline of $3 rather than some higher amount that some participants receive through the Screenwise program. (Lasinski Report ¶¶ 147-50.) Lasinski opines that this rate is conservative because that is the rate willing people would accept to give up their data and that unwilling users, hence users in private browsing mode, will likely require more incentive to give up their data. (Dkt. No. 661-3, Lasinski Dep. 101:13-102:22.) The Court finds such considerations and analysis logical and reliable. The question is one of weight, not admissibility.

Accordingly, the motion is **DENIED** on this ground.

### iii. Variability in User Benefit and Valuation of Privacy

Third, Google avers that Lasinski's restitution opinions should be excluded as unreliable because he ignores: (i) the strong evidence of variability in the benefits that users may have received from ad personalization and (ii) the value users place on their private browsing data and their privacy. In response, plaintiffs argue that under their theory of restitution such subjective valuations are not necessary.

Where there is "enrichment from the receipt of nonreturnable benefits," restitution can be measured by either: (a) the value of benefit to the defendant; (b) the cost to plaintiff of conferring such benefit; (c) the market value of the benefit; or (d) the price the defendant has expressed a willingness to pay, if the defendant's asset may be treated valid on the question of price.

United States District Court
Northern District of California

United States District Court
Northern District of California

Restatement (Third) of Restitution and Unjust Enrichment § 49.

The Court finds that under any of these formulations, this is precisely what Lasinski's method measures. He measures the value that Google actually pays to users who voluntarily give up their right to privately browse the Internet. Lasinski's method does not turn on the subjective feelings and beliefs of class members. Rather, he employs an objective standard focused on paying users to relinquish their right to browse privately.

Indeed, Google employs a similarly objective standard in compensating Screenwise participants. The amount Google pays participants does not fluctuate depending on the participants' subjective beliefs. Rather, Google sets a base rate and then compensates based on objective measures such as how many devices are registered and what kinds of devices are used. These same objective criteria that Google employs in its Screenwise panel study is what Lasinski uses as a base for his calculation of restitution damages. Therefore, Google's disagreement with the restitution method applied and the outcome of that method does not make Lasinski's method unreliable. Google's concerns go to weight, not admissibility.

Accordingly, the motion on this ground is **DENIED**.

#### iv. Unjust Enrichment Model and Costs

Fourth, Google seeks to exclude Lasinski's unjust enrichment model on the grounds that it looks at Google's revenue and does not take into account Google's costs. Plaintiffs argue that Lasinski did not deduct costs from his calculation because there are no incremental costs to Google.

"Disgorgement is a remedy in which a court orders a wrongdoer to turn over all profits obtained by violating the law." *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1195 (9th Cir. 2016). A party that is wronged and seeks unjust enrichment "may present evidence of the total or gross amount of the benefit, or a reasonable approximation thereof, and then [the defendant] may present evidence of costs, expenses, and other deductions to show the accrual or net benefit the defendant received." *Meister v. Mensinger*, 230 Cal. App. 4th 381, 399 (2014). Importantly, "the residual risks of uncertainty in calculating net profit is assigned to the wrongdoer." *Id.*

In proffering his unjust enrichment model, Lasinski did not account for costs in calculating Google's profits. He testified that he did not include costs because there was no proof of incremental costs to Google included in the record. Lasinski relied on plaintiffs' other expert, Hochman, who explained to Lasinski that there are no costs to Google for maintaining the advertising infrastructure that Google has already built. (Lasinski Dep. 165:20-166:8.) Hochman also explained to Lasinski that many of the costs associated with the at-issue data collection is passed down to users by way of Google's tracking beacons. (*Id.* at 163:15-23.) In response, Google argues that Strombom's Report identifies many components of Google's costs including those associated with generating the at-issue data.

Google misstates the evidence. Strombom testified during his deposition that Google does not account for costs associated with private data, and that he had no evidence of actual costs saved because of Google launching ChromeGuard. (Dkt. No. 698-8, Strombom Dep. 93:1-13, 111:21-119:10, 119:11-17.) Google's 30(b)(6) witness, Sonal Singhal, did not contradict him. Ms. Singhal was designated to talk about an Ads Impact document that looked at the impact of ChromeGuard on Google's finances. She testified that, while questions about costs are outside of her expertise, she "[didn't] think that there is any cost that would vary." (Dkt. No. 698-7, Singhal Dep. 23:25-24:9.) Plaintiffs may rely on those admissions.

Thus, the only evidence of any potential costs is in the form of a declaration by George Levitte, a Google employee, who testifies generally about form-sharing agreements with publishers. (Dkt. No. 659-8, Levitt Decl., ¶¶ 11-13.)[5] Levitte explains that there are costs

---

[5] Pending before the Court is plaintiffs' Motion to Strike Google's Non-Retained Expert Declarations for Glenn Berntson, Steve Ganem, George Levitte, and Jonathan McPhie. (Dkt. No. 704-2.) Having considered the parties' briefing, and the record in this case, the Court **DENIES** the motion because plaintiffs have not shown harm. Plaintiffs admit that Google disclosed three of the four witnesses (Ganem, Levitte, and Bernston) in its initial disclosures before the close of discovery, and plaintiffs were able to depose these witnesses. While Google did not disclose McPhie in its amended disclosures, Google explains that it did disclose Gregory Fair, who was McPhie's former supervisor. Fair has since left the company and Google substituted McPhie as a declarant in lieu of Fair. (Dkt. No. 746-3, Opposition to Motion to Strike, at 5.) McPhie's declaration covers the topics Google disclosed for Fair in its amended disclosures. (*See* Dkt. No. 705-6.) Accordingly, the Court finds that any harm to plaintiffs is minimal, and the motion is **DENIED** on that ground. However, the Court will allow plaintiffs to depose the witnesses on the topics contained in their declarations to the extent relevant. The parties shall meet and confer regarding a schedule for depositions. A joint proposed schedule shall be filed within seven (7)

United States District Court
Northern District of California

associated with Google generating revenue but that the profits (which would reflect costs) cannot be calculated for "individuals who browsed while in Incognito mode, or those individuals who use any other browser's private browsing mode." (*Id.* ¶ 20.) While possible, this conflicting evidence reflects on the weight of the testimony, not admissibility.

Accordingly, the motion is **DENIED** on this ground.

### v.  Method for Apportionment

Next, Google's attempt to exclude Lasinski's method for apportioning the aggregate damages does not persuade. With respect to Lasinski's method of apportionment, Google does not have standing to complain. The Ninth Circuit counsels that when "the only question is how to distribute the damages, the interests affected are not the defendant's but rather those of the silent class members." *Six (6) Mexican Workers v. Az. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990); *see also Story Parchment Co. v. Paterson Parchment* Paper Co., 282 U.S. 555, 563 (1931) ("[w]here the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.") Further, the argument is premature.

Accordingly, the motion is **DENIED** on this ground.

### vi.  Statutory damages

Lastly, Google moves to exclude Lasinski's methods for calculating statutory damages on the basis that the proposed methods fail: (1) to account for instances where Google would not have received the at-issue data—like when a user starts a private browsing session but closes it before navigating to a third party website; (2) to provide a way to calculate statutory claims for the California CIPA class; and (3) to opine on a method for apportioning statutory damages.

Google does not persuade. As to the first argument, Google offers only a hypothetical situation with no proof or data to support the idea that Lasinski should have accounted for instances where Google did not receive data. That Google can think of different ways in which

days from the date of this order.

United States District Court
Northern District of California

United States District Court
Northern District of California

Lasinski ought to have created his model does not make it unreliable and is thus no reason to exclude. Google's second argument is merely a rehash of its arguments about Lasinski's apportionment method. As previously explained, Google does not have standing to raise such arguments. Moreover, none of Google's concerns about apportionment render Lasinski's methods and opinions unreliable. As to the third argument regarding the California CIPA class, Lasinski explained both in his report, and during the hearing, that his model could be adapted to account for just California residents by extrapolating the percentage of California users based on publicly available information from the general United States population. (Lasinski Report ¶ 197; *see also* Dkt. No. 775, Hearing Transcript, at 36:24-39:9.) Plaintiffs also explained that this information can also be collected by using Geolocation data and users' IP addresses. (Hearing Transcript, at 36:24-39:9.) The Court finds the proffered explanations reasonable.

Thus, the Court finds the proffered statutory damages method reliable for calculating statutory damages. Accordingly, the motion is **DENIED** on this ground.

### 2. *Daubert as to David Nelson*

Google moves to exclude plaintiffs' expert, David Nelson, report under *Daubert* and Rule 702. (Dkt. No. 663). Nelson is the co-founder of Full Nelson Investigations, LLC ("FNI") and a former agent for the Federal Bureau of Investigation ("FBI"). (Dkt. No. 608-8, Nelson Report ¶¶ 3-4.) Prior to co-founding FNI, Nelson spent twenty-four years as an FBI agent. (*Id.* ¶ 4.) Approximately eighteen of those years were devoted to investigating and instructing cyber crime matters as a Cyber Special Agent. (*Id.* ¶¶ 5-6.) His investigations in the cyber division of the FBI included obtaining and enforcing administrative subpoenas, grand jury subpoenas, court orders, and search warrants to obtain additional information to investigate criminal conduct. (*Id.* ¶ 23.) Nelson's investigations also included extensive interactions with Google where IP addresses or other information would be provided to Google to obtain information from Google. (*Id.*)

Nelson offers one main opinion: that Professor Zervas' opinions regarding the functionality of private browsing are incomplete and misleading because he failed to address how Google saves, collects, and routinely produces private browsing data tied to IP addresses that can be linked to specific individuals and devices. (*Id.* ¶ 2.)

Google moves to exclude Nelson's opinion on the basis that Nelson's opinion is: (1) based on statements from three unidentified individuals that Nelson allegedly interviewed but about whom he refused to provide any information due to ongoing confidentiality obligations to the FBI, and (2) admitted speculation about the meaning of an empty field in certain spreadsheets Google provided to the FBI.

In response, plaintiffs argue that: (1) Nelson's opinion is reliable given his experience as a FBI agent; and (2) Nelson provided sufficient details about the three individuals he bases his opinion on. The Court addresses each argument in turn.

Here, Nelson opines that Google routinely collects, saves, and produces private browsing data to third parties, including the FBI, that can be linked to specific individuals and devices. When asked about the basis of this opinion, Nelson testified that his opinion that the information the FBI received in response to requests is private browsing information is based on his interview of three suspects and subjects who told him, during interviews, that they "were surprised that he had the information [] because they were using private browsing mode whe[n] they conducted those activities." (Dkt. No. 663-2, Nelson Dep. 53:4-25.) He also testified that the only other source for his opinion was his recollection of receiving spreadsheets from Google when he was an FBI agent and seeing that certain entries under the "Google user account" column were left blank. (*Id.,* 54:1-20.) Nelson did not review any documents produced by Google in discovery, nor does he have an opinion on the content or meaning of any documents that Google has produced. (*Id.,* 38:14-39:2.)

Here, the Court finds that Nelson's opinion that the information Google produced was from private browsing sessions is not sufficiently reliable. First, Nelson testified that he did not verify the witnesses' statement at the time to determine whether they were in fact identified using information obtain from private browsing sessions. Rather, Nelson merely accepted their words as true. However, it is possible that the suspects, who were being interviewed and interrogated for crimes, had an incentive to say that they were in private browsing mode as a way to not have whatever evidence that was had against them. Without knowing more about the witnesses and their specific circumstances, the Court finds Nelson's reliance on such information unreliable.

Similarly, Nelson's testimony that he was not for certain why Google's spreadsheets had an empty space also renders his opinion unreliable. During his deposition Nelson testified that the empty column on the spreadsheet could mean various things and does not necessarily mean that the blank space means the user was in private browsing mode. (Nelson Dep. 54:14-58:5.)

Based on the foregoing, the Court finds Nelson's opinion to be unreliable. Accordingly, the motion is **GRANTED** on this ground.

### 3. *Daubert as to Bruce Schneier*

Next, Google seeks to exclude the entirety of plaintiffs' expert, Bruce Schneier, reports (both opening and rebuttal) under *Daubert* and Rule 702. (Dkt. No. 661-4.) Schneier is an international security technologist. (Dkt. No. 608-7, Schneier Report ¶ 7.) Schneier received his master's degree in computer science from American University in 1986, a bachelor's degree in physics from the University of Rochester in 1984, and an honorary Ph.D. in Computer Science from the University of Westminster in 2011. (*Id.* ¶ 6.)

Schneier currently serves as the Chief of Security Architecture at Inrupt, Inc. (*Id.*) He also serves as an Adjunct Lecturer and fellow at the Harvard Kennedy School where he teaches cybersecurity policy. (*Id.* ¶ 8.) Schneier has authored approximately twelve books on the topics of cryptography, computer security, general security technology, trust, surveillance, and privacy. (*Id.* ¶ 10.) He has also authored or coauthored over 100 academic publications on many of these same subjects. (*Id.* ¶ 12.)

Schneier filed two expert reports in this case: (1) an opening report from April 15, 2022 (Dkt. No. 608-7, "Schneier Opening Report") and (2) a rebuttal report from June 7, 2022 (Dkt. No. 608-6, "Schneier Rebuttal Report"). Schneier offers a total of twenty opinions, fourteen in the opening report and six in his rebuttal report. The parties separate Schneier's opinions into four separate categories: (a) data and privacy topics (opinions 1-6); (b) Google specific topics (opinions 7-10); (c) private browsing and incognito topics (opinions 11-14); and (d) rebuttal opinions concerning the expert report of Professor Zervas. Google argues that these opinions should be excluded for five different sets of reasons. The Court addresses each category below.

///

United States District Court
Northern District of California

United States District Court
Northern District of California

a. *Data and Privacy Topics*

First, Google seeks to exclude Schneier's data and privacy opinion, not because of a lack of qualifications, but on the basis that those opinions do not "fit" the allegations in the case and fail to speak clearly and directly to a disputed issue in the case. Specifically, Google argues that Schneier's opinions on broad privacy topics such as "major data leaks" and other topics that are not directly at issue in this case.

Plaintiffs counter that Schneier's data and privacy opinions provide relevant context for other opinions and are thereby generalized opinions admissible under Rule 702. The Court agrees.

Rule 702 permits generalized testimony without application to the underlying facts of the case. The Committee Notes of Rule 702 (2000) explains:

> It might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case. For example, experts might instruct the factfinder on the principles of thermodynamics, or blood clotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case. The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.

To past the *Daubert* test, the expert's testimony must be "relevant to the task at hand" and must "logically advance[] a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995).

Here, Schneier offers the following six main opinions under the data and privacy category: (1) "privacy, including freedom from unwanted surveillance, is important and has historical roots in political liberty, commercial fairness, and economic competition"; (2) the rise of the Internet has created greater threats to online privacy; (3) "such privacy concerns are justified by the volume and scope of data generated, collected, and used when people access the Internet"; (4) personal data and peoples' browsing activities are highly valuable to commercial actors and users; (5) "effective protection of privacy requires disclosures and controls" in terms of how data is used,

16

what is collected, and how long such information is retained; and (6) "expectations about sharing information are easily manipulated by commercial actors with an economic interesting in fabricating the appearance of consent." (Schneier Opening Report ¶ 1.A.-1.F.)

The Court finds that such opinions, while largely general in nature, fit the allegations and issues of this case. These opinions provide background and context information about what privacy is, the importance of privacy, the different types of data, pervasive data collection and tracking of users as a function of the Internet, and the impact and negative consequences of the misuse of one's data. Schneier explains that such opinions are a "general overview of data privacy in the context of internet usage" that "provide context for how a reasonable user would have reasonably expected privacy over their browsing information, and to understand the considerations relating to why Google's collection of use and use of private browsing information data is highly offensive." (*Id.* ¶ 23.) Such background information is permitted under Rule 702 and *Daubert*.

Accordingly, the *Daubert* motion is **DENIED** on these grounds.[6]

### b.    *Consumer Expectation Opinions*

Second, Google seeks to exclude Schneier's consumer expectation opinions (mostly in opening opinions 10-13 and rebuttal opinions 3 and 5) on the basis that Schneier is not qualified to opine on consumer expectations and his methods for doing so are not reliable.

Schneier offers several opinions about the purported expectations and understandings of "reasonable users." (*See* Schneier Opening Report ¶¶ 261, 283, 285, 286, 296, 297, 298, 300, 301, 302, 306, 307, 356; Schneier Rebuttal Report ¶¶ 1.C, 1.F, 63, 64, 70, 75, 79, 101, and 102.)[7]

---

[6] Google also seeks to exclude these opinions and others under Rule 403 on the grounds that they are highly prejudicial. (Schneier Daubert at 16-18.) The motion to exclude on these grounds strains credulity and is **DENIED**. Any trial in this action will have time limitations. Google can review the 403 objections during trial if appropriate.

[7] Google also argues that Schneier's following opinions should also be excluded for the same reasons. (*See* Schneier Opening Report ¶¶ 2, 63, 77, 78, 246, 248, 316, and 317.) As to these opinions, the motion is **DENIED**. The Court finds Schneier has the necessary background and experience to render these specific opinions.

United States District Court
Northern District of California

1    These opinions, which rely on Schneier's interpretation of certain Google documents and a

2    purported "industry standard," fall outside the scope of Schneier's expertise and are not reliable.[8]

3    While experts are allowed to opine as to a reasonable consumer's expectation, such opinion must

4    be rooted in the expert's relevant expertise. *Chamberlan v. Ford Motor Co*, 369 F. Supp. 2d 1138,

5    1145 n.3 (N.D. Cal. 2005). While Schneier is a security technologist, and can opine generally

6    about relevant privacy issues, he does not have specialized expertise in opining about the

7    purported understandings and expectations of consumers specifically. Nor can he merely impute

8    his own opinions to those of a reasonable consumer.

9    Further, plaintiffs have not established that the methodology employed to arrive at such

10    opinions are reliable. When asked about the methodology for arriving at his opinions on what

11    reasonable users would think of Google's disclosures, Schneier testified that he is "not a random

12    person coming in off the street and reading a screen and telling you what I think. I mean, I write

13    books on this stuff. This is what I do. Security and privacy experts have [] standards of what

14    disclosure looks like, and we know when it's met and when it's not met." (Dkt. No. 664-2,

15    Schneier Dep. 84:17-23.) When questioned about the industry standard, Schneier testified that the

16    standard is not really an objective one but is instead one that is based on his personal opinion. (*See*

17    *id.,* 146:21-147:22.) Schneier also acknowledged that he had not "queried any privacy and security

18    expert" relating to whether Google's disclosures were adequate. (*Id.*, 147:1-11.) Nor has he

19    conducted any consumer surveys regarding these issues. (*Id.*, 20:20-22.).

20

21

22    [8] Google's argument that Schneier's opinions are also unreliable because he failed to
     conduct any consumer surveys does not persuade. An expert who offers testimony on the question
23    on what a reasonable consumer is likely to do and/or think is not required to conduct a consumer
     survey if his or her testimony is otherwise reliable. *See Bailey v. Rite Aid Corp.*, 338 F.R.D. 390,
24    401 (N.D. Cal. 2021); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal.
     2018) (holding that an expert need not conduct a consumer survey to reliably opine on likelihood
25    of deception and materiality); *see also Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th
     663, 681-82, 38 Cal.Rptr.3d 36 (2006) (noting that California courts have "reject[ed] [the] view
26    that a plaintiff must produce a consumer survey or similar extrinsic evidence to prevail on a claim
     that the public is likely to be misled by a representation" under the FAL, CLRA, or UCL) (citation
27    and internal quotation marks omitted). Thus, Schneier's failure to conduct a survey is not
     necessarily dispositive. However, a survey might have helped in this case given his lack of
28    relevant expertise on the specific opinions at issue.

United States District Court
Northern District of California

In essence, Schneier's opinions are based on nothing more than his personal interpretation of the at-issue disclosures and Google documents and the idea that such interpretations are reasonable. While Schneier may have a relevant *personal* view, plaintiffs fail to explain why Schneier's interpretation of Google's policies and documents qualify him to opine on how a *reasonable consumer* would understand them, or what expectations they would derive from them.

Accordingly, Google's motion to exclude the consumer expectations opinions found at the following paragraphs is **Granted**: Schneier Opening Report ¶¶ 261, 283, 285, 286, 296, 297, 298, 300, 301, 302, 306, 307, 356; Schneier Rebuttal Report ¶¶ 1.C, 1.F, 63, 64, 70, 75, 79, 101, and 102.[9]

### c. Opinions Based on Summarization of Google Documents

Third, Google moves to excludes Schneier's opinions seven through fourteen of his opening report on the basis that such opinions are "biased summaries of Google documents testimony, and disclosures that merely regurgitate attorney argument." In opposition, plaintiffs argue that exclusion is not warranted because such opinions do more than just summarize Google's documents and are necessary to lay a foundation for Schneier's other opinions.

The Court agrees with plaintiffs. The Court finds that Schneier does more than summarize Google's documents, testimonies, and disclosures. While some of the opinions reference such documents, the opinions analyze them by synthesizing information from a variety of different sources, including both Google's internal documents and public documents. (*See* Schneier Report ¶¶ 179-84.) The opinions also provide Schneier's interpretation and meaning of certain trends seen within Google and the risks associated with such trends. (*Id.* ¶¶ 202-30.) Further, Schneier employs a readability tool in paragraphs 231 to 242 and opines on the accessibility and readability

---

[9] Plaintiffs' reliance on *Berman v. Freedom Financial Network, LLC* 400 F.Supp.3d 964, 972 (N.D. Cal. 2019) does not persuade. In *Berman*, the Court found that the proffered expert was qualified to offer opinions on the issue of whether the design of a website would be likely to mislead or confuse a typical user. *Id.* The Court found the expert's training and work as a web development practitioner and Chief Technology Officer of a web development and consultancy firm sufficient because "his daily work include[d] the design of websites that solicit a user's consent to receive marketing communications." *Id.* He was not imputing his view but explaining why the design would mislead and should be designed differently. Plaintiffs have not established that Schneier's experience is like the expert's experience in *Berman*. Thus, plaintiffs fail to persuade.

1    of Google's polices. These are just some of the many ways in which Schneier does more than

2    summarize facts and "regurgitate" legal arguments.

3        Thus, Google's motion on this ground is **DENIED**.

                              *d.     Opinions about Hypothetical Risks*

4

5        Fourth, Google seeks to exclude Schneier's opinions about hypothetical risks on the

6    grounds that such opinions are irrelevant to the issues in this case. (*See* Schneier Report ¶¶ 29, 34,

7    36, 37, 39, 41, 49, 71, 73, 100, 102, 114, 119, 127, 288, 292, 293.) Plaintiffs oppose, contending

8    that such opinions about the potential risks of data retention are relevant to the offensive of

9    Google's conduct.

10       Again, the challenge is not one of expertise or methodology. Whether plaintiffs' data can

11   be linked to other data such that plaintiffs' identity can be revealed is relevant to the issues in this

12   case. At this juncture, it appears such information is at least relevant to the analysis of plaintiffs'

13   intrusion upon seclusion and invasion of privacy claims, both which turns on the offensiveness of

14   Google's conduct. Google's argument does not change the Court's *Daubert* analysis. The Court

15   will not engage in a merits analysis or fact-finding at this stage.

16       Accordingly, Google's motion on this ground is **DENIED**.

                              *e.     Google's Intent, Services, or Receipt of Data*

17

18       Fifth, Google argues that Schneier's opinions based on what Google calls "Google's intent,

19   services, or receipt of data" should be excluded because he does not have the requisite knowledge

20   or expertise to opine on such subjects.

21       In general, an expert may only testify as to "scientific, technical, or other specialized

22   knowledge that will assist the trier of fact to understand the evidence or determine a fact in issue"

23   and may not testify as to legal conclusions. *U.S. v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015).

24       The Court has considered the parties' arguments and agrees that some of Schneier's

25   opinions impermissibly opine on Google's intent or state of mind. For example, he opines that

26   "Incognito mode's simple, bold, and friendly 'Spy Guy' may communicate Google's 'intent' to

27   lead users to believe that Incognito will provide them with virtual cover of darkness." (Schneier

28   Report ¶ 302.) Similarly, Schneier opines that "Google counts on most people to access the

United States District Court
Northern District of California

Internet using Google's Chrome browser, check their messages in Gmail, use Google search, watch videos on YouTube, or obtain directions from Google Maps, without thinking about how much personal information they're revealing to Google when they search for information, communicate with others, entertain themselves, and get themselves from here to there." (*Id.* ¶ 57.) Schneier also impermissibly opines that "Google is motivated to ensure that any privacy controls are difficult to understand." (*Id.* ¶ 255.)

However, with respect to the other opinions, Google does not persuade. Schneier's has offered opinions about Google's services and receipt of data based on conclusions that he drew after reviewing the discovery and Google's documents in this case. He cites to such documents in his report. Further, given his computer scientist background, the Court finds that he has the necessary skill and expertise to provide general opinions about Google's services so long as those opinions are tied to documents and/or discovery relevant to this case.

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** the motion to exclude. The motion is granted with respect to the opinions in paragraphs 57, 255, and 302 of the Opening Report and denied as to the remaining opinions.

### 4. *Daubert as to Konstantinos Psounis*

Plaintiffs move to exclude six opinions by Google's computer scientist expert, Konstantinos Psounis, under *Daubert* and Rule 702. (Dkt. No. 702-1.) Psounis is a Professor and Associate Chair of the Electrical and Computer Engineering and Professor of Computer Science at the University of Southern California ("USC"). (Dkt. No. 659-10, Psounis Report ¶ 16.) He joined USC's faculty in 2003 after completing his Ph.D. at Sanford University as a Stanford Graduate Fellow. (*Id.*)

Throughout his career, Psounis has analyzed, designed, and developed efficient, privacy-preserving networked distributed systems, for the Internet and the world wide web, content delivery networks, data centers and cloud computing, and wireless mobile networking systems. (*Id.* ¶ 19.) He has also published more than 100 technical papers in these fields. (*Id.* ¶ 18.) Psounis also has practical experience with networked distributed systems designed and developed to operate in the World Wide Web deployed over the Internet. (*Id.* ¶ 22.) For instance, he has

designed and developed systems to accelerate the delivery of content over the Internet. (*Id.*)

Psounis offers a total of thirteen opinions to rebut plaintiffs' expert, Johnathan Hochman. Of the thirteen opinions, plaintiffs seek to exclude six: (1) Hochman' opinion that users can readily be identified from the data at issue is incorrect (first opinion); (2) Hochman's opinions on private browsing profiles, server-side processes, and data joinability are inaccurate (third opinion); (3) Hochman's proposal to identify Class I (Chrome Class) is unreasonable and unreliable (seventh opinion); (4) Hochman's opinion that the "maybe_chrome_incognito" bit reliably detects incognito traffic is incorrect (eighth opinion); (5) Hochman's proposal to identify Class 2 is unreasonable and unreliable (ninth opinion) and (6) Hochman's proposed methods for identifying class members do not and cannot account for shared devices or accounts (tenth opinion). (Psounis Report § 1.) Plaintiffs seeks to exclude these opinions on the grounds that: (1) Psounis did not employ any methodology to evaluate the data that he opines about and (2) Google's lawyers performed his (limited) analyses. Neither argument persuades.

As an initial matter, the Court notes that plaintiffs primarily object because Psounis did not conduct a competing analysis of the data sets Hochman analyzed. The Court disagrees. Plaintiffs do not point to any binding authority, nor is the Court aware of any, that mandates such testing requirement to meet *Daubert's* test. *See Linares v. Crown Equip. Corp.*, 2017 WL 10403454, at *12 (C.D. Cal. Sept. 13, 2017) ("While one of the Daubert factors suggests that the reliability of expert testimony can be judged by whether the expert's technique or theory can be and has been empirically tested, such testing is not required."); *Wyman v. Sunbeams Prods. Inc.*, 2021 WL 1531000, *3 (N.D. Cal. Apr. 19, 2021). Indeed, plaintiffs concede in their reply brief that "failing to conduct a study is not always an automatic ticket to exclusion." (Psounis *Daubert* at 5:25-26.)

Next, the Court finds that Psounis opinions are based on reliable principles of information theory and networked distribution systems and relevant documentation. In arriving at the challenged opinions, Psounis reviewed the Hochman Report and the corresponding exhibits, appendices, and sources on which he relied, Google documents and discovery responses produced in this case, including Google's logging polices and infrastructure, issues surrounding fingerprinting and IP addresses, publicly available sources, and existing technical and academic

22

research. (Psounis Report ¶ 33.) For example, Psounis' first opinion, which rebuts Hochman's, is based on Psounis' experience researching browser communications, review of documents upon which Hochman relied, and review of relevant testimony and documents in this case. (*Id.* ¶¶ 37, 58.) Psounis also reviewed and analyzed Google's policies regarding technical barriers and polices meant to prevent identification of private browser users. (*Id.* ¶¶ 65-68.)

With respect to opinion three, Psounis not only relied on his experience in the industry and relevant documents, but he also analyzed certain data produced under the Special Master process and to which Hochman cites in his report. (*Id.* ¶¶ 79-83.) Psounis uses this data, plus his industry knowledge, to arrive at his opinion.

Similarly, Psounis' opinions seven through ten are based not only on Psounis' industry experience but also on additional principles such as the characteristics of IP addresses and networked distributed systems. Psounis then reaches the conclusion that one's IP addresses and User Agent cannot reliably identify devices or class members. Psounis also relies on studies and research that show that people share devices and accounts to support his conclusions that Hochman's proposed methods of identifying class members are unreasonable and unreliable. (*Id.* ¶¶ 162-169.) The Court finds that Psounis relied on a sound methodology to support his opinions.

That Google's lawyers assisted Psounis in gathering the data and running the testing that Psounis conducted in this case does not change the result. Plaintiffs have not pointed to any error or discrepancies in the testing that is attributed to such assistance. Nor do plaintiffs argue as much. If anything, the fact that Google's lawyers were involved in the process goes to the weight of the opinions not the admissibility.

Accordingly, the motion on this ground is **DENIED**.

## IV.  CLASS CERTIFICATION

Plaintiffs move for certification of a proposed nationwide class under Rules 23(b)(2) and 23(b)(3) based on the following Counts: (I) violation of the Federal Wiretap Act, 18 U.S.C. § 2510, *et. seq.*; (II) violation of CIPA; (III) violation of CDAFA.; (IV) invasion of privacy; (V) intrusion upon seclusion; (VI) breach of contract; (VII) violation of California's UCL.  Plaintiffs' theory of the case is that Google collects users' private browsing data after promising not to do so.

United States District Court
Northern District of California

In their class certification motion, plaintiffs seek to certify the following proposed classes under Rules 23(b)(2) and 23 (b)(3):

> Class 1 – All Chrome browser users with a Google account who accessed a non- Google website containing Google tracking or advertising code using such browser and who were (a) in "Incognito mode" on that browser and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present.

> Class 2 – All Safari, Edge, and Internet Explorer users with a Google account who accessed a non-Google website containing Google tracking or advertising code using such browser and who were (a) in a "private browsing mode" on that browser and (b) were not logged into their Google account on that browser, but whose communications, including identifying information and online browsing history, Google nevertheless intercepted, received, or collected from June 1, 2016 through the present.

Docket No. 608-3 at 1. Plaintiffs seek to certify nationwide classes for Counts I, III, IV, V, VI, and VII of their complaint and California-resident only classes for Count II. (*See* generally TAC.)[10]

### A. Rule 23(a)

#### 1. Numerosity

The requirement of numerosity is that the class be so numerous that joinder of all members individually would be impracticable. Fed. R. Civ. P. 23(a)(1). "Although there is no exact number, some courts have held that numerosity may be presumed when the class comprises forty or more members." *See Krzesniak v. Cendant Corp.*, No. 05–05156, 2007 WL 1795703, at *7 (N.D. Cal. June 20, 2007).

---

[10] Excluded from the classes are: (1) the Court (including any Judge or Magistrate presiding over this action and any members of their families); (2) Defendant, its subsidiaries, parents, predecessors, successors and assigns, including any entity in which any of them have a controlling interest and its officers, directors, employees, affiliates, legal representatives; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel, Class counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons. (*Id.* at 55-56.)

United States District Court
Northern District of California

Plaintiffs contend that this requirement is met because there are tens of millions of class members. (*See* Lasinski Report ¶¶ 194-95.) Google does not dispute this estimate. Accordingly, the Court concludes that plaintiffs have satisfied the numerosity requirement.

### 2.    Commonality

Commonality requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  To satisfy this requirement, the common question must be of "such nature that it is capable of class-wide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) "[F]or purposes of Rule 23(a)(2)[,] even a single common question will do." *Id.* at 359 (internal quotations and brackets omitted). The requirements of Rule 23(a)(2) have "been construed permissively," and '[a]ll questions of fact and law need not be common to satisfy the rule." *Ellis*, 657 F.3d at 981 (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350). A district court must analyze the persuasiveness of the evidence submitted to establish the commonality requirement and may not simply conclude that the commonality requirement is met on the basis that the plaintiff's evidence in support of that requirement is admissible. *See Grodzitsky,* 957 F.3d at 986 (holding that "[a] district court errs when it 'limit[s] its analysis of whether there was commonality to a determination of whether Plaintiffs' evidence on that point was admissible" and that a "district court must engage in a 'rigorous analysis' of commonality, rather than 'merely conclud[ing] that, because . . . evidence was admissible, a finding of commonality was appropriate' ") (quoting *Ellis*, 657 F.3d at 984).

Here, plaintiffs argue that common issues include whether: (1) Google promised not to collect private browsing information; (2) Google collected, stored, and used private browsing information; (3) Google's conduct was highly offensive to a reasonable person; and (4) Google uniformly attempted to and actually intercepted private browsing communications between class members and non-Google websites. Plaintiffs submit that Google's standardized contracts and actions constitute common evidence capable of answering the common questions above. Google does not dispute that the commonality requirement is met.

The Court agrees and finds that, at least for commonality purposes, Google's form contract is proof that could resolve the question of whether Google promised not to collect users' private browsing data. Having found at least one common question among the class members' claims, the Court need not consider, for commonality purposes, the other questions. *Wal-Mart Stores,* 564 U.S. at 359 ("[F]or purposes of Rule 23(a)(2)[,] even a single common question will do.") Thus, the commonality requirement is satisfied.

### 3. Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "The typicality requirement looks to whether the claims of the class representatives [are] typical of those of the class, and [is] satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted). Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citation and quotation marks omitted). The requirement is "permissive," and the representative's claims need only be "reasonably co-extensive with those of absent class members." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir. 1998)).

Plaintiffs argue that this requirement is satisfied because:

> [E]ach named Plaintiff browsed in Chrome Incognito (Class 1) and one, Ms. Trujillo, also used a non-Chrome private browsing mode (Class 2). For both classes, the "injuries arise from a common wrong" based on Google's broken promises and systematic collection.

Docket No. 608-3 at 5 (referencing plaintiffs' declarations and citing Hochman Report § VIII.A (detailing Google's practices)). Google does not dispute that this requirement is met. Accordingly, the Court finds that plaintiffs have pointed to sufficient evidence to show that named plaintiffs'

1   claims and defenses are typical of the classes. Thus, the typicality requirement is satisfied.

2             **4.**       **Adequacy**

3         The requirement of adequate representation requires a showing that the representative

4   parties "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

5   This requires inquiry into whether the plaintiff and its counsel have any conflicts of interest with

6   other class members, and whether the plaintiff and its counsel will prosecute the action vigorously

7   on behalf of the class. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Google does not

8   dispute that counsel and plaintiffs adequately represent the class.

9         With respect to plaintiffs, the Court finds that they have already expended a substantial

10   amount of time litigating this case, including by responding to discovery, sitting for depositions,

11   and allowing for Google to pull information from their accounts. (*See e.g.,* Dkt. No. 609-3. at

12   ¶ 13.) As to counsel, the Court finds that counsel has extensive experience litigating privacy class

13   actions and that given Counsel's experience, proposed class counsel can adequately represent the

14   proposed class. Accordingly, the Court finds that the adequacy requirement is met with respect to

15   counsel and named plaintiffs.

16         In sum, the Court finds that plaintiffs have satisfied all the requirements of Rule 23(a).

17   **B.**       **Rule 23(b)(3)**

18         Having found that plaintiffs satisfy Rule 23(a), and consistent with plaintiffs' order of

19   briefing, the Court starts with its analysis under Rule 23(b)(3) first, namely predominance of the

20   elements and damages.

21            **1.**       **Predominance of Evidence re Liability Inquiry**

22         Rule 23(b)(3) requires the Court to determine whether "questions of law or fact common to

23   class members predominate over any questions affecting only individual members." Fed. R. Civ.

24   P. 23(b)(3). "An individual question is one where 'members of a proposed class will need to

25   present evidence that varies from member to member,' while a common question is one where 'the

26   same evidence will suffice for each member to make a prima facie showing [or] the issue is

27   susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442,

28   453, 136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016) (citation omitted). The "predominance inquiry

asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quoting 2 W. Rubenstein, 2 Newberg on Class Actions § 4:49 (5th ed.)). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 (3d ed.)). "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) (citation omitted).

Here, plaintiffs argue that the predominance requirement is satisfied with respect to all seven counts. Unsurprisingly, Google disagrees. The Court begins with the parties' primary dispute over implied consent.

### a.    *Implied Consent*

With respect to all seven of plaintiffs' claims, Google argues that the affirmative defense of implied consent raises individualized issues that defeat predominance.

Defenses that must be litigated on an individual basis can defeat class certification. *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018). However, courts may certify a Rule 23(b)(3) class "even though [ ] important matters will have to be tried separately, such as some affirmative defenses peculiar to some individual class members." *Id.* (original alterations omitted) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

The Ninth Circuit's decision in *True Health* is instructive. In *True Health*, the Ninth Circuit affirmed in part, reversed in part, and remanded a district court's denial of class certification. *True Health Chiropractic, Inc.,* 896 F.3d at 931. In that case, the plaintiff moved to certify a class of all persons who received faxes from the defendant where the faxes failed to inform the recipient that they could opt out of future faxes. *Id.* at 928. In opposing class certification, the defendant argued that the consent defense available against class members could

not be resolved without individualized inquires. *Id.* The Ninth Circuit held that consent is an affirmative defense on which the defendant bears the burden of proof. *Id.* That said, the plaintiff nonetheless maintains the burden of predominance. *Id.* Thus, in assessing this issue, the Ninth Circuit started by "analyzing the consent defenses [defendant] has actually advanced and for which it has presented evidence." *Id.*[11]

---

[11] In *True Health*, the defendant produced evidence with respect to individual class members, namely three exhibits listing putative class members that eventually provided the bases for subclasses. *Id.* at 927. Exhibit A listed all putative class members that provided their fax numbers when registering a product purchased from a business unit of the defendant or entered into a software-licensing agreement. *Id.* Exhibit B listed class members that checked a box during their software registration that indicated their express permission to be sent faxes, completed a written consent form where they provided express permission, and/or confirmed via phone that they would like to continue to receive faxes. *Id.* Exhibit C listed class members that gave consent in individual oral or email communications with sales representatives. *Id.*

The Ninth Circuit reversed with respect to the class members listed in Exhibit A. The Ninth Circuit found that this group may have given consent by providing their fax numbers when registering a product or when entering into a software-licensing agreement. *Id.* The Ninth Circuit held that "consent, or lack thereof, is ascertainable by simply examining the product registrations and the [software-licensing agreements]." *Id.* at 932-33. The Ninth Circuit remanded with respect to the class members list in Exhibit B, explaining that the record was somewhat unclear as to that group. *Id.*

With respect to the class members in Exhibit C, those that arguably gave consent in individual communications with sales representatives, the Ninth Circuit affirmed the district court's denial of class certification. *Id.* There, the defendant argued that "because of . . . long-standing and well-developed relationships . . . sales representatives would learn and know that a particular customer exclusively preferred to receive faxes[.]" *Id.* In support of this position, defendant submitted a declaration from one of its sales representatives who testified that many customers specifically asked him to send them faxes. *Id.* In affirming the denial of plaintiff's class certification motion, the Ninth Circuit held:

> [Defendant] provided evidence in the district court that its consent defenses to these claims would be based on individual communications and personal relationships between [Defendant's] representatives and their customers. The variation in such communications and relationships, as evidenced by the declaration [of a sales representative] and deposition testimony of [a separate sales representative], is enough to support denial of class certification under Rule 23(b)(3) for the putative class members listed in Exhibit C.

*Id.* at 932.

United States District Court
Northern District of California

*True Health* instructs that a defendant must present non-speculative evidence that an affirmative defense would require individualized inquiries to defeat the predominance inquiry. *Id.* at 932 (quoting *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016)); *cf. Gene And Gene, LLC v. Biopay, LLC*, 541 F.3d 318, 327 (5th Cir. 2008) ("predominance of individual issues necessary to decide an affirmative defense may preclude class certification."); *True Health Chiropractic, Inc.,* 896 F.3d at 931 ("Since [defendant] bears the burden, we assess predominance by analyzing the consent defenses [defendant] has actually advanced and for which it has presented evidence.") Thus, the Court analyzes Google's proffered evidence in light of its burden to show consumers consented to, or had adequate notice of, the data collected, stored, and disclosed.

First, Google points both to its and plaintiffs' experts' surveys detailing how class members had divergent knowledge and expectations regarding their privacy in private browsing mode. Google also relies on several statistics included in its consumer expectations expert's, On Amir, report. For instance, Google points to Amir's findings that after being shown just the incognito screen, 44% of chrome users answered that they expect companies like Google "probably do or do" receive IP addresses, URLs of sites visited, and cookies versus the 35% of participants that expect that such companies "probably do not or do not" receive such information. (Dkt. 659-9, Amir Report ¶ 56 & Tables 2 & 3 (summarizing similar results for other browsers).) Amir's report also indicates that participants, when shown the documents plaintiffs claim comprise their contract (the Incognito Screen, the Privacy Policy, and the Chrome Privacy Notice), 63% of respondents expect Google receives their IP addresses in Incognito mode, while 55% expect that Google receives the URLs of sites visited and cookies. (*Id.* ¶¶ 69, 73 & Tables 5 & 6.)

Google also points to plaintiffs' rebuttal consumer expectations expert, Mark Keegan, who showed that class members knowledge of the alleged conduct varies. Keegan's report shows that respondents, after only being shown the splash screens, 20.2% indicated a belief that they had not given consent to Google to collect and save their Internet browsing activity when they browser the Internet in private browsing mode. (Dkt. No. 608-10, Report of Keegan ¶ 187.) Further, roughly half of respondents who were asked whether they agreed that Google "collects and saves" "URL

United States District Court
Northern District of California

1   information," "IP address," "browsing activity," and "cookies" in private browsing mode

2   confirmed that they did agree, which represents more than three times the number of respondents

3   who disagreed. (*Id.* at Ex. 72.)

4         Second, Google identifies several media and academic reports that publicly disclosed the

5   alleged conduct and the fact that 40% of named plaintiffs were aware of media and academic

6   reports discussing the privacy limitations of private browsing mode. (Dkt. No. 659-3, Opposition

7   to Class Certification Motion "Class Cert. Opp." at 5-6.)

8         Third, Google submits a declaration by Jonathan McPhie, a Group Product Manager for

9   Google's Privacy and Data Protection Office, that describes a developer tool that users can use to

10  see, in real time, what data is being collected when users are browsing in private mode. (Dkt. No.

11  659-6, Declaration of Jonathan McPhie "McPhie declaration" ¶ 99.) At least one plaintiff, Byatt,

12  testified that he is aware of this developer tool and that the tool shows a lot of information. (Dkt.

13  666-2, Ex. 25, 47:17-49:12.) However, plaintiff does not recall ever using the tool in private

14  browsing mode. (*Id.*)

15        Lastly, Google submitted the McPhie declaration which discusses various other ways

16  users' knowledge of the alleged conduct could vary. McPhie explains that the Incognito Screen

17  included a "Learn More" hyperlink that took users to different pages throughout the class period.

18  (McPhie declaration ¶ 73.) The "Learn More" hyperlink has been clicked more than 14 million

19  times between August 1, 2016, and January 1, 2022. (*Id.*) For half the class period, the button

20  linked to the "How private browsing works in Chrome" page in the Google Help Center

21  explaining that "Incognito mode stops Chrome from saving your browsing history to your local

22  history," but "[y]our activity . . . might still be visible to," among others: "websites you visit,

23  including the ads and resources used on those sites"; "Search engines" and "web-service[s]." (*Id.*

24  ¶¶ 59, 73.) This page was visited about 30 million times between its launch in July 2017 and

25  January 2022. (*Id.* ¶ 59 & Ex. 17.)

26        Plaintiffs proffer three reasons why predominance is not defeated: (1) Google waived any

27  implied consent defense in its form contract throughout the class period; (2) Google's internal

28  documents from Google employees recognize that Google collects private browsing data without

consent; and (3) none of the news articles identified by Google discloses the collection at issue here.

The Court finds that the inquiry into implied consent that Google advances, and which it also presents evidence, creates individualized issues that defeat predominance. Here, as in *Truth Health*, Google provides evidence that its consent defense would be based on individual, and subjective, interactions of what certain class members knew, read, saw, or encountered.[12] Evidence shows variation between what users knew or did not know.

A factfinder, in determining whether class members impliedly consented to the alleged conduct would have to determine the sources of information to which each class member was exposed. Given the plaintiffs' strategy, this would require individualized assessment into class members' experience. Thus, the Court finds that if the class was certified, the jury would be tasked with filtering out what members consented to the alleged conduct, and how. Identifying what members impliedly consented to the alleged conduct, and what members did not, would undoubtedly drive the litigation. That is because consent is a defense to all of plaintiffs' claims. (Dkt. No. 113, at 14.) Unsurprisingly, consent remains the central disputed issue in this case. Indeed, both sides have heavily litigated this issue at every stage of this litigation. The Court expects that the parties will also litigate the issue at trial. Accordingly, for the reasons set forth above, the Court finds that individual issues of implied consent are likely to predominate over any common issues. Accordingly, the Court **DENIES** plaintiffs' motion to certify a damages class under Rule 23(b)(3).

---

[12]  However, the nature of the evidence in *True Health* slightly differs from the evidence in this case. In *True Heath*, the defendant pointed to actual evidence with respect to specific class members in the subclass that arguably "gave consent in individual 'oral or email' communications with [defendant's sales representatives.]" *True Health Chiropractic, Inc.*, 896 F.3d at 927. Here, with the exception of the developer tool data, Google's data is not connected to any particular class member, but general data that shows that class members have differing experiences and knowledge of the alleged conduct. Nonetheless, Google's evidence, like the evidence in *True Health*, establishes that individual and subjective interactions require individualized inquiries into the consent defense.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  **C.    Rule 23(b)(2)**

2       Plaintiffs also seek certification under Rule 23(b)(2). Rule 23(b)(2) permits certification of

3  a class when "the party opposing the class has acted or refused to act on grounds that apply

4  generally to the class, so that final injunctive relief or corresponding declaratory relief is

5  appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "Class certification under

6  Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive."

7  *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir.), *opinion amended on denial of*

8  *reh'g*, 273 F.3d 1266 (9th Cir. 2001).

9       To obtain certification under Rule 23(b)(2), plaintiffs must "describe[] the general contours

10 of an injunction that would provide relief to the whole class, that is more specific than a bare

11 injunction to follow the law, and that can be given greater substance and specificity at an

12 appropriate stage in the litigation through fact-finding, negotiations, and expert testimony."  B.K.

13 *by next friend Tinsley v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019) (quoting *Parsons v. Ryan*, 754

14 F.3d 657, 689 n.35 (9th Cir. 2014))

15      Google argues that plaintiffs cannot obtain certification under Rule 23(b)(2) because

16 plaintiffs are precluded from seeking Rule 23(b)(2) certification because they also seek monetary

17 relief, and such relief is not "incidental." Here, plaintiffs are not precluded from seeking

18 certification of a Rule 23(b)(2) class for injunctive relief merely because they also seek

19 certification of a Rule 23(b)(3) class. Indeed, "Ninth Circuit precedent indicates that the court can

20 separately certify an injunctive relief class and if appropriate, also certify a Rule 23(b)(3) damages

21 class."  *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 573 (C.D. Cal. 2014) (rejecting the argument

22 that "the court can certify a Rule 23(b)(2) class only if the monetary relief sought is purely

23 incidental to the injunctive relief").

24      Moreover, plaintiffs describe the "general contours" of the injunction they seek. Injunctive

25 relief would (1) preclude Google from collecting further private browsing information; (2) require

26 Google to delete the private browsing information that it previously collected and is currently

27 storing; (3) require Google to remove any services that were developed or improved with the

28 private browsing information; and (4) appointment of an independent third-party to verify that the

injunctive relief has been implemented. These would be important changes to reflect transparency in the system.

Plaintiffs' description sufficiently identifies the specific course of conduct that plaintiffs seek to enjoin, and it establishes that this course of conduct applies to the entire proposed class. *See Broomfield v. Craft Brew All., Inc.,* No. 17-CV-01027-BLF, 2018 WL 4952519, at *8 (N.D. Cal. Sept. 25, 2018) (certifying Rule 23(b)(2) class where the injunctive relief sought was to enjoin defendant's "uniform policy and practice of misrepresenting on its packaging the brewing location of the Kona Beers").

Accordingly, the Court concludes that plaintiffs have met their burden under 23(b)(2). Having previously found that plaintiffs meet all the requirements under Rule 23(a), the Court **GRANTS** plaintiffs' motion to certify a class under Rule 23(b)(2).

## V.  CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS IN PART** plaintiffs' motion for class certification and certifies an injunctive class under Rule 23(b)(2). Plaintiffs' Motion to Strike Google's Non-Retained Experts is **DENIED**, but the Court will allow plaintiffs to depose the witnesses based on the topics covered in their declarations. The parties shall file a joint proposed schedule for completing these depositions within seven (7) days from the date of this Order. The parties' pending motions to seal will be addressed by separate court order.

The Court sets a case management conference for **JANUARY 30, 2023, AT 2:00 P.M.**  Parties shall meet and confer on a schedule for the balance of the action and file a statement with respect to scheduling no later than **JANUARY 23, 2023**.  If sufficient, the Court will issue a scheduling order without a conference unless requested.

This Order terminates Docket Numbers 609, 662, 663, 664, 703, 705.

**IT IS SO ORDERED.**

Dated: December 12, 2022

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

# EXHIBIT 2

Pages 1 - 97

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

CHASOM BROWN, ET AL.,           )
                                )
          Plaintiffs,           )
                                )
  VS.                           )      **NO. CV 20-03664-YGR**
                                )
GOOGLE LLC,                     )
                                )
          Defendant.            )
_____ )


                        Oakland, California
                        Tuesday, October 11, 2022


                **TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES**:

For Plaintiffs:
                    MORGAN & MORGAN, P.A.
                    201 North Franklin Street, 7th Floor
                    Tampa, FL  33602
               **BY: JOHN YANCHUNIS, ESQUIRE**
                    **JEAN MARTIN, ESQUIRE**
                    **RYAN J. MCGEE, ESQUIRE**

                    BOIES SCHILLER FLEXNER LLP
                    100 SE 2nd Street,Suite 2800
                    Miami, FL  33131
               **BY: JAMES W. LEE, ESQUIRE**

                    BOIES SCHILLER FLEXNER LLP
                    44 Montgomery Street, 41st Floor
                    San Francisco, CA  94104
               **BY: MARK C. MAO, ESQUIRE**




Reported By:      Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                  Official Reporter

**APPEARANCES CONTINUED:**

For Plaintiffs:

      SUSMAN GODFREY LLP
      1900 Avenue of the Stars, Suite 1400
      Los Angeles, CA  90067
    BY:  **AMANDA K. BONN, ESQUIRE**

      SUSMAN GODFREY LLP
      1301 Avenue of the Americas
      New York, NY  10019
    BY:  **ALEXANDER P. FRAWLEY, ESQUIRE**


For Defendant Google LLC:

      QUINN EMANUEL URQUHART & SULLIVAN LLP
      191 N. Wacker Drive, Suite 2700
      Chicago, IL  60606
    BY:  **ANDREW H. SCHAPIRO, ESQUIRE**

      QUINN EMANUEL URQUHART & SULLIVAN LLP
      51 Madison Avenue, 22nd Floor
      New York, NY  10010
    BY:  **DONALD SETH FORTENBERY, ESQUIRE**

      QUINN EMANUEL URQUHART & SULLIVAN LLP
      865 S. Figueroa Street, 10th Floor
      Los Angeles, CA  90017
    BY:  **VIOLA TREBICKA, ESQUIRE**
      **STEPHEN BROOME, ESQUIRE**
      **ALYSSA G. OLSON, ESQUIRE**

      QUINN EMANUEL URQUHART & SULLIVAN LLP
      1300 I Street NW, Suite 900
      Washington, DC  20005
    BY:  **DR. JOSEF T. ANSORGE, ESQUIRE**

| | |
|---|---|
| 1 | **Tuesday - October 11, 2022**                          **2:00 p.m.** |

1  **Tuesday - October 11, 2022**                              **2:00 p.m.**

2                        **P R O C E E D I N G S**

3                            ---oOo---

4          **THE CLERK:**  Now calling CV 20-3664-YGR, Brown, et al.

5   vs. Google LLC, et al.

6       Counsel, please approach the podium.  Starting with the

7   plaintiff, state your appearances for the record.

8          **MS. BONN:**  Good morning, Your Honor -- excuse me.

9   Afternoon.  My --

10         **THE COURT:**  People can't even remember if it's morning

11  or afternoon.

12         **MS. BONN:**  It's tough on a day like today.

13      I'm with Susman Godfrey on behalf of the plaintiffs.

14         **THE COURT:**  And you are?

15         **MS. BONN:**  Amanda Bonn.

16         **THE COURT:**  Good afternoon.

17         **MR. SCHAPIRO:**  Good afternoon, Your Honor.  I'm Andrew

18  Schapiro from Quinn Emanuel for Google.

19      Would you like me to introduce my colleagues who will be

20  speaking today or have them --

21         **THE COURT:**  So I appreciate that, Mr. Schapiro.  Let's

22  go back to -- Ms. Boon, is it?

23         **MS. BONN:**  Bonn.

24         **THE COURT:**  Bonn.

25      Are you going to be doing the entirety of the argument

1  today?

2        **MS. BONN:**  No, Your Honor.

3        **THE COURT:**  All right.  Why don't you go ahead and

4  tell me who is going to accompany you and what issues.

5        **MS. BONN:**  Thank you, your Honor.  I will be arguing

6  portions of our motion for class certification dealing with the

7  breach of contract claim, Google's consent arguments, Article

8  III standing arguments, and Google's arguments regarding

9  ascertainability and class member identification in part.

10       My colleague, Mr. Mark Mao from the Boies Schiller firm,

11  will be addressing arguments regarding the Federal Wiretap Act,

12  the California Invasion of Privacy Act, the CDAFA, and to the

13  extent the Court has questions about ways in which class

14  members could be identified other than through

15  self-certification, he will be addressing that as well.

16       **THE COURT:**  Okay.

17       **MS. BONN:**  Mr. Lee, James Lee from the Boies Schiller

18  firm, will be handling the *Daubert* motion that they filed as to

19  our damages expert, Mr. Lasinski, and to the extent there are

20  questions regarding how damages play into the class

21  certification decision, he may answer some of those questions

22  as well.

23       Mr Yanchunis from the Morgan & Morgan firm will be

24  addressing issues concerning our UCL claim and our request that

25  an injunctive relief class be certified under Rule 23(b)(2).

1          Ms. Jean Martin from the Morgan & Morgan firm will be

2    addressing Google's *Daubert* as to our expert, Mr. Schneier.

3          And finally, my colleague, Alex Frawley from Susman

4    Godfrey, will be addressing our motion to strike some of the

5    Google declarations that were filed.

6          And I'm realizing, as I'm rounding the bend, that I forget

7    to mention Mr. Mao will also be addressing the Psounis *Daubert*.

8          And Mr. Ryan McGee the Morgan & Morgan will be handling

9    Google's *Daubert* as to our expert, Mr. Nelson.

10          **THE COURT:**  Okay.  So there is one unfortunate lonely

11    person whose name didn't get called at your table.  Might as

12    well tell me who that is.

13          **MS. BONN:**  That is our wonderful graphics person in

14    case we have the opportunity to use some slides.

15          **THE COURT:**  Okay.  Welcome.  You don't have to be a

16    lawyer.

17          Okay.  Mr. Schapiro, on your side, sir.

18          **MR. SCHAPIRO:**  Thank you, Your Honor.

19          I hope we're not jumping up and down too much during the

20    presentations.  I'm going to be handling implied consent and

21    issues that relate to that.

22          My colleague, Stephen Broome, is going to be covering the

23    individual causes of action and also, if it comes up, the

24    motion to strike that opposing counsel just mentioned.

25          My colleague, Viola Trebicka, is going to be discussing

1  the difficulties that damages models present for class

2  certification and also the Lasinski *Daubert*.

3      Our associate, Alyssa Olson, will be covering the Schneier

4  *Daubert*.

5      Our associate, Seth Fortenbery, will be covering --

6  handling the Nelson *Daubert*.

7      And our counsel, Josef Ansorge, will be handling the

8  Psounis *Daubert*.

9      I think that covers everything, but if there are topics

10  that we haven't covered, we'll find a way.

11          **THE COURT:** Okay. All right.

12      Let's go ahead, since you're both at the mic and since it

13  is just a large issue, and deal with implied consent.

14          **MR. SCHAPIRO:** Can I grab my binder, Your Honor?

15          **THE COURT:** You may.

16      All right. So with respect to the issue of implied

17  consent, given that you haven't had a chance, Ms. Bonn, to

18  respond to the reply, we'll start with you.

19          **MS. BONN:** Thank you, Your Honor.

20      As plaintiffs have set forth in our papers, we think that

21  the issue of implied consent will be resolved using common

22  classwide proof and common issues of law that are applicable to

23  the class as a whole. Those are the issues that will

24  predominate, and I will explain why.

25      First and foremost, throughout the entirety of the class

1    period, it is undisputed that Google's form contract in its

2    Privacy Policy included a provision that says, "We will not

3    reduce your rights under this Privacy Policy without your

4    explicit consent."  And as we set forth in our moving papers,

5    in light of that classwide common promise, in order for Google

6    to even be heard to raise an implied consent defense, they

7    would somehow have to demonstrate that that provision had been

8    modified.  And yet here, Google has no argument that they have

9    presented that there was a contractual modification of that

10   provision, that there was an oral agreement to modify that

11   provision, or that there is any evidence whatsoever that a

12   single class member waived Google's contractual promise only to

13   reduce rights with the users' explicit consent.

14        And, in fact, in response to that argument, Google has

15   made only one argument in one sentence of its opposition brief,

16   and in that sentence --

17        **THE COURT:**  Let me ask you a question that has been --

18   I've been toying with, and that is, are you aware of any law or

19   any case where there is evidence proffered of some non-party to

20   a contract that can be used to modify a contract between two

21   parties?

22        **MS. BONN:**  I am not, Your Honor.

23        **THE COURT:**  I didn't think you were.

24   Mr. Schapiro.

25        **MR. SCHAPIRO:**  Your Honor, I think that the position

1  that opposing counsel is taking puts the cart before the horse

2  because we do not believe that a user's choice to use a service

3  while aware of the conduct --

4      **THE COURT:**  How do you know, though?  All of the

5  evidence that you have proffered is indirect, circumstantial

6  evidence -- who's got their phone on?  Somebody has a phone on.

7      **MR. SCHAPIRO:**  Mine is on silent, but I don't think

8  it's -- nope.

9      **THE COURT:**  Make sure your phones are off.  It's

10 amazing what mics will pick up and what I can hear up here.

11     So you have -- Google makes references to news articles,

12 academic reports, all sorts of stuff that is not customer

13 specific and yet wants to use that kind of generic evidence to

14 presumably modify an agreement between a particular person and

15 Google.  I just don't understand -- I don't know, is there any

16 case -- can you cite to me any case where that's done?

17     **MR. SCHAPIRO:**  I think the closest I have, though I

18 agree I would not call it modifying a contract because, for

19 reasons I'll explain, I don't think that's what's happening

20 here -- certainly the *Gmail* case or the *Backhaut* case or the

21 *Facebook vs. Campbell* case were cases where there was evidence

22 out in the world of disclosures that had been made that in an

23 individual action, the defendant would have had every right to

24 question the plaintiffs about.  And even in this case, two of

25 the five plaintiffs admitted that they had seen articles about

1 the supposed collection of data that they're suing on in this

2 matter.

3 So if this were an individual case and there were a

4 plaintiff on the stand, we would have every right to ask that

5 plaintiff, "Well, do you subscribe to *USA Today*, did you see

6 the book that sold a hundred thousand copies published by

7 plaintiffs' own expert, Mr. Schneier, who wrote that being in a

8 private browsing mode does not mean that you are not seen on

9 the web. It just means that you have local privacy." We would

10 have the right to do that, and I think it is a fair

11 interpretation of *Gmail*, *Backhaut*, *Facebook vs. Campbell*, and

12 the two other cases that we cite.

13 **THE COURT:** All right. Response as to those cases and

14 their applicability here.

15 **MS. BONN:** Yes, Your Honor.

16 In none of those cases was there a claim that the

17 collection at issue breached an express contract that forbade

18 the collection or that the contract at issue had an explicit

19 consent standard in writing.

20 In *Backhaut*, the facts were that former Apple iPhone users

21 brought a claim under the ECPA that even after they stopped

22 using their Apple iPhones, when they sent text messages to

23 other iPhone users, Apple was intercepting those. So these are

24 people out in the world who no longer had a contractual

25 relationship with Apple whatsoever.

1    In *Gmail*, likewise, some of the classes included non-Gmail

2    users who were sending emails to other people who had a Gmail

3    account.  And I think it's worth noting that in *Gmail* where

4    plaintiffs raised the argument that these types of news

5    articles should not be considered on the issue of consent, the

6    court expressly said that the plaintiffs might have a point if

7    there was a breach of contract claim, but there was not one in

8    that case.

9    And finally, in the *Campbell vs. Facebook* case, there is

10   actually an interesting discussion on the topic of consent, and

11   the court specifically pointed to the fact that Facebook had

12   not notified users that this type of conduct would be

13   collected.  And the court expressed great skepticism that

14   public articles could override the fact that Facebook itself

15   had failed to make the disclosure.

16   **THE COURT:**  The *Gmail* case -- I'm looking at your

17   table of contents.  It's not referenced as "Gmail."  What is

18   the full cite?

19   **MS. BONN:**  It should start with "In re Gmail."

20   **THE COURT:**  No.  I'm not talking to you.

21   Mr. Schapiro.

22   **MR. SCHAPIRO:**  Yes, Your Honor.  It's *In re Gmail*, and

23   it is 2014 Westlaw 1102660.

24   **THE COURT:**  Did you cite that in your briefs because

25   I'm looking at your Table of Authorities, and I don't see it.

1     **MR. SCHAPIRO:**  Yes.  We cited it in five different

2     places, according to our Table of Authorities.  This is our

3     brief in opposition to the motion for class certification.

4          **THE COURT:**  I see it now.  All right.

5     Any comment on --

6          **MR. SCHAPIRO:**  Yes.

7          **THE COURT:**  -- her argument?

8          **MR. SCHAPIRO:**  Yes, Your Honor.

9     So, first of all, Ms. Bonn began by saying well, in none

10    of those cases was there an express contract, and of course

11    here, as I think Mr. Broome is going to amply demonstrate,

12    there is no express contract saying that Google is not going to

13    collect this data.  There are statements from which some

14    plaintiffs claim to have inferred that this data would not be

15    collected.  So that's not a distinction.

16    But in the *Campbell vs. Facebook* itself -- that's 315

17    F.R.D. 250, Northern District of California -- the court denied

18    class certification stating individual issues of implied

19    consent do predominate due to the media reports on the practice

20    because, quote, as long as users heard about it from somewhere

21    and continued to use the relevant features, that can be enough

22    to establish implied consent.

23    Also in the *Backhaut* case, Northern District of

24    California, the court determined -- here I'm paraphrasing --

25    implied consent defeats predominance where, quote, numerous

1   sources of information could have put some -- could have put

2   some proposed class members on notice of the interception.

3       We also cite *Torres vs. Nutrisystem*, 289 F.R.D. 587, and

4   *Federated University Police Officers Association* --

5           **THE COURT:**  Right.  And these are all district court

6   cases.  None of them are binding, but I take your point.

7           **MR. SCHAPIRO:**  That is correct, Your Honor.

8       I would say what I hope might be persuasive in addition to

9   the cases is logic and common sense.  We have a situation here

10  where not only is there --

11          **THE COURT:**  Let me tell you what concerns me about

12  logic and common sense.

13      Logic and common sense suggests to me that when mega

14  corporations make promises and do not fulfill those promises

15  and do not want to resolve their cases by settlement, that a

16  jury should decide.  So I don't know if that means that in this

17  particular case, part of it gets decided or nothing gets

18  decided, but it concerns me that somehow you don't want to be

19  held accountable for what you say.  And by "you," I obviously

20  mean your client.

21          **MR. SCHAPIRO:**  Sure.  Respectfully, Your Honor, it

22  won't surprise you to hear our position is that everything we

23  have said is accurate and --

24          **THE COURT:**  Then what's the concern?  Then what's the

25  concern?  If what you have said is accurate and if that is what

1    the evidence shows, then you should have no concern.

2          **MR. SCHAPIRO:**  Your Honor, it would nevertheless,

3    under *Wal-Mart vs. Dukes* and its progeny be improper to take

4    for -- to treat as a class action a case in which there is a

5    very strong individualized affirmative defense --

6          **THE COURT:**  But there it was very different because in

7    *Wal-Mart vs. Dukes*, you were talking about individual

8    employees.  Very different from this kind of circumstance where

9    you have users of a product and statements -- policy statements

10   which explain to people what they can expect and what there is

11   an agreement for using your product.  That's different than --

12   it's much more like a consumer class action, which is routinely

13   certified, than it is an employee labor circumstance, which is

14   quite different.

15         **MR. SCHAPIRO:**  Your Honor, I agree a hundred percent

16   that the factual background of the *Wal-Mart vs. Dukes* case is

17   different in substantial ways.  The point that I was citing it

18   for is that a defendant cannot be deprived of a meaningful

19   defense that it would have in an individual case just because a

20   class is going to be treated in an aggregated way as a class

21   action.

22        And what is the statement -- the statements that were made

23   here were that you can browse privately and others who use your

24   device won't see your activity.  The surveys that are in the

25   record from both sides show that a substantial portion of users

1　understand that perfectly well.  They say, "We know what that

2　means.  It means that if I'm doing something on my device, it's

3　not going to be seen by people who are using my device," but

4　not that it somehow makes them invisible on the web.

5　　　Article after article, including statements by the --

6　published statements by the plaintiffs' own expert also showed

7　they understood precisely what Incognito does, but if we're

8　faced with a class where we have a few representatives who say,

9　"Well, I never saw this," or "I didn't understand it," we will

10　be at a --

11　　　**THE COURT:**  So how many millions of people then did

12　not?  How many millions of people did not understand it, even

13　based on your survey?

14　　　**MR. SCHAPIRO:**  It's hard to know because this gets

15　into another problem with class certification.  It is

16　impossible to truly know how many people --

17　　　**THE COURT:**  Ballpark, Mr. Schapiro.

18　　　**MR. SCHAPIRO:**  Ballpark, tens of millions.

19　　　**THE COURT:**  Tens of millions of people did not even --

20　even in your best case, did not understand.

21　　　**MR. SCHAPIRO:**  I'm sorry.  I misunderstood you.  How

22　many people on our surveys?  Yes.  We're talking -- when we're

23　talking about a class of hundreds of millions of people, if you

24　have a large percentage that had awareness and another

25　percentage who did not have awareness, the numbers are going to

1  be large no matter what.  But all of those people then -- not

2  all of those people are entitled to recover.

3          THE COURT:  But tens of millions of people would be.

4          MR. SCHAPIRO:  No.  They would not be entitled to

5  recover.  There are other reasons why they would not be

6  entitled to recover.

7          THE COURT:  I'm just saying that this notion that

8  you're too big to be held accountable concerns me.

9      Response.

10         MS. BONN:  Your Honor, every single class member,

11  whether this case was tried one by one or as a class action,

12  would have available to them the same common argument that

13  Google promised in its form contract not to reduce rights

14  without explicit consent.

15     These class members were bound by a form contract.

16  Mr. Schapiro says, "Well, we don't think the contract means

17  what plaintiffs think it means."  That is a common issue and a

18  common argument that will rise or fall in one stroke.  That is

19  all that *Wal-Mart* demands.

20     And so the notion that somehow this case will turn on what

21  individual class members privately believed goes against basic

22  contract law in California and every other jurisdiction.  It is

23  an objective manifestation theory of consent.  Private,

24  unexpressed, subjective beliefs don't control and especially

25  not where a company like Google has chosen affirmatively to

1  place in its own Privacy Policy a promise that says "We will

2  not reduce your rights without your explicit consent."

3      And now effectively what Google is arguing is that "We can

4  promise people in our contract that we won't collect your

5  private browsing data.  We can promise to rely on an explicit

6  consent standard, but if some news organizations begin to

7  suspect what we might be doing and publish articles, well, that

8  means that our contractual promises aren't worth the paper

9  they're printed on.  We cannot be held accountable, and

10  Americans cannot control in any way what we collect, even when

11  we have a contract that says they can."

12      **THE COURT:**  Mr. Schapiro, can you tell me whether -- I

13  just want to make sure I understand the evidence.

14      Can you identify users who clicked on the FAQs?  Can you

15  identify who they are?

16      **MR. SCHAPIRO:**  Specifically who they are, no -- well,

17  it depends.  I think if -- there would be some unusual

18  circumstances, but, no.  We know that there were numbers of --

19  the numbers of people who did.  I think that's in our brief.

20      **THE COURT:**  Can you identify the individuals who used

21  the developer tools?

22      **MR. SCHAPIRO:**  Other than, of course, by

23  cross-examination, which, you know, as --

24      **THE COURT:**  I'm talking about technology.  Can you

25  identify any of the individuals who used the developer tools?

1       **MR. SCHAPIRO:** Not as far as I'm aware, Your Honor.

2       **THE COURT:** Can you identify any of the individuals

3  who read any of these disclosures that you rely on?

4       **MR. SCHAPIRO:** Well, we can identify people who

5  read -- if they were setting up Google accounts, for example,

6  Terms of Service or at times the Privacy Policy -- which, by

7  the way said, nothing about private browsing until mid 2018,

8  contrary to what was just said.

9     So in some circumstances, yes; in some circumstances, no,

10  would be the short answer, Your Honor.

11       **THE COURT:** So it seems to me the best you have is

12  really kind of circumstantial class evidence that in many ways

13  you don't have any evidence that is specific to the person like

14  what existed in the *True Health* decision by the Ninth Circuit.

15       **MR. SCHAPIRO:** Your Honor, I think actually it cuts

16  the other way. If we can't overall in some aggregate way say

17  all right, well, here is a way we can pick out individuals who

18  did or didn't have awareness of what Incognito actually does

19  before using the service, then we should have the right -- and

20  I think under *Wal-Mart vs. Dukes* the Court has to assume we're

21  going to present that defense --

22       **THE COURT:** In *Wal-Mart vs. Dukes*, there was specific

23  evidence; that is, the employees' interactions with their

24  supervisors, that was all specific to the employee. That's why

25  I'm asking whether you can identify or whether you can --

1    whether you can take that evidence that you've thrown out there

2    as evidence of implied consent and actually connect it to

3    anybody.

4         **MR. SCHAPIRO:**  Your Honor, a finder of fact, if this

5    were an individual case and we had a witness there, would be

6    entitled to find, based on cross-examination, about that

7    person's habits, that person's knowledge, that person's use of

8    developer tools, what magazines that person reads -- to

9    conclude that that person had awareness, and that's why the

10   *Campbell* case came out the way it did, the *Gmail* case came out

11   the way it did, the *Backhaut* case and others.

12        I would also point out that the contract here, of course,

13   does not affect the other -- the claims other than breach of

14   contract here, the individual causes of action that I gather

15   Mr. Mao is going to be speaking about and that Mr. Broome is

16   going to be speaking about.

17        But, again, we, during discovery, would have the right --

18   and in this case, two of the plaintiffs said that they read

19   such articles.  Two of the 40 percent of the plaintiffs in this

20   case agreed that they had read such articles.

21        So if this case were just treated in an aggregated fashion

22   where we would not have the right to conduct discovery of or

23   ask similar questions of tens of millions of people but instead

24   could be found liable to all of those people if certain other

25   conditions are met would be -- would not be fair and would not

1    be --

2           **THE COURT:**  Only as to damages, not as to injunctive

3    relief.

4           **MR. SCHAPIRO:**  I can address --

5           **THE COURT:**  All of your arguments in that regard go to

6    damages.

7           **MR. SCHAPIRO:**  They go to -- correct.  They go to the

8    causes of action -- that is true.  I can address injunctive

9    relief if --

10          **THE COURT:**  I'm just making clear that none of the

11   arguments with respect to implied consent really impact a claim

12   for injunctive relief.

13          **MR. SCHAPIRO:**  I mean, the one way I would say that

14   the points I've just been making do affect a claim for

15   injunctive relief is that the sweeping injunctive relief that

16   the plaintiffs are asking for here is injunctive --

17          **THE COURT:**  Which would affect tens of millions of

18   people.

19          **MR. SCHAPIRO:**  That we believe many people would not

20   want.  Okay?  So the fact that there are many people out there

21   who understand exactly how private browsing works and who want

22   it to work that way, that is a relevant fact that I think, if

23   we were fighting about an injunction, would be before this

24   Court because an injunction would not be practical or sensible.

25   Certainly the injunction that --

1    **THE COURT:** But, again, that doesn't have anything to

2 do with implied consent.

3    **MR. SCHAPIRO:** It has only to do with the knowledge

4 and awareness that I was speaking of. Yes. There is not an

5 implied consent defense that I can think of that is specific to

6 injunction.

7    **THE COURT:** All right. Let's go ahead and move on.

8    **MR. SCHAPIRO:** Just can I, in closing, state again,

9 Your Honor, that the --

10    **THE COURT:** Why would you state again, Mr. Schapiro?

11    **MR. SCHAPIRO:** Sorry. I would just like to make sure

12 that I've emphasized that the implied consent defense -- so

13 the -- it is -- the implied consent defense we believe knocks

14 out not only the contract claim that we've been talking about

15 but all of the others, and there is no argument about an

16 express contract somehow superseding the implied consent as to

17 those claims.

18    **MS. BONN:** May I respond to that briefly, Your Honor?

19    **THE COURT:** You may.

20    **MS. BONN:** Thank you.

21   We disagree fundamentally that Google's contractual

22 promise, "We won't reduce your rights without your explicit

23 consent," only applies to a breach of contract claim. It

24 doesn't say, "We won't reduce your rights in contract without

25 your explicit consent."

1    And California law, which governs here, recognizes that
2    parties may contract around defenses.  Parties may contract
3    around a statute of limitations.  And if Your Honor looks at
4    the *In Re Pharmatrak* decision from the First Circuit, it is a
5    Wiretap Act case in which the court declined to find implied
6    consent precisely because the express contract, when it was
7    being drafted, helped provide, quote, assurances to the
8    plaintiff that the data would not be collected.

9        There's a second case we cite, *Harris vs. Comscore*, that
10   likewise applies this question of is there an express contract
11   not only to a contract claim but to wiretap claims.

12       **MR. SCHAPIRO:**  Your Honor, the *Harris vs. Comscore*
13   case that the plaintiffs rely on, which is an out-of-circuit
14   case, was rejected by Judge Koh in the *Gmail* case who wrote
15   that she finds it, quote, unpersuasive because, quote, express
16   and implied consent are analytically distinct, and, quote, a
17   finder of fact is allowed to consider a broader set of
18   materials in answering the factual question whether users
19   impliedly consented.

20       On this point about we won't reduce your rights, I think
21   our position is clear and correct, which is this isn't a
22   dispute about whether anybody reduced rights in a contract one
23   way or another.  This is a question about whether, with regard
24   to the contract claim, Google breached the contract or did not,
25   and one question that is relevant to that is whether plaintiffs

1    impliedly consented or waived their claims by using the service

2    with full knowledge of what it does, and it does what it's

3    supposed to do.

4            THE COURT:  Moving on, let's go ahead and talk about

5    the *Dauberts*.  We'll start with Lasinski.  That's Mr. Lee?

6            MR. LEE:  Yes, Your Honor.

7            THE COURT:  And -- let's see.

8            MS. TREBICKA:  Viola Trebicka for Google, Your Honor.

9            THE COURT:  I'm looking for your -- well, your last

10   name?

11           MS. TREBICKA:  "T," as in "Tom," R-E-B as in "boy,"

12   I-C-K-A.

13           THE COURT:  Okay.  I have you.  Thank you.

14       Let's go ahead and start with you, Ms. Trebicka.  Go

15   ahead.

16           MS. TREBICKA:  Yes, Your Honor.

17       And the Lasinski *Daubert* is really intertwined with the

18   damages issues that are discussed in plaintiffs' motion for

19   class certification as well.  And looking at the damages

20   inquiries here, there's several -- there's four fundamental

21   issues that preclude class certification.

22       The first is that individualized injury determinations

23   will --

24           THE COURT:  So I'm not talking about class cert.  What

25   I'm talking about -- I want to focus on the *Daubert*.

1      **MS. TREBICKA:**  Absolutely, Your Honor.  Then I will

2   focus on Mr. Lasinski's method.

3      He has three damages opinions:  A restitution opinion, an

4   unjust enrichment opinion, and half a statutory damages

5   opinion.

6      The unjust enrichment and restitution models that

7   Mr. Lasinski puts forth violate *Comcast*, Your Honor, because

8   they do not measure the damages that flow as a result of the

9   alleged wrong.  And I'm not talking here about the damages --

10      **THE COURT:**  You understand that damages models can be

11   aggregate in nature.

12      **MS. TREBICKA:**  Yes, Your Honor.  They can be aggregate

13   in nature, but for -- so this is where we intersect with class

14   certification.  Damages models can be aggregate in nature.

15   Mr. Lasinski's damages models are deeply flawed, and I'm -- I

16   would like to discuss that.

17      In addition to that, Mr. Lasinski's allocation methods

18   that are necessary for plaintiffs to prove --

19      **THE COURT:**  You need to get to the point.  I've read

20   your stuff.

21      **MS. TREBICKA:**  Uh-huh.

22      **THE COURT:**  So let's get to the point here.

23      **MS. TREBICKA:**  Let's get to the point, Your Honor.

24   The question is --

25      **THE COURT:**  I don't want to talk about allocation.

1   You don't have standing, but we'll get -- let's focus on the

2   other.

3          MS. TREBICKA:  So restitution model first, Your Honor.

4   It is entirely arbitrary.  Mr. Lasinski uses a $3 per month per

5   device --

6          THE COURT:  That's not arbitrary, is it?  It's, in

7   fact, what your client pays individuals.  How is that

8   arbitrary?

9          MS. TREBICKA:  It's arbitrary, Your Honor, because

10  what it is based on is the Ipsos study that pays for data that

11  is qualitatively and quantitatively different, and these are

12  not my words.  These are Mr. Lasinski's words.

13      So it's the same, Your Honor, as if a farmer --

14          THE COURT:  Can I --

15          MS. TREBICKA:  May I explain?

16          THE COURT:  No.

17      Can you remind me how many cases you've tried to a jury?

18          MS. TREBICKA:  Myself, Your Honor?

19          THE COURT:  Yourself, yes.

20          MS. TREBICKA:  A couple.  Two.

21          THE COURT:  So every day --

22          MS. TREBICKA:  Not as a first-chair lawyer,

23  Your Honor, but, yes.  And many more that did not reach

24  verdict, but, yes.

25          THE COURT:  Okay.  Well, I'm talking about jury

1    verdicts, jury trials.

2         Every day in courtrooms across the country, juries are

3    instructed in slightly probably different -- slightly different

4    terms, but they're basically instructed that with respect to

5    damages, they cannot be speculative.  Damages -- especially

6    aggregate damages and especially in patent cases, I would say,

7    are not always mathematically precise nor do they have to be.

8    Juries are instructed in that way.  That's the law.  They just

9    can't be speculative.

10        When I have an expert who analyzes the opposing party's

11   practices and finds a payment method where they have -- that

12   party has decided that that's reasonable compensation for a

13   good, that is data in this case, that doesn't seem to me to be

14   speculative.

15        Now, I may agree with it or not agree with it.  I may

16   challenge it, but there seems to be a reasonable basis for the

17   number that he's chosen.  He didn't pick it out of thin air.

18        **MS. TREBICKA:**  May I respond?

19        **THE COURT:**  You may.

20        **MS. TREBICKA:**  Two bases, Your Honor.  First is that

21   it is the same as if a farmer who believes that his avocado

22   should be sold for $3 would -- if the -- a bushel of corn is

23   taken from him, we'll say well, that bushel of corn should also

24   be valued at $3.  Yes, they're both produce; yes they're both

25   agricultural produce, but they are not the same, Your Honor.

1    That is how different the data is here.

2          **THE COURT:**  Why are they the same?  She is saying

3    they're not the same.  It's not the same product.

4          **MR. LEE:**  Sure.  I will start, Your Honor, with I

5    think we can all agree that the $3 is an input and *In Re Juul*

6    *Labs, Inc. Marketing, Sales Practices* -- it's 2022 Westlaw

7    1814440, which was cited in our opposition -- says criticisms

8    about the input that are used are classic criticisms that go to

9    weight, not admissibility.  So we can have this fight but it

10   will have to be a jury that decides whether these differences

11   matter.  And I'll get to the differences.

12        So it's sort of strange that Google is saying that this

13   input is somehow unreliable given, as Your Honor pointed out,

14   that it's the exact amount of minimum payment that's given to

15   users --

16        **THE COURT:**  Get to the product.

17        **MR. LEE:**  Sure.

18        So here is the differences that they say, right?  They say

19   that Google says that Screenwise asks for more personal

20   information, like your phone number, your address, things like

21   that, had certain rules and requirements to participate, and

22   collected more data.  What they don't say is that Mr. Lasinski

23   backed all of that out, and he did not include any of those

24   additional payments for those extra -- for that extra

25   information.

1     For instance, $20 for providing personal -- your personal

2   information and agreeing to the survey rules, Lasinski excluded

3   that.  Five dollars for having WiFi devices connected to a

4   special Screenwise router that could collect more information,

5   Lasinski excluded that.  Two dollars for allowing Google to

6   track across multiple devices within the home, Lasinski

7   excluded that.  All he kept was the $3, and that $3 is what

8   they pay in order to track their online browsing.  That's it.

9       **THE COURT:**  So if the $3 doesn't track online -- well,

10  let me ask.  Does the $3 track online browsing?

11      **MS. TREBICKA:**  It tracks more than that, Your Honor,

12  and I'd like to show you a slide, if you have an interest in

13  that because --

14      **THE COURT:**  Okay.  Go ahead.

15      **MS. TREBICKA:**  Would that be okay, with permission?

16  Ms. Olson is putting that up for me.

17      **THE COURT:**  So the $3 does track online browsing?

18      **MS. TREBICKA:**  It tracks online browsing for not

19  private browsing mode, all online browsing and more.

20      And, Your Honor --

21      **THE COURT:**  So you're suggesting it should be less

22  than $3 because it tracks more than just online browsing?

23      **MS. TREBICKA:**  No, Your Honor.  I'm suggesting that it

24  is entirely unconnected to the private browsing de-identified

25  data that Mr. Lasinski's job is to value to say look at this

1    other data that Google collects in another circumstance, that

2    data is valued at $3 per month per device, according to

3    Mr. Lasinski.  They should be the same.  They are not,

4    Your Honor.

5        And to the product question that you -- may I also answer

6    the product issue because I think that's -- that's a very, very

7    good question.

8            THE COURT:  Do you have a hard copy for me of that

9    slide?

10           MS. TREBICKA:  Hard copy?

11           MR. SCHAPIRO:  I might have one.

12           MS. TREBICKA:  We're looking, Your Honor.

13           THE COURT:  Go ahead.

14           MS. TREBICKA:  Your Honor, the product question is a

15   very -- is a very good one, and I direct Your Honor's attention

16   to the *Freitas vs. Cricket* case.  It's a recent case out of the

17   Northern District of California.  And in that case, Your Honor,

18   the judge found this model to be unreliable where the expert

19   looked at a 4G phone to identify what the damages would be

20   related to a 5G phone, and said yes, it's a phone; yes, it's a

21   G phone; however, the problem is that there are so many

22   additional qualities and features --

23           THE COURT:  Yeah.  But why doesn't that go to weight

24   as opposed to admissibility?

25           MS. TREBICKA:  It doesn't, Your Honor, because it's so

1  arbitrary.  There is a rigorous --

2          THE COURT:  It's not arbitrary.  Arbitrary means he

3  has gotten it from nowhere.  He just pulled a number.  And, by

4  the way, I have had economists that do that.  That's not what

5  it is.

6      There has to be a substantive difference, and if that's

7  all it is, which is a substantive difference, then it goes to

8  weight.

9          MS. TREBICKA:  Your Honor, with due respect, we

10  disagree.  We think that the data --

11          THE COURT:  Mr. Schapiro, do have you that slide or

12  not?

13          MR. SCHAPIRO:  We do not have a hard copy of that.  I

14  apologize, Your Honor.

15          MS. TREBICKA:  The data issue, the private browsing

16  de-identified data is so different from the data --

17          THE COURT:  So why?  That's the heart of it.  So why?

18  He says it's online browsing.  You're collecting the same

19  stuff.  All you're saying is that there's more.  We're

20  collecting more.  So that means to me maybe it's $2, not $3.

21          MS. TREBICKA:  No, Your Honor.  We're saying it's --

22  again, Mr. Lasinski words -- qualitatively and quantitatively

23  different, so it's not just more.  It's actually qualitatively

24  different from the data at issue here.

25      These differences matter, Your Honor.  If this case goes

1    to the jury --

2        THE COURT:  I'm still waiting to hear what the

3    differences are that matter so much.

4        MS. TREBICKA:  Your Honor, the private browsing data

5    is de-identified.  It is not connected to an individual.  This

6    data is connected to your specific name.  The data that --

7    that -- that is attached to the $3 per device per month.  That

8    is a fundamental difference because if Google does not know who

9    the de-identified pseudonymous data is related to, then that

10   data is necessarily a lot -- a lot less worth, and Mr. Lasinski

11   has done nothing to identify that.

12       THE COURT:  Except that data was never supposed to be

13   taken if we get to a damages stage; that is, if you get to a

14   damages stage, then a jury has decided that it should have

15   never been taken in the first place, and that makes it perhaps

16   more valuable since it shouldn't have been taken in the first

17   place.

18       MS. TREBICKA:  Your Honor, I think that is not

19   necessarily a distinction that governs when we're talking about

20   why this number, the $3 number, should be attached to this data

21   that Your Honor is suggesting may not have -- should not have

22   been taken in the first place.  It's just not -- logically does

23   not follow.  Just because the data was -- should not have been

24   taken, it does not mean that it is valued at a certain amount

25   of money that data that was properly taken is valued at.

1    THE COURT:  Okay.  Let's move to a different model.

2    MS. TREBICKA:  Yes, Your Honor.  And we are very happy

3    to email the slide as an email to the clerk.  Would that be

4    appropriate?

5    MR. LEE:  If that's the case, Your Honor, may I

6    respond to the slide?

7    THE COURT:  Well, we need -- we are going to move on.

8    I won't -- I didn't read it, so we'll just stand on the briefs.

9    MR. LEE:  Okay.

10   MS. TREBICKA:  Your Honor, may I also address

11   Mr. Lasinski's unjust enrichment model?

12   THE COURT:  Yes.

13   MS. TREBICKA:  Mr. Lasinski's unjust enrichment model

14   is -- overstates damages because in all three scenarios, it

15   evaluates -- it values data that for unjust enrichment --

16   THE COURT:  Okay.  But overstating damages is not --

17   again, that goes typically to weight as opposed to

18   admissibility.  His math isn't wrong; right?

19   MS. TREBICKA:  No, Your Honor, but the biggest problem

20   with it is that there is no way to actually subtract the data

21   that should not have been valued as part of the unjust

22   enrichment, and that is a fundamental flaw in his -- in his

23   methodology.  He has no way to actually value the data at

24   issue.  It is not connected to the damages -- I'm sorry -- it

25   is not connected to the offending conduct.

1    **THE COURT:**  Response.

2    **MR. LEE:**  Yeah, Your Honor.

3    Mr. Lasinski used the key input for unjust enrichment.  He

4    used Google's own internal analysis.  So the internal analysis

5    that Google prepared, I won't say it's name, but it was a

6    financial impact analysis for -- which analyzed the percentage

7    of Google Incognito traffic across its different business

8    segments.

9    So he used that percentage to determine how much Google

10   enriches itself from Incognito traffic and then he extrapolated

11   that out for other relevant private browsing data.  And Google

12   actually in the papers does not take issue with this

13   methodology.

14   Their main concern here is what they say -- is what

15   Ms. Trebicka just said.  She said it's too high.  Why is it too

16   high?  Because they said he didn't look at enough of the costs.

17   **THE COURT:**  Right.

18   **MR. LEE:**  Right?  And let's be clear.  Mr. Lasinski

19   read our papers.  He did consider the costs.  There just

20   weren't any.

21   At his deposition, he explained the four things he did to

22   discount whether there were any costs or not.  The first thing

23   he did is he looked at Google's expert, Dr. Strombom's report,

24   to see if he identified any costs.  Now, Dr. Strombom

25   calculated costs from Google's overall business, but he never

1    isolated costs that were tied specifically to private browsing

2    traffic, so Mr. Lasinski didn't find that helpful.

3        What did he do next?  Mr. Lasinski then spoke to the

4    plaintiffs' technical expert, Mr. Hochman, and Mr. Hochman

5    explained that Google has already built the infrastructure to

6    collect all browsing data.  It's a sunk cost so it's not an

7    incremental cost.  So if Google stopped collecting private

8    browsing data, which is just a tiny sliver of all the browsing

9    Google collects, there are no cost savings.

10       Mr. Hochman also explained the true cost of data

11   collection actually comes from processing power and energy, and

12   that cost is passed off to users because it comes from their

13   device.

14       **THE COURT:**  So, again, why isn't that an issue of

15   weight?  As I understood it, that was the main concern or

16   argument that the defendants had, which is that he didn't back

17   out costs.  But there's evidence in the record -- and I'm not

18   here to decide one way or the other -- but there's evidence in

19   the record that Google doesn't have costs relative to this

20   slice of the pie.

21       **MS. TREBICKA:**  Your Honor, that is only part of the

22   challenge that we have to the unjust enrichment model, and I'd

23   like to reserve some time to talk to the other part of the

24   challenge that we have.

25       On the issue of costs, our motion to exclude is to exclude

1  the opinion that says costs do not have to be taken into

2  account for unjust enrichment damages.  Whether those costs

3  exist or not, we're happy to duke out in front of the jury.

4  The problem is that Mr. Lasinski here is essentially rendering

5  a legal opinion saying costs should not be excluded.

6  **THE COURT:**  That's not a legal opinion.

7  Next issue.  What else did you want to --

8  **MS. TREBICKA:**  The issue is -- yes, Your Honor.  So we

9  were talking about the three scenarios of unjust enrichment.

10  The problem is one of methodology.  It's not one of we don't

11  like how high the damages are.  And the methodology that the

12  problem -- and the methodological problem is that the fact that

13  Mr. Lasinski values all revenue from transmissions, whether or

14  not -- on the basis of third-party cookies, assuming that there

15  was no consent for those third-party cookies, whether or not

16  there is evidence that there was actually consent given in the

17  form of -- for the third-party cookies -- in the form of the

18  triggering of the new tab page to consent to third-party

19  cookies.  That is a new trigger on the new tab page that comes

20  up with every Incognito browsing session that says it's okay to

21  allow third-party cookies to track you.  Those should be

22  admittedly excluded, and he's not excluding them.

23  **THE COURT:**  All right.  A response.

24  **MR. LEE:**  Sure.

25  Counsel didn't tell you what percentage that actually

1   amounts to.  Based on what Google has produced in the case,

2   that's less than one percent of all users.  There is a Google

3   internal document that says "99.1 percent of our Incognito

4   users have not opted in to this third-party tracking."  And

5   Google's response is, "Well, it may have gone up since it

6   launched."  Not a shred of evidence of that in the record.

7        **THE COURT:**  Any response?

8        **MS. TREBICKA:**  Your Honor, the document that Mr. Lee

9   is pointing to was a month after this feature was launched, and

10  of course it has gone up since.

11       **THE COURT:**  And the date of it was?

12       **MS. TREBICKA:**  It was July-- so it was launched in

13  June 2020 and the date is July 2020.  It was within a month of

14  the launch, so it's not proper evidence.

15       Your Honor, there is an additional point with respect to

16  unjust enrichment and how the methodology -- the methodology is

17  wrong because there's also evidence in the record of pop-ups

18  that a user -- of individual websites, not Google, that a

19  user -- with which a user can provide consent to allow

20  third-party cookie tracking.

21       **THE COURT:**  Okay.  Pop-ups.

22       **MR. LEE:**  Sure.

23       I really want to say one more thing about the third-party

24  tracking, but if Your Honor wants me to go to pop-ups, I will

25  go to pop-ups.

1    **THE COURT:**  Pop-ups.

2    **MR. LEE:**  Okay.

3    So the pop-ups that counsel is referring to, they pop up

4    on third-party websites.  The thing she didn't tell you is that

5    none of them say in their -- when it pops up, "you are

6    consenting to data collection in private browsing mode."  None

7    of them say that.  So that's not something that can be deducted

8    here because what we're focused on, what Mr. Lasinski is

9    focused on is the traffic when you're in private browsing mode.

10   **THE COURT:**  Okay.

11   **MS. TREBICKA:**  May I respond?

12   **THE COURT:**  You may.

13   **MS. TREBICKA:**  Users are obviously aware of the fact

14   that they are in private browsing mode when the pop-up comes

15   up, so the consent to the third-party cookie tracking is

16   proper.

17   **THE COURT:**  All right.  Let's see.  We've got

18   statutory damages.

19   **MS. TREBICKA:**  Yes, Your Honor.  May I go first?

20   **THE COURT:**  Uh-huh, you may.

21   **MS. TREBICKA:**  Mr. Lasinski's bases for statutory

22   damages have a major issue, Your Honor, and that is the fact

23   that -- sorry, Your Honor.  I'm trying to find my notes.

24   **THE COURT:**  I will tell you what the major issue is.

25   He hasn't identified California -- how he is going to get to a

1    number for the California subclass.  It's not in the report.

2              MR. LEE:  What's in the report, Your Honor, is that he

3    has an aggregate statutory word for California that he says can

4    be performed, and the way he is going to do that is extrapolate

5    the private browsing use by California residents.

6              THE COURT:  But how do you get that number?

7              MR. LEE:  He uses the California population as a

8    percentage of the total U.S. population, and he already has the

9    aggregate damages.  He has the whole pie.  So if we are trying

10   to figure out which part of the pie goes to California, you

11   extrapolate by the population based in California.  And Google

12   offers no legal authority that it can't be done this way.

13             THE COURT:  Okay.

14        MS. TREBICKA:  The California -- yes, Your Honor.  The

15   California issue --

16        THE COURT:  You can say whatever.  That's the one I

17   wanted to hear from.

18        MS. TREBICKA:  Yes, Your Honor.

19        The methodology used is unreliable as to the California

20   issue, and we have addressed it in our papers.

21        There is a manageability issue that goes with the

22   statutory damages as Mr. Lasinski has framed them, Your Honor,

23   and that's what I would like to talk about with your

24   permission.  And that issue is --

25             THE COURT:  So manageability is not, as I recall, a

1   *Daubert*-specific issue.  Can we focus -- can we stay focused on

2   *Daubert*?

3          MS. TREBICKA:  Yes, Your Honor.

4      We believe that Mr. Lasinski's statutory bases are

5   improper because they are -- they will necessitate

6   individualized damages into how many of these violations that

7   he claims each of the bases will calculate will go for each

8   class member.  So it's essentially -- it's not so much a

9   *Daubert* issue as it is a manageability class certification

10  issue, Your Honor, so if you'd --

11         THE COURT:  So I'm not talking about class cert right

12  now.

13         MS. TREBICKA:  I understand that, Your Honor.

14         MR. LEE:  May I have the last word on the California

15  issue, Your Honor?

16         THE COURT:  You may.

17         MR. LEE:  Okay.

18     So what happened was Mr. Lasinski initially assumed that

19  the California wiretap statute would apply nationwide.  He did

20  create a carve-out just in case Your Honor would decide that it

21  was to California only.  And given your decision in the *RTB*

22  case, that ended up being prescient.  So at the time that he

23  wrote his report, though, he didn't know that the claims would

24  be limited to California.

25     The truth of the matter is that based on the discovery

1    taken in this case, we can hone in on California usage much

2    more than population percentages if that's what Your Honor is

3    concerned about.  For instance, we can do it by IP address.  We

4    can do it by Geolocation.  This is Google.  Of course they can

5    do this.  There was just a case settled about this less than a

6    month ago.

7        So if we need to limit it in some way by California

8    residents and Your Honor requires a little more precision, that

9    can easily be done on the back end.

10            **MS. TREBICKA:**  May I respond, Your Honor?

11            **THE COURT:**  You may.

12            **MS. TREBICKA:**  That is speculation that we're hearing

13   today for the first time.  Mr. Lasinski's methodology, which we

14   are here to address, does not do any of that work, and it is

15   extremely doubtful that it is able to be done.

16            **THE COURT:**  Okay.  Moving on.  The next expert I have

17   is Mr. Nelson.

18            **MR. BROOME:**  Your Honor, before we get to Mr. Nelson,

19   may I just briefly address the issue of confidentiality of

20   documents and ask all parties to be mindful of discussing

21   documents that are under seal?

22            **THE COURT:**  So far I haven't heard anything that is so

23   specific that there would be a problem.

24            **MR. BROOME:**  I understand, Your Honor.  I believe one

25   document that is in fact under seal was just referenced but --

1    **THE COURT:**  So a generic reference is not a violation

2   of a sealing order.  I think everybody -- I'm not going to kick

3   out everybody in this courtroom.

4    Everybody be cognizant of it.  I don't want to -- if

5   there's a document reference you want me to pull up, I can do

6   that.  You all have -- are professionals, and you're all

7   operating under Rule 11.

8    **MR. BROOME:**  Understood, Your Honor.  Thank you.

9    **THE COURT:**  Okay.  Mr. Nelson.  So I have -- all

10  right.  Remind me who you are.

11   **MR. FORTENBERY:**  Good afternoon, Your Honor.  This is

12  Seth Fortenbery.  I'm an associate at Quinn Emanuel and a

13  Google attorney.

14   **THE COURT:**  Okay.  Hold on.  How do you spell your

15  last name?

16   **MR. FORTENBERY:**  F-O-R-T-E-N-B-E-R-Y.

17   **THE COURT:**  Okay.  And?

18   **MR. MCGEE:**  Good afternoon, Your Honor.  Ryan McGee of

19  the law firm of Morgan & Morgan.

20   **THE COURT:**  Okay.  So Mr. Nelson.  I think the main

21  issue that there is with Mr. Nelson is his inability to connect

22  his years of service as an FBI agent with information that may

23  or may not exist in private browsing mode specifically.  That's

24  the concern.  I don't see where he does that.  It's one thing

25  to say generically, "I have 30 years of experience working with

1   Google and getting information." We all get them. We see

2   them. I try criminal cases, and it's based on that kind of

3   evidence, so I understand that. That's not the concern.

4        If he was just saying generically or if Google was saying

5   generically that they can't do it and he's saying, "Yes, you

6   can, you've been doing it for 30 years," it would seem to be

7   fine. The problem is that he's making representations

8   regarding a specific mode and yet there doesn't seem to be a

9   sufficient basis upon which he's making that opinion.

10       What am I missing, Mr. Fortenbery?

11       **MR. FORTENBERY:** I think you've got it exactly right,

12   Your Honor.

13       **THE COURT:** So nice; right? All right.

14       **MR. MCGEE:** Your Honor, Mr. Nelson is offered as a

15   rebuttal expert to Google's expert, Georgios Zervas, who says

16   essentially the data from private browsing is orphaned on the

17   islands, and Google is never able to find it, locate it, or

18   produce it to a third party. And with Mr. Nelson's experience

19   with the FBI, he testified that he was involved in hundreds of

20   investigations where information was produced based on an IP

21   address. Google never denied him production saying, "This

22   section of this data is private browsing information and we

23   can't give that to you." They never denied one of his requests

24   saying, "We need consent from these people because certain of

25   this information may be subject to private browsing information

1  or private browsing mode." And he testified that he had had

2  hundreds of interactions with Google attempting to obtain and

3  successfully obtaining information from Google just based on an

4  IP address and a date range.

5      **THE COURT:** Right. And I don't disagree with that

6  assessment, but how does he get to the link, because I don't

7  see it in the report --

8      **MR. MCGEE:** Sure. The link, Your Honor, would be the

9  three individuals that he spoke with, the subjects of his

10  investigations. I believe it's paragraph 35 of the report. It

11  says that he had spoken with people during his investigations

12  who admitted, when confronted with the evidence, that activity

13  was done in a private browsing mode and that they were

14  surprised to see that he had that level of detail and that

15  level of information.

16      **THE COURT:** So doesn't -- doesn't Mr.-- and I don't

17  know if I am saying this right, Hochman?

18      **MR. MCGEE:** Hochman, Your Honor.

19      **THE COURT:** Doesn't Mr. Hochman address this issue in

20  his report from a technical perspective?

21      **MR. MCGEE:** I believe so, Your Honor.

22      **THE COURT:** So why do you need someone who's not able

23  to make that connection other than those -- I'll grant you the

24  three people, but is it -- it sounds duplicative at best.

25      **MR. MCGEE:** It's a real-life observation of this

1     information being produced.

2            **THE COURT:** All right. A response.

3            **MR. FORTENBERY:** Yes, Your Honor.

4     I think a couple points. First, Mr. McGee, on behalf of

5 plaintiffs, opened saying that well, this is a rebuttal report,

6 and it's a rebuttal to Mr. Zervas' report. And I just want to

7 point out for the Court that Mr. Zervas, the report that's

8 being identified there, is a 211-page technical report.

9     Here in that report, Mr. Zervas doesn't purport to talk

10 about Google's server side information: What's saved, what's

11 collected. The only thing that Mr. Zervas is saying in the

12 paragraphs that plaintiffs quote is that in -- on the browser

13 side of things, on the Chrome side of things, Chrome is not

14 storing data locally on the computer -- on the particular

15 person's computer.

16     So when it comes to Mr. Nelson trying to say what Google

17 does or whether Google can link IP addresses to particular

18 private browsing data, that's wholly out of cloth and has

19 nothing to do with what Mr. Zervas was opining on, and so it

20 can't properly be characterized as a rebuttal.

21     Second, I think Your Honor hits on a very good point.

22 Mr. Nelson doesn't simply purport to say that "I worked with

23 Google over my" -- "my," you know, "decade" -- "several

24 decade-long career, and in those" -- "in that career, I

25 received data from Google." That would be a wholly different

1    opinion.  Instead, he wants to make another analytical leap,

2    and that analytical leap is that, "The information I received

3    from Google was private browsing mode data," one, and, two,

4    that private browsing mode data through IP address alone and a

5    date range can be linked back to individual users and devices.

6         Now, that alone is an analytical leap.  And you put the

7    question to Mr. McGee, how do you connect those two things.

8    And Mr. Nelson, in his deposition, plaintiffs today, say that

9    the reliance there is the statements of three accused criminals

10   in investigation saying they were surprised the FBI had data

11   because at some point, when they were conducting those actions

12   that were being investigated, they used a private browsing

13   mode.

14        Now --

15             THE COURT:  So can I -- let me interrupt you.

16             MR. FORTENBERY:  Yeah.

17             THE COURT:  Mr. McGee, is it also true that Mr. Nelson

18   never identified the actual people, so there's no way that

19   Google could even verify or not verify what it is he's claiming

20   to know?

21             MR. MCGEE:  That's correct, Your Honor.  In the --

22             THE COURT:  Why didn't he?

23             MR. MCGEE:  He cited confidentiality issues with the

24   Federal Bureau of Investigation.  He provided details related

25   to one of the investigations that he was questioned on, but

1   when it ultimately came to details that would sufficiently

2   identify victims and subjects of those investigations,

3   Mr. Nelson cited confidentiality concerns.

4           **THE COURT:**  Okay.

5           **MR. MCGEE:**  And he was not questioned on the two other

6   investigations, Your Honor, at all.

7           **MR. FORTENBERY:**  Your Honor, if I may respond to that

8   last point.  This is something in their brief that we very much

9   dispute.

10      During the deposition when we asked Mr. Nelson about

11  his -- the statements of the suspects, he stated that he would

12  not provide any details about any cases no matter how minute

13  they may seem.  So while plaintiffs have characterized

14  Mr. Nelson's testimony as simply saying that he won't provide

15  the identity of suspects or that type of thing, in reality --

16  or that Google should have asked more questions of Mr. Nelson

17  to get more details on the second and third suspects, that just

18  doesn't comport with what he testified about or what he was

19  willing to give Google.

20          **THE COURT:**  Yeah.  I'm not sure the plaintiffs can

21  have it both ways.

22          **MR. MCGEE:**  And, Your Honor, that was briefed, and I'm

23  not going to belabor that point.  But one thing the

24  defendant -- excuse me -- Google in this case -- it really

25  comes down to a dispute about reliability.  They don't dispute

1    that the practice occurs. They don't dispute that they provide

2    information that is from a private browsing session to law

3    enforcement and that that can be retrieved with an IP address

4    and a date range. So in a reliability analysis, which is the

5    third prong of the *Daubert* inquiry, it's whether it's

6    independently verifiable, and just like with the prior analysis

7    that you discussed with counsel before us on Lasinski, it's not

8    arbitrary. He didn't pick this out of thin air. It's from his

9    own experience, and he was providing that as the foundation for

10   the rebuttal opinion that he was providing in rebuttal to

11   Professor Zervas.

12        **THE COURT:** Well, if they don't dispute it, then you

13   don't need an expert to -- an expert who's -- you don't need an

14   expert to rebut something that's not being disputed.

15        **MR. MCGEE:** I think that what Professor -- what

16   Mr. Nelson provided was that Professor Zervas' opinion was

17   misleading and incomplete, Your Honor. But if you're

18   suggesting that Mr. Nelson should be a percipient witness and a

19   fact witness, then that's something that could be discussed,

20   but I think right now, we would contend that he's not subject

21   to a *Daubert* and that it's a weight/credibility issue.

22        **THE COURT:** Like I said, my concern with him is that

23   he hasn't -- he hasn't justified the basis for his analytical

24   leap, and -- well, is that -- are you, in fact, disputing -- is

25   Google disputing that they can identify individuals who -- with

1    an IP address and a date range in a private browsing -- are you

2    disputing that or not?

3         MR. FORTENBERY:  Yes, Your Honor, we are disputing

4    that.  The fact that I think -- one thing that plaintiffs say

5    in their response is that this was -- Mr. Nelson's opinion was

6    confirmed by the special master process, and I think two points

7    to that, Your Honor.  First, we would disagree with that

8    characterization, but I think it goes back to something else

9    Your Honor said.  Then why is Mr. Nelson needed as an expert in

10   this case if it's duplicative of what can be found in the

11   record elsewhere, and Mr. Nelson is clearly making an

12   analytical leap based on, one, a field and a spreadsheet that

13   during his deposition he admitted that he did not know one way

14   or another whether that absence of that field indicated a user

15   was in private browsing mode.  He is simply saying, "I asked

16   Google during my career for data.  They provided data, and I'm

17   assuming that that was private browsing mode data," and he does

18   not have the -- the required --

19        THE COURT:  It's probably not a bad assumption.  I

20   just don't know that I can verify it.

21   Okay.  We're going to move on.

22        MR. MCGEE:  Thank you, Judge.

23        MR. FORTENBERY:  Thank you, Your Honor.

24        THE COURT:  Let's go to Schneier.  Who do I have?

25        MS. OLSON:  Aly Olson from Quinn Emanuel.

1    **MS. MARTIN:** Jean Martin, Your Honor, from Morgan &

2    Morgan for plaintiffs.

3         **THE COURT:** Okay. June Martin.

4         **MS. MARTIN:** Jean Martin.

5         **THE COURT:** And you said Olson?

6         **MS. OLSON:** Olson, yes. Aly Olson.

7         **THE COURT:** Alyssa Olson?

8         **MS. OLSON:** Alyssa, yes.

9         **THE COURT:** See, this is so great. So many issues.

10   Everybody gets a turn at the podium.

11        Okay. We'll start with you, Ms. Olson.

12        **MS. OLSON:** Thank you, Your Honor.

13        Professor Schneier's reports read more like a closing

14   argument than an expert opinion, and this is because his

15   opinions are improper for a couple of reasons. First, he's

16   opining on the ultimate issue of fact; that is, what a

17   reasonable person would expect or understand approximately 30

18   different times. And even if such an opinion were a proper

19   opinion, his opinion is further not reliable because the

20   standards that he claims to apply are "I know it when I see

21   it," which is the quintessential unreliable method.

22        **THE COURT:** Well, you've got about five different

23   arguments, so let's just take them one at a time. That way I

24   can get a response from Ms. Martin.

25        With respect to this argument that there needs to be a

1    fit, that seems to me, at least with respect to that argument,

2    a stretch too far.

3        Ms. Martin.

4        **MS. MARTIN:**  My apologies, Your Honor.  Are you

5    agreeing with us that there is a fit or are you agreeing with

6    the defendant --

7        **THE COURT:**  No.

8        **MS. MARTIN:**  -- that we are stretching with the fit?

9        **THE COURT:**  I am agreeing that there is a fit.  That

10   is, this isn't -- you're not going to agree.  Rarely, if ever,

11   do I have an opposing party come in and agree with the opposing

12   party's expert.  That's why you have experts.

13       This issue of a fit is -- it's almost a relevance

14   objection, which is not a *Daubert* issue.

15       Now, there are some other arguments, but with respect to

16   that one, as I tell the law clerks, when we have 403 objections

17   at this point in the proceedings, you know that's the bottom of

18   the barrel.  Just if you're a young associate, 403 objections

19   don't get you very far at this point.  Maybe if we're in day

20   three of trial, that would be different.

21       So I -- yeah.  If you want to address the fit; otherwise,

22   we will move on to the next one.

23       **MS. OLSON:**  I'll just briefly respond, if I may,

24   Your Honor, that I think fit actually is one of the *Daubert*

25   requirements.

1    **THE COURT:**  Not by the United States Supreme Court.

2  There was a mention of it in a Ninth Circuit case, but it is

3  not the bread and butter of *Daubert*.

4    **MS. OLSON:**  Understood, Your Honor.  Then I'm happy to

5  move on to the other issues.

6    **THE COURT:**  Consumer expectation opinions.  Here, I

7  think there are numerous opinions that seem to be, "Yeah,

8  because I said so."

9    Ms. Martin, that's not enough for me.  Go ahead.

10    **MS. MARTIN:**  I agree, Your Honor.  It is not enough to

11  say "because I said so," but yet defendants' brief is replete

12  with *ipse dixit* statements in and of itself.

13    Here, Professor Schneier has decades of relevant

14  experience in cybersecurity and data security, and it is

15  well-known that the application of an expert's specialized

16  experience is in and of itself an appropriate expert

17  methodology.

18    **THE COURT:**  Right.  But it's a step further to say

19  that -- an expert can sit on the stand and say, "Based upon my

20  research, this is my analysis."  It's quite different to say,

21  "And all consumers believe as I do."  That, I think, is a step

22  too far when you've done no analysis, no research, no surveys

23  on consumer expectation.

24    **MS. MARTIN:**  And I appreciate that, Your Honor, and we

25  have read your admonishments in other cases and also what was

1    brought forth in the Calhoun hearing, and we understand -- we

2    believe that we understand the contours of proper testimony for

3    Professor Schneier and the other experts, and we anticipate and

4    expect to fully appreciate those contours and abide by them in

5    the context of a trial in presenting these experts' opinions.

6        I mean, here plaintiffs are seeking to establish that they

7    have a reasonable expectation of privacy and that -- in their

8    private browsing communications, and that Google's habit and

9    collection of data is highly offensive to a reasonable user.

10   We do not anticipate Professor Schneier going further to say

11   what is unreasonable.  He will be presented to use his

12   background and experience to give the historical context of the

13   evolution of privacy, to talk about the motivations of

14   companies to collect and monetize data, why companies collect

15   and retain data, and also the deceptive nature of the

16   disclosures and Google's context from a standpoint of data

17   privacy.

18       **THE COURT:**  All right.  Ms. Olson.

19       **MS. OLSON:**  So I appreciate that.  I think maybe that

20   plaintiffs are conceding that they are not -- that Mr. Schneier

21   will not be making the arguments that he makes in those 30 or

22   so paragraphs, but this is -- this is our -- one of our three

23   *Dauberts* that we're arguing now, and I think this applies for

24   the entire case, not for just class certification.  But I also

25   don't think that the promises that they make resolve the issue.

1   Comments about the motivation of various companies, again,

2   I don't think that Mr. Schneier has indicated that he is

3   qualified to opine on motivations of companies in the industry

4   or Google specifically.

5   She talked about the disclosures themselves, and I think

6   that ties in to one of our other issues with Mr. Schneier's

7   report, which is that he is just summarizing internal

8   documents, summarizing disclosures, and saying that they are

9   unreasonable.  And I know plaintiffs cite to the *Berman*

10  opinion, but I think Mr. Schneier is not like the expert in

11  that opinion, who, in his daily work, was designing user

12  consent interfaces.

13  Mr. Schneier doesn't -- he is a security expert, as was

14  mentioned, and I think that --

15  **THE COURT:**  Well, I certainly agree that he cannot

16  testify as to intent.

17  **MS. MARTIN:**  We agree, Your Honor, and Professor

18  Schneier is not opining as to intent.  He is opining as to the

19  incentives and services and how Google's conduct conforms or

20  does not conform to privacy standards and disclosures, how

21  those disclosures do not conform to industry standards.

22  It is appropriate here to talk about why companies collect

23  and retain data.  That is an issue that can assist the jury in

24  this matter, and that is what Professor Schneier will be

25  discussing.

1    **THE COURT:** Okay. Any further comments? On this one,

2    it really is a paragraph-by-paragraph analysis. There's lots

3    in his report, I think, that is objectionable, so if there's

4    anything else you want to say. But there's plenty there that

5    is not, but there is stuff in there that is.

6    **MS. MARTIN:** If I may, Your Honor, Google has sought

7    to strike or exclude Professor Schneier in its entirety. We

8    believe that is overreaching. We do not believe that that is

9    appropriate.

10    **THE COURT:** Any comments?

11    **MS. OLSON:** So we disagree with that, obviously,

12    Your Honor. I think we cite the specific paragraphs that fall

13    under kind of each of the buckets of issues that we have for

14    Mr. Schneier. We cite on the bottom of page 9 to top of page

15    12 of our motion the various paragraphs where Mr. Schneier is

16    opining on what reasonable people expect or understand. We

17    cite to the various -- the very many paragraphs, the more than

18    a hundred paragraphs where he is just summarizing internal

19    Google emails.

20    The first six opinions which plaintiffs are claiming are

21    teaching opinions, which don't really fall into what is

22    normally a teaching opinion, a complex issue like

23    thermodynamics, blood clocking, cardiopulmonary bypass --

24    **THE COURT:** I hope that if this ever gets to trial

25    you're all going to have some nice demonstratives about how

1    things work because I know my jurors -- and some of them are

2    going to know what you're talking about and some of them are

3    not.  And experts actually -- I mean, look, I got a

4    presentation on Fortnite, and I never played it in my life.

5         So you are going to have to -- you do have to -- it is

6    helpful to have people who can explain those things to you.

7    And he does.  My view is that if -- you know, some of this will

8    stay in; some of it will come out.

9         **MS. MARTIN:**  Your Honor, may I address the summaries

10   of the documents?  That it is appropriate for experts to render

11   opinions based on information and data that they have reviewed

12   personally.  And in the *Borges* case, Dr. Barry Castleman -- it

13   was found that on his years of experience and expertise, you

14   know, it was more than just casual research for him to provide

15   a description of the documents that he read to lay a foundation

16   for his opinions, and that's what Professor Schneier is doing

17   here.

18        And if he misdescribes, as Google has said, any of the

19   findings or any of the documents, then that is fodder for

20   cross-examination.  That is not fodder for *a Daubert* motion.

21             **THE COURT:**  Okay.  Ms. Olson, you have the last word.

22             **MS. OLSON:**  Sure.

23        I'll also just add to what Your Honor was saying earlier.

24   Mr. Schneier was asked if he knows what Google does or what

25   Google does not do, and Mr. Schneier said no, and while I

1    think -- I totally agree with you that there will be helpful

2    testimony from experts about the technology, about what Google

3    does, that's not Mr. Schneier.  And --

4            **THE COURT:**  But rarely, if ever, do I have one person

5    who is the entirety of the case.  This is a puzzle.  That's

6    what I tell my jurors.  Lots of pieces, and he's just one of

7    those pieces.  That's all it is.

8        Okay.  Next, Mr. Psounis.  I'm not saying that right, I'm

9    sure.  My apologies to that person for butchering the name.

10           **MR. MAO:**  Good afternoon, Your Honor.

11           **THE COURT:**  And -- go ahead.

12           **DR. ANSORGE:**  Good afternoon, Your Honor.  Josef

13   Ansorge.

14           **MR. MAO:**  Sorry.  Good afternoon, Your Honor.  Mark

15   Mao, Boies Schiller Flexner.

16           **THE COURT:**  Josef Ansorge.

17       And you said?

18           **MR. MAO:**  Mark Mao, M-A-O.

19           **THE COURT:**  Got it.  Okay.  All right.

20       Your motion, Mr. Ansorge.

21           **DR. ANSORGE:**  We're actually defending this one.

22           **THE COURT:**  Plaintiffs' motion.  Mr. Mao.

23           **MR. MAO:**  Yeah.  I will summarize pretty quickly,

24   Your Honor.

25       Our motion is to strike certain portions of Dr. Psounis'

1   expert rebuttal report where he purports to be a rebuttal

2   expert but has not actually looked at the data in which our

3   moving expert analyzed and provided.

4       There were 160 sources identified by Google as relevant.

5   Our expert looked at over 40, I believe 47 sources, and

6   Dr. Psounis looked at one and came up with his alleged

7   conclusions.  These alleged conclusions was also tested by not

8   Dr. Psounis himself and instead by an associate whose

9   qualifications opposing counsel refuses to give.  And therefore

10  we believe that Dr. Psounis' portions on the data and what

11  Google supposedly can and cannot do with the data should be

12  stricken.

13          **THE COURT:**  Well, what case, if any, do you have for

14  the basic proposition that any expert must do or must perform

15  the exact analysis of your own?  They can attack it without

16  having done the exact analysis.  Why doesn't this just go to

17  weight?

18          **MR. MAO:**  Your Honor, it's because Dr. Psounis is a

19  purported rebuttal expert, and he was only providing rebuttal

20  opinions, so his rebuttal opinions do not look at and address

21  the analysis that was provided by the expert in which he was

22  supposedly rebutting nor the data in which he actually looked

23  at.

24          **THE COURT:**  All right.  A response.

25          **DR. ANSORGE:**  Yes, Your Honor.

1      Mr. Mao just stated that they are only seeking to strike

2    certain portions of his report.  There is 219 paragraphs in

3    Dr. Psounis' report.  Plaintiffs are striking 115.  We don't

4    believe that is an appropriate thing to ask for, and for the

5    specific reason, as you have already put your finger on,

6    Your Honor, there is no requirement for a rebuttal expert,

7    especially at class certification under these conditions, to

8    recreate the exact same analysis that the other expert

9    conducted, nor did Mr. Hochman exclusively rely on the tests

10   that plaintiffs are now referring to.  Even a cursory glance of

11   Mr. Hochman's report and appendices will show that there is

12   many sources that are considered and looked at.  And just like

13   each one of his 31 opinions don't exclusively rely on any data

14   tests, it would follow that they can also easily be rebutted

15   without having to recreate the specific data tests.

16       With regard to the "tested by an associate" comment

17   Mr. Mao made, he is referring there to a specific appendix,

18   Appendix F, in which Dr. Psounis conducted an analysis of the

19   distribution of IP address and user agent.  That analysis -- am

20   I too close?

21           **THE COURT:**  You are having an issue with yours.

22       **DR. ANSORGE:**  That analysis --

23           **THE COURT:**  And, if you will, slow down.

24       **DR. ANSORGE:**  Yes, Your Honor.  I'm sorry for trying

25   to get in so many words so quickly.

1       That analysis is discussed in four paragraphs in

2   Dr. Psounis' report.  So we don't believe it's appropriate or

3   proportional to strike any parts of the Psounis report, but to

4   the extent focus should be on the data tests, those are 4 out

5   of the 219 paragraphs.  None of his opinions exclusively rely

6   on the tests and, indeed, they don't have to because

7   Mr. Hochman in essence opined that individual class members

8   could be identified by taking an IP address and a user agent,

9   and that information combined had sufficient entropy to

10  identify the class members.

11      And Dr. Psounis shows that that's contrary to the

12  established information theory principles.  He actually teaches

13  courses on entropy.  Mr. Hochman, at his deposition, said that

14  well, Dr. Psounis' description of entropy appeared to be fine.

15  He wasn't contesting any of the math, and it seemed to just be

16  what was in textbooks.

17      So Dr. Psounis' opinions are both relevant and reliable,

18  and for those reasons, we would ask that you deny plaintiffs'

19  motion to strike Dr. Psounis' opinions.

20      **MR. MAO:**  Your Honor, if I may address that real

21  quickly?

22      **THE COURT:**  You may.

23      **MR. MAO:**  So counsel just pointed out exactly why

24  there must be a direct rebuttal.  Counsel conceded that

25  Dr. Psounis was supposed to address Mr. Hochman's use of the

1    special master data, Google's data that produced -- that helped

2    identify class members, and yet Dr. Psounis is supposedly

3    looking at some other data sources and saying well, when Mr.--

4    without looking at what Mr. Hochman used in order to identify

5    the class members.  How in the world is a rebuttal expert that

6    is supposed to rebut an identification process going to rebut

7    the identification by looking somewhere else?

8         **DR. ANSORGE:**  May I respond, Your Honor?

9         **THE COURT:**  You may.

10        **DR. ANSORGE:**  So that's not what I was saying.

11   Dr. Psounis relied on a lot of different sources of

12   information:  9 filed documents, 3 expert reports, hearing

13   transcripts, 31 deposition transcripts, 118 public documents,

14   368 produced documents, which include all of the produced

15   documents that Mr. Hochman cited and relied on in his report.

16   Mr. Hochman's opinions didn't exclusively rely on tests, and

17   they can easily be rebutted without having to rely on tests.

18        Indeed, Mr. Hochman states in his report that he was

19   unable to identify class members at this time, and the reason

20   for that is that the special master process was focused on the

21   named plaintiff data.  So to rebut it under those conditions is

22   not necessary nor appropriate to reproduce data and analysis

23   when the overall picture and theory are insufficient.

24        In any event, tests and which tests he conducted would all

25   go to weight and admissibility, and we believe you explained

1    very clearly in your standing order in paragraph 11 neither of

2    those are sufficient bases.

3            **MR. MAO:**  Your Honor, that's just not true that

4    Dr. Hoch -- Mr. Hochman's report obviously identified the class

5    members and went through the entire exercise.  If you just look

6    at the rebuttal report, for example, pages 17, all the way

7    through page 53 proved numerous ways and numerous examples of

8    how class members were reidentified using the same data.  We

9    did the same thing in the opening report.

10        In a case like this involving what Google alleges it does

11   not do with the data and our expert has actually identified,

12   using Google's own data, where class members are being

13   identified, the rebuttal expert -- we cited opinions as to what

14   the rebuttal expert's job needs to be limited to be.  The

15   rebuttal expert needs to address that data to give examples of

16   why the identification was either inaccurate or untrue.

17   Dr. Psounis didn't do any of that in his purported rebuttal.

18   If he wanted to offer something else as a moving expert, Google

19   should have provided that.

20        Your Honor, lastly, this is particularly important in a

21   case about what Google -- about what Google collects from

22   private browsing in which Google has repeatedly refused to

23   proffer and provide to the Court and to the public.  Here the

24   expert himself does not even have the data, Your Honor.

25            **THE COURT:**  All right.  We are going to move to the

1  balance of the class cert motion.

2      My reading with --

3          DR. ANSORGE:  May I have two sentences to respond,

4  Your Honor?

5          THE COURT:  No.  Rule 23(a), no one is really

6  disputing numerosity; correct?

7          MR. BROOME:  No.

8          THE COURT:  And typicality; correct?  You are not

9  disputing that?

10         MR. BROOME:  We have not made a typicality challenge,

11 Your Honor.

12         THE COURT:  Or adequacy?

13         MR. BROOME:  We have not made an adequacy challenge.

14         THE COURT:  Just getting it in the record.

15         MR. BROOME:  Yep.

16         THE COURT:  So the commonality, not really except

17 we've got predominance; right?

18         MR. BROOME:  We're at predominance.

19         THE COURT:  So predominance is the big issue.

20         MR. BROOME:  Yes.

21         THE COURT:  Okay.  So we've talked about implied

22 consent.  Assuming for purposes of argument we get past implied

23 consent and then there is an analysis of the individual counts,

24 we'll start from the top.  Count 1 -- Count 1 and 2 I think can

25 be done together.

1    **MR. BROOME:** Sorry. I have them organized -- is that

2    the wiretapping and the CIPA claims, I think, Your Honor?

3        **THE COURT:** Correct.

4        **MR. BROOME:** Yes. So the argument that we make there,

5    Your Honor, is that the issue of whether Google intercepted the

6    contents of communications, which is required for both

7    wiretapping claims under federal and state law -- that analysis

8    requires individualized inquiries because URLs on their own do

9    not qualify as content in every circumstance, and to determine

10   whether a particular URL qualifies --

11       **THE COURT:** Didn't Judge Koh already decide at the

12   class -- motion to dismiss stage that we are dealing with

13   confidential communications?

14       **MR. BROOME:** Confidential is not the question in this

15   analysis, Your Honor. The statute requires contents, the

16   contents of a communication.

17       **THE COURT:** It is under Count 2; right? Under CIPA?

18       **MR. BROOME:** Sorry. Under CIPA 632. I was going to

19   address that separately. That's correct, yeah.

20       But if we are talking about 631, the federal -- the ECPA

21   wiretapping claim and the CIPA 631 claim, there there is a

22   requirement that the plaintiffs show Google intercepted

23   contents. And the Ninth Circuit in *Zynga* held very clearly

24   that just a URL on its own without any sort of search terms

25   associated with it or other user-generated content --

1      **THE COURT:** Right.  But that's not what this is, is

2  it?

3      **MR. BROOME:** It's not what it is.

4      **THE COURT:** All right.  Go ahead.

5      **MR. MAO:** Your Honor, so you are absolutely right.

6  Not only did this Court find that URL was sufficient for

7  content for wiretap claims in the *RTB* case, as Your Honor just

8  pointed out, all of the data, all the browsing histories at

9  issue in this case involves private communications, things in

10  which the user has explicitly identified as private.  And under

11  not only *Pharmatrak* but the statute itself of 28 U.S.C. 2510,

12  which is the ECPA statute, content is merely defined as any

13  information concerning the substance, purport, or meaning of

14  those communications.

15      And Your Honor, as you may recall, specifically Google

16  tries to identify whether or not a communication is actually

17  confidential by the -- by the absence or the existence of the

18  ex-client data header, for example.  And here there is no

19  dispute ever raised by Google that all of the communications at

20  issue in this case, as defined by the Complaints, have ever

21  been anything other than private browsing.

22      **MR. BROOME:** Again, Your Honor, I think we're talking

23  about the federal and state -- Federal Wiretap Act and the CIPA

24  631 claim.  If the issue is contents, whether it's private or

25  not private is irrelevant.  The issue is whether the

1  communication contains some user-generated message to the other

2  party.  And there is a controlling case on this.  It's the

3  *Zynga* case.  It is the only Ninth Circuit case that has

4  addressed this issue --

5      THE COURT:  But that only addressed, right, the

6  information that was in the header.

7      MR. BROOME:  That's right.  And that's the information

8  that plaintiffs are claiming Google has intercepted uniformly

9  across the class.  Now, if they had said that we are uniformly

10 intercepting URLs that contain search terms, while we would

11 have the argument that that's not an analysis --

12     THE COURT:  So Hochman argues that the URLs here as

13 opposed to in the *In Re Zynga* case contain folders, subfolders,

14 and precise files requested from web servers which are

15 different and distinct from the URLs in *Zynga*.  So talk to me

16 about that specific distinction.

17     MR. BROOME:  Sure.  That's not something that could be

18 established classwide, Your Honor.  We're talking about a

19 private browsing session.  That may be one individual goes to

20 one website, looks at one web page, and signs out.  That

21 person's a class member, but that person hasn't conveyed any

22 content to Google.

23     Conversely or differently, you could have a class member

24 who goes to google.com in their private browsing mode, conducts

25 a search --

1      **THE COURT:**  So what I'm concerned here -- the inquiry

2  here is not a complete merits analysis.  The inquiry here is

3  whether or not there's sufficient common evidence for the

4  plaintiffs to make their case with respect to this topic, and

5  presumably you have an expert who's going to provide common

6  evidence to rebut that.  So isn't that sufficient?

7      **MR. BROOME:**  No, Your Honor, because there is no

8  evidence that Google intercepted contents from every class

9  member.  They have to establish that.  They have a burden under

10  *Olean* to show by a preponderance of the evidence that Google --

11  that -- on this claim that Google intercepted contents

12  uniformly across the class, and there are multiple scenarios.

13  I just gave Your Honor one, where Google would not have

14  intercepted contents as that term has been defined by the Ninth

15  Circuit.  And that's why this claim can't be certified.

16      **THE COURT:**  All right.  A response.

17      **MR. MAO:**  Real quickly, Your Honor.

18      We identified three types of contents.  First, we do

19  identify search terms, okay; however, we also identified full

20  URLs.

21      **THE COURT:**  The search terms aren't going to be

22  sufficient under *Zynga*.  Would you agree with that?

23      **MR. MAO:**  I tend to agree with that except to the

24  extent that there may be a subclass on search terms alone.  But

25  for URLs, we have alleged, Your Honor, and we've demonstrated

1    with our expert reports that these are full URLs.  It has never

2    been rebutted by the other side.

3         And then lastly, Your Honor, very important, all of the

4    contents, all the communications here, all contain content

5    because they are all tagged "private."  Whether a message --

6    when I'm trying to look and ask from another person and say,

7    "Hey, this conversation is private, I don't want you to let

8    anybody know, please do not track this, please do not save

9    this, please don't do anything with this communication," that,

10   Your Honor, comports with the definition of a communication.

11   And that is exactly what Your Honor just identified in terms of

12   why this is so critical for Americans to be able to actually

13   believe in Google's proffer of a choice.

14            **MR. BROOME:**  Your Honor, if I may?

15            **THE COURT:**  Hold on.

16        What you're talking about, it seems to me, is a nature of

17   a communication as opposed to the communication.  I make that

18   distinction in this way.  If Party A and Party B are

19   communicating and then you have Party G, Google, where Party A

20   tells Google, "I'm going to communicate with someone else, and

21   I want it to be private," that's the nature of the

22   communication as opposed to the communication itself.  If the

23   communication itself is just the URL, the Ninth Circuit says

24   that that's not enough.

25        What you're talking about is some other communication with

1  Google, at least that's what I understood your argument to be;

2  that the mere nature of the communication, that is, the mere

3  agreement with Google that this is going to be private is

4  somehow transformed into the communication between A and B.

5  And I'm not sure that that gets -- that that's enough under the

6  statute.

7      **MR. MAO:**  I don't know if I quite agree with that,

8  Your Honor, respectfully --

9      **THE COURT:**  And that's fine.  But that's what I want

10  you to address.

11      **MR. MAO:**  Sure, sure, sure.

12      Again, as Your Honor recognized in *RTB*, that

13  qualifications of 28 U.S.C. 2510 is that it's any information

14  concerning the substance, purport, and meaning of that

15  communication.  That's how -- at least how that's defined under

16  the ECPA.  For CIPA 631, the word is "communication."

17      However, Your Honor, I do want to cite an additional case

18  in which we had sent to the other side yesterday, which is S,

19  period, D vs. Hytto, which is H-Y-T-T-O.  It's a 2019 Westlaw

20  8333519, where vibration intensities sent via a body chat app

21  constitute content because the court went back to read

22  definition of "communications," which included substance,

23  purport, and meaning of what was intended to be sent by the

24  user.

25      And here, Your Honor, if we may just take a step back and

1    look at the idea of communications, if I communicate something

2    and if that's not necessarily flagged for the other side --

3    although I would disagree with that here, particularly for

4    Incognito because Google does flag that as confidential --

5    regardless of whether the receiving party, okay, fully

6    appreciates that it's been labeled "private" I don't think is a

7    requirement under the statute, so I do believe the fact that I

8    actually want to communicate a private message, especially if

9    it's understood by interceptor, that is communications,

10   Your Honor.

11        **THE COURT:**  You are trying to identify the tagging

12   itself as a communication as opposed to the underlying

13   communication.

14        **MR. MAO:**  Yes, Your Honor.  But the fact that I flag

15   something as confidential -- for example, Your Honor, if I were

16   looking at a political cite because I happen to be a Republican

17   within the Ninth Circuit where, you know, it's a little more

18   sensitive, the fact that I flagged what I'm reading as

19   confidential, that would give an extra layer of meaning to that

20   communication to the website to request that full page URL

21   during a different situation.  So I do respectfully disagree,

22   Your Honor, at least on that.

23        **THE COURT:**  Response.

24        **MR. BROOME:**  Yes, Your Honor.

25        I think if you look at the *Zynga* opinion, the Court

1    distinguishes --

2        **THE COURT:**  Remind me, *Zynga*, though, didn't have this

3    extra layer of the privacy zone into which the party who --

4    let's assume for purposes of argument that the interception

5    occurred.  Here the argument is that the mere fact that you've

6    entered into the zone that is a special privacy zone, whatever

7    it is that I say in that zone of -- cone of silence is, in

8    fact, a communication.  That wasn't the case in *Zynga*.

9        **MR. BROOME:**  I actually think it was, Your Honor.  I'm

10   just trying to locate the argument.  I think plaintiff did make

11   the argument that because it was -- they did not expect their

12   communication to be intercepted, that there was an expectation

13   of confidentiality, that that -- the court rejected that

14   because the question -- again, you come back to is it contents,

15   and the court's distinguishing between record information,

16   right, addressing information, and that's what a URL is, right?

17   If you go to a website or a web page -- and I have the exact

18   quote here, Your Honor.

19       The court says, "The web page address identifies the

20   location of a web page a user is viewing on the Internet and

21   therefore it functions like an address.  Congress excluded this

22   sort of record information from the definition of 'contents'."

23       And if we come back to this case, the only information

24   that plaintiffs can show Google intercepted uniformly across

25   the class while users were in private browsing mode are web

1    page addresses, URLs.  That's not contents.

2         **THE COURT:**  So what are then the folders, sub-folders,

3    and files referenced by Hochman?

4         **MR. MAO:**  Your Honor, when it's a folder and

5    sub-folder, it basically tells you it's pointing to a specific

6    page; in other words, if you're looking in the *New York Times*,

7    what particular story you're looking at.  And I'm glad that

8    Mr. Broome concedes that that is uniform and typical across the

9    class because that is exactly what we've alleged.

10        But I want to add one more point real fast, Your Honor,

11   which is that please note that even if you have to ponder a

12   little bit more about this idea of tagging specific

13   communications private, okay, with regard to a URL, if you are

14   looking at full page URL, Your Honor, and I've tagged what I'm

15   looking at private, I believe that that would certainly for

16   anybody in the United States believe that that is communication

17   when I'm requesting a specific page --

18        **THE COURT:**  He is saying in *Zynga* it was private, and

19   the Ninth Circuit said no, that's not enough.

20        **MR. MAO:**  What Mr. Broome is talking about is

21   different, Your Honor.  I'm talking about the communication

22   being tagged private.

23        What Mr. Broome is talking about is that in that context,

24   they thought they were having a private moment.  I profess that

25   I do not recall that being in the *Zynga* case other than they

1  were making a claim on the basis of privacy and not that their

2  communication, their request to the web page was private, but

3  what we're talking about here, Your Honor, is where a specific

4  page request, "hey, I want to see this following story," right,

5  and I want to tag that private, Your Honor, I want to view that

6  in my privacy -- in my private moment, I'm sorry --

7    **THE COURT:** Your reference -- and I apologize because

8  I threw the word into the discussion.  Define for me how you're

9  using the word "tag."  Is your use of the word "tag" the mere

10  fact that you're in this mode?

11    **MR. MAO:** It's both, actually, but let me -- recall,

12  Your Honor, there is a -- how would I call this -- a gigantic

13  dispute in discovery over Incognito bits.  Each Incognito bit

14  was designed by Google to flag what was or what was not a

15  private moment requested page, okay, in Chrome.  And where you

16  have a full URL and Google is specifically tracking "Hey, this

17  person has specifically requested that I want to be in

18  control," okay, "do not track me, I'm in my private moment,"

19  Your Honor, surely that that is communications.

20    **THE COURT:** So the argument is that when you're in

21  Incognito mode, anything you do has an Incognito bit which tags

22  it as private?

23    **MR. MAO:** Yes.  And they are full-page URLs which

24  Mr. Broome does not disagree in each and every moment, and they

25  are also not disagreeing that it's tagged private.

1    **MR. BROOME:**  Your Honor, first of all, we would

2    disagree that the Incognito bit that Google was using is

3    relevant at all to this.  I mean, I don't think -- there is

4    nothing in *Zynga* that suggests that because somebody is in a

5    private mode, that somehow is conveying to a website that the

6    communication -- or to Google that the communication --

7    sorry -- is conveying the content of a communication to Google.

8        The private browsing modes are actually designed not to

9    indicate to the websites or Google that they are in private

10   browsing mode.  The ex-client -- the Incognito bit that Mr. Mao

11   referenced was a more recent development later in the case, and

12   that is not used to sort of uniformly across the class identify

13   private browsing mode users.  It was an inference based off of

14   the absence of a header in Chrome -- it only applies in

15   Chrome -- and the testimony throughout discovery, I think, has

16   pretty much been unassailed, is that that is not uniform across

17   the class.  There are many instances in which that -- the

18   ex-client data header -- the absence of the ex-client data

19   header may not reliably identify a user as being in Incognito

20   mode.

21       **MR. MAO:**  Your Honor, respectfully, if you're not

22   trying to -- so, first of all, we have not gotten all the

23   evidence, but if you're not trying to identify users and you're

24   not trying to identify Incognito sessions, I'm not sure why a

25   bit to indicate whether or not the person is in Incognito or

1     not would be necessary.  So I -- we fully disagree with that

2     statement and representation, Your Honor.

3             **THE COURT:**  Okay.  Let's move on to Count 3.

4             **MR. BROOME:**  So we are at CIPA 632, Your Honor?

5             **THE COURT:**  You want to say more about that?  I wanted

6     to move to 3.

7             **MR. BROOME:**  If you can remind me, Your Honor.  I

8     don't have them listed out by counts.  I'm sorry.

9             **THE COURT:**  Count 3 is the Comprehensive Computer Data

10    Access and Fraud Act.

11            **MR. BROOME:**  Yes.  So this is an anti-hacking statute,

12    Your Honor.  It's the California equivalent of the Federal

13    Computer Fraud and Abuse Act, and right in the text of the

14    statute it requires that the authorization -- the access be

15    without permission.  So the statute requires that the defendant

16    accesses the plaintiff's computer without permission.

17        We would argue, Your Honor, this comes back to implied

18    consent, that many users are well aware that Incognito --

19            **THE COURT:**  That doesn't need to be reargued.

20            **MR. BROOME:**  Okay.  Thank you, Your Honor.

21            **THE COURT:**  4 and 5.

22            **MR. BROOME:**  All right.

23            **THE COURT:**  Invasion of privacy and intrusion upon

24    seclusion.

25            **MR. BROOME:**  Thank you, Your Honor.

1          So there are three additional reasons why the privacy

2     claims cannot be certified.  The first is standing.  At least

3     one named plaintiff must have standing, and here, Your Honor,

4     we would argue that none has standing to insert invasion of

5     privacy or intrusion upon seclusion because these common law

6     claims require that the privacy invasion be highly offensive.

7     But the data collection at issue here consists of orphaned

8     islands of browsing activity that are not identified with any

9     particular user so Google's collection of it cannot meet the

10     highly offensive --

11          **THE COURT:**  I'm not going to make that kind of merits

12     determination at this juncture.

13          The question is if there's sufficient evidence to support

14     that at this juncture.  So if you don't have anything to say on

15     that particular issue, we can move to 6.

16          **MR. BROOME:**  Well, I have additional arguments with

17     respect to 4 and 5, Your Honor, although under both claims,

18     there is a requirement that they show a reasonable expectation

19     of privacy and here we --

20          **THE COURT:**  Someone is saying, "I want to go to into

21     Incognito mode," that's a reasonable expectation arguably.

22     We're moving to 6.

23          **MR. BROOME:**  Arguably, but not --

24          **THE COURT:**  We're moving on.  You've got stronger

25     arguments.  That's not one of them.

1          **MR. BROOME:**  Pardon me?

2          **THE COURT:**  You have stronger arguments.  That's not

3     one of them.

4          **MR. BROOME:**  Thank you, Your Honor.

5          **THE COURT:**  Breach of contract.

6          **MR. BROOME:**  Breach of contract.  Thank you.

7     So certification of the contract claim should be denied

8     because the contract was not uniform throughout the class

9     period.

10         **THE COURT:**  Yeah.  But why can't I -- even if I buy

11    that argument, that's why we have subclasses.

12         **MR. BROOME:**  Yes.  Exactly, Your Honor.

13         **THE COURT:**  So subclasses take care of that entire

14    argument.

15         **MR. BROOME:**  They don't here, Your Honor.  They don't

16    here because there are material variations throughout the class

17    period in the alleged contract that give rise to very specific

18    defenses that Google has that would be claim-defeating.  The

19    question is which defenses apply to which class members.

20    In order to -- we don't know -- we don't -- we are not

21    able to tell when a given class member used any of the private

22    browsing modes at issue here, so the only way -- well, let me

23    take a step back.

24    We can't just assume that class members used Incognito

25    mode or one of the other two private browsing modes

1    consistently throughout the class period.  And we know that

2    because we asked the plaintiffs when did they use private

3    browsing mode.  Well, they responded in response -- in --

4            THE COURT:  Isn't that an issue with respect to

5    damages?

6            MR. BROOME:  No, Your Honor.  It's an issue as to

7    what -- which defenses apply to which class members because if,

8    for example -- let me give you an example.  One of the

9    plaintiffs said, "I used Incognito mode in 2016 and 2017."

10   Well, for that class member, we would say the alleged contract,

11   which sort of starts at the Terms of Service and then goes to

12   the Privacy Policy -- the Privacy Policy doesn't have any

13   representations about Incognito mode in that period of time,

14   right?  So that class member would not have a claim.

15       In addition to that, during that same time period, there

16   is a limitation of liability that limits that class member's

17   damages to the amount they paid for the service, which is zero

18   dollars here, right?

19           THE COURT:  Didn't I just say doesn't that go to

20   damages?

21           MR. BROOME:  Well, it goes to damages.  It also goes

22   to predominance because we're talking about whether or not a

23   class member actually has a claim in the first place.  I agree,

24   Your Honor.  The liability issue, limitation does go to

25   damages.

1    But the point is, is that depending on when a class member

2    used private browsing mode, there are different defenses that

3    apply, and if the plaintiffs themselves in response to

4    interrogatory requests cannot reliably recall exactly when they

5    used the private browsing mode and which private browsing mode

6    they used -- I mean, some of these people -- I have some quotes

7    here.  We asked Plaintiff Brown, and he said, "I may have tried

8    the private browsing mode with Microsoft's web browser once or

9    twice," but he wasn't certain.  He had also used Incognito

10   mode.

11   We asked Plaintiff Byatt which other private browsing

12   modes he used, and he said, "I may have browsed privately in

13   Firefox but cannot recall any specific details of the

14   activity."

15   And more generally, Your Honor, when we asked them this

16   question, "which private browsing modes did you use and when

17   did you use them," plaintiffs responded that this request was

18   unreasonable, not proportional to the needs of the litigation.

19   They said that because they used private browsing mode so that

20   their activity would not be memorialized, they could not

21   recall -- quote, they cannot recall the particular details of

22   each and every time they engaged in private browsing mode.

23          **THE COURT:**  All right.  A response.

24          **MS. BONN:**  Yes, Your Honor.

25   This is absolutely a damage allocation and proof-of-claim

1    issue for this reason, and I'll use just one example.  Google
2    in their brief says, "Well, we think Class 2, the contract,
3    doesn't give rise to a claim between 2016 and 2018."  That is a
4    common argument.  They could move for summary judgment on that,
5    and if the Court were to agree, then that means we would have
6    to make an adjustment to our aggregate damage model, and at a
7    proof-of-claims post-judgment process, a plaintiff would have
8    to sign an affidavit that says what time period did you use
9    this private browser between 2018 and on.  And anyone who put
10   in an affidavit saying, "I browsed in 2016 isn't entitled to an
11   allocation."
12       I will also say that Google itself has been from --
13   precluded from using the absence of complete data in order to
14   challenge class certification generally or self-attestation in
15   particular, and yet what I just heard from Google is that we no
16   longer have records that can reliably identify who did what.
17   So this is nothing more than an issue that, number one, can be
18   taken care of with subclasses; number two, it is a common
19   argument on the basis of a form contract that applied during a
20   particular time period; and, number three, at best it's an
21   argument about how an aggregate pie should be allocated amongst
22   class members, and Google doesn't have standing under plain
23   Ninth Circuit law, *Ruiz Torres vs. Mercer Canyons*, *Hilao vs.*
24   *Estate of Marcos*, *Six (6) Mexican* to make any such argument.
25   And moreover, they've been precluded from making precisely that

1    type of argument because of their refusal to fully produce and
2    preserve data in this case.

3        **MR. BROOME:** Your Honor, that last point is a gross
4    misrepresentation of the sanction that was imposed by
5    Judge van Keulen, and the argument that we are making here that
6    Google does not have the ability to identify private browsing
7    users is not because Google failed to preserve data or Google
8    deleted data that it should have preserved. The fact is that
9    the data never existed in the first place. And the order does
10   not preclude us from making that argument.

11       Ms. Bonn's assertion that class members can just put in an
12   affidavit, well, we asked the plaintiffs to put in
13   interrogatory responses, and their responses -- their response
14   was, "This is burdensome. This is not proportional to the
15   needs of the case. We can't remember the specific details."
16   Now that it serves their interest, they want to have class
17   member, tens of millions of class members, right, come forward
18   and say, "I used this particular private browsing mode on these
19   particular months" because their damages model is a
20   month-by-month period --

21       **THE COURT:** It's a legitimate approach. It has been
22   used in other cases.

23       **MR. BROOME:** It has but not in a case where the
24   plaintiffs themselves have said, "We can't remember these kinds
25   of details."

1    And, remember, Your Honor, it's not every private browsing

2    mode at this point.  That was the case when plaintiffs filed

3    their Third Amended Complaint.  We thought we were litigating a

4    case about all private browsing modes.  For some reason during

5    expert discovery or before expert discovery, plaintiffs

6    determined that not all private browsing modes created the same

7    issue, and so they've narrowed the private browsing modes at

8    issue to just three.  We're going to ask tens of millions of

9    class members to submit affidavits saying, "I used this" --

10    **THE COURT:**  If you defrauded tens of millions of

11    users -- if a jury found you defrauded them, then perhaps yes.

12    **MR. BROOME:**  Well, respectfully, Your Honor, we did

13    not defraud anyone.

14    **THE COURT:**  I understand that's your perspective.

15    That's not what I'm here to decide.

16    The question is whether the class can be certified so that

17    those tens of millions of users don't have to sue you for $3 or

18    $10 or whatever it is.  That's the point of a class action.

19    **MR. BROOME:**  I understand that, Your Honor.  But

20    Google also has rights in this proceeding, and we have defenses

21    that are viable as to many, many class members.

22    **THE COURT:**  Well, let's talk about certification of

23    issues, bifurcation, liability findings without monetary

24    damages.

25    Who wants to be heard?

1        **MR. BROOME:** I'm not sure -- I may step down,

2   Your Honor, depending on what the question is. I'm not sure.

3        **THE COURT:** All right. I've got someone at the mic on

4   this side.

5        **MR. YANCHUNIS:** So, Your Honor, in --

6        **THE COURT:** What is your name, sir?

7        **MR. YANCHUNIS:** I'm sorry, Your Honor. John Yanchunis

8   of the law firm of Morgan & Morgan.

9        **THE COURT:** All right. Go ahead.

10        **MR. YANCHUNIS:** If one of the issues that you want to

11   address is our request for certification under 23(b)(2) --

12        **THE COURT:** Go ahead.

13        **MR. YANCHUNIS:** I'm sorry, Your Honor?

14        **THE COURT:** Go ahead.

15        **MR. YANCHUNIS:** Yes. Thank you.

16    So in that request we seek an injunction to address four

17   different activities. One is to stop the collection of

18   browsing information data in connection with anyone using

19   Incognito mode; in other words, make the button work or stop

20   using the button.

21    Second of all, we seek that to the extent that information

22   that we know has been collected and stored, that that be

23   deleted.

24    The third element is -- and we've indicated in

25   Mr. Hochman's report, the ways in which that information has

1    been used in the development of products and services, that

2    that information either be extracted out or those products and

3    services that use unlawfully collected information be

4    destroyed.

5        And fourth, that the Court appoint an assessor to

6    determine that Google has, in fact, complied with the

7    injunctive relief if it's ordered by the Court.

8        The argument, which is really one sentence in the

9    opposition to our request, is that we have an adequate remedy

10   at law.  Well, this deals with prospective conduct going

11   forward as well as addressing the fact that they have

12   information that they're going to continue to use in connection

13   with their products and services.  So an adequate remedy of law

14   does not satisfy those elements that we seek in our injunctive

15   relief.

16       They claim --

17       **THE COURT:**  I've heard a lot of argument here,

18   Mr. Schapiro, that none of these damages models work.  If I

19   accept your argument, then clearly they don't have an adequate

20   remedy at law, and so injunctive relief is the only remedy that

21   would be appropriate.

22       **MR. SCHAPIRO:**  Two answers to that, Your Honor.  First

23   of all, a classwide damages model doesn't work.  That doesn't

24   automatically mean that injunctive relief is available.  But I

25   believe the law is also fairly clear that if the primary remedy

1    that the plaintiffs are seeking, even though we say you can't

2    apply this classwide -- but if the primary remedy they are

3    seeking --

4            THE COURT:  This is an alternative, and it's a new --

5    I don't -- I don't think that's a strong argument.

6            MR. SCHAPIRO:  Well, then let me give you an argument

7    that I hope you will find is stronger, and that is, Your Honor,

8    even if injunctive relief were somehow appropriate in this

9    case, the relief -- the injunctive relief that the plaintiffs

10   are asking for here is not feasible, goes well beyond the

11   alleged harm, and I want to explain why, and would --

12           THE COURT:  Yeah, but that -- again, isn't that

13   something to be fought about later as opposed to whether or not

14   a class can be certified to provide injunctive relief?

15           MR. SCHAPIRO:  No, I don't think so, Your Honor,

16   because also it would detrimentally affect users inside and

17   outside the class whose rights are not going to be represented

18   in an aggregate hearing, so there would be --

19           THE COURT:  Again, that -- so you could -- assuming

20   for the sake of argument that the tens of millions of people

21   who you think like the way you've got this structured could

22   continue to use it doesn't necessarily mean that you couldn't

23   create two options:  Incognito Total and Incognito, the way we

24   used to have it, Original.

25           MR. SCHAPIRO:  Incognito Classic.

1    **THE COURT:**  Classic.  There you go.  Zero Incognito

2    and Incognito Classic.

3    **MR. SCHAPIRO:**  Well, Incognito Zero, we submit, would

4    ultimately be a -- would lead to an Internet that doesn't even

5    work for reasons that we've described.  But I want to address

6    your point head on about class certification here, which is --

7    and I would ask the Court if after this argument you are going

8    back and you're thinking about injunctive relief, you look at

9    specifically what the plaintiffs would be asking the jury --

10   **THE COURT:**  Mr. Schapiro, I don't -- certainly if I'm

11   going to issue injunctive relief, it seems to me that I

12   shouldn't do it without hearing from the parties.  It seems to

13   be a judicious thing, to wait to hear from the parties before

14   you do injunctive relief.  That's not the question.  The

15   question is do I certify the class so that we can in fact have

16   that discussion.

17   **MR. SCHAPIRO:**  Respectfully, Your Honor, I don't

18   think -- I can have -- take a position here where I don't think

19   we can reach a resolution at the class certification stage

20   without at least inquiring as to what it is they are seeking in

21   their Complaint and in their papers, and what they are seeking

22   is to delete -- is, first of all, to identify what information,

23   what private browsing information has -- has been -- could

24   somehow be linked to users and delete that.  That would require

25   violation of privacy standards.

1      Secondly, they're asking Google to remove any services

2    that were developed or improved with private browsing

3    information.  That not only faces the problems above because

4    they don't tell us what these are --

5        **THE COURT:**  Mr. Schapiro, the fundamental thing they

6    are asking for is that Google stop profiting off of data that

7    is collected -- assuming their argument is true, right -- that

8    is collected by people who are using Incognito with the

9    understanding that you aren't collecting their data.  In many

10    ways, it's quite simple.

11      Now, all this other stuff, yeah, maybe you're right, maybe

12    you're wrong, I don't know, but that's not a hugely complicated

13    issue if in fact you are collecting data from users, the

14    millions, the tens of millions of users that think you're not.

15        **MR. SCHAPIRO:**  Your Honor, this case is about -- I

16    don't think we will have a dispute from the plaintiffs about

17    this -- is about people in private browsing mode who go to a

18    site, let's call it the *New York Times*, although sometimes

19    there might be different kinds of sites, and had thought, they

20    say, that not only would their browsing history not be stored

21    on their computers at that time, but that if they clicked an ad

22    that was served up by Google, there would be no indication that

23    that ad -- excuse me -- that the device that was clicking on

24    that ad existed in any way, that you wouldn't know there was a

25    URL or other device, because all that is identified in any way,

1  it's not a human being, it's there's a device somewhere that

2  was in private browsing mode that clicked on an ad.  I think

3  there is no dispute that the cookies are all deleted at the end

4  of a session.

5        **THE COURT:**  Okay.  Is there no dispute?

6        **MR. YANCHUNIS:**  There is a dispute that the private

7  browsing information of consumers is collected, stored, and

8  used by Google.

9        **THE COURT:**  See, that's the problem, Mr. Schapiro. I

10  have got all of these plaintiffs' lawyers on this side shaking

11  their head "no" when you're talking.  They're shaking their

12  head "no," which means there's a dispute.

13        **MR. SCHAPIRO:**  I don't think they can reasonably

14  dispute that the "you" who they are talking about when they say

15  "you now" -- "you" -- the "your."  "Your browsing isn't

16  visible" --

17        **THE COURT:**  Maybe I --

18        **MR. SCHAPIRO:**  -- "to data; it's just a device."

19      There is a reason that we're permitted to undertake some

20  discovery before a class cert hearing.  And there is a record

21  in this case, and the record is clear that the only thing that

22  is collected is information that some computer somewhere

23  clicked on an ad and then that is deleted.  We have spent a lot

24  of time in front of the magistrate, in front of the special

25  master.  If they had the goods on that, they would come forward

1    with it.  They're not.

2          **THE COURT:**  Maybe I need to have an evidentiary

3    hearing in this case, too.

4          **MR. SCHAPIRO:**  That's obviously up to the Court, but

5    when we're talking about an injunction here, the reason I was

6    raising that is that it is impossible to think of -- although

7    at a high level, you would say, "Okay, well, stop profiting."

8    What that would actually mean in a context like that, it means

9    there should be no Google Analytic, we should identify people

10    who are in private browsing so that when a web page, the *New*

11    *York Times*, is visited by someone who is in private browsing

12    mode, *New York Times* knows that person is in private browsing

13    and doesn't serve ads.  The Court would be heading down into a

14    deep rabbit hole there, and so an injunctive class would not be

15    feasible.

16          **MR. YANCHUNIS:**  May I have the last word on this,

17    Your Honor, or have you heard enough?

18          **THE COURT:**  No.  Go ahead.

19          **MR. YANCHUNIS:**  Let me make clear that, again, that in

20    connection with the 23(b)(2), the injunctive relief deals with

21    prospective conduct.  Damages deals with what happened in the

22    past.

23    I think the Court has hit the issue right on the head.

24    What we're talking about is the lick-log issue here, the

25    merits.  Whether it's feasible, not feasible, we certainly have

1    an expert, Mr. Hochman, who talks about the ways in which this

2    information is collected and used, and to say it's not

3    feasible, that doesn't -- isn't synonymous with "it hurts,"

4    "it's too hard."  But at the heart of our UCL claim is the

5    unfairness of the collection of this information.

6            **THE COURT:**  Okay.  I'll give you each five minutes for

7    any parting comments, or you can yield back.

8            **MS. BONN:**  Thank you, Your Honor.

9            **THE COURT:**  Would you like five minutes?

10           **MS. BONN:**  Thank you, Your Honor.

11           **THE COURT:**  Go ahead.

12           **MS. BONN:**  I would like to pick up with the argument

13   that Mr. Schapiro just made, which I think sort of permeates

14   the entirety of their brief, which is even if we made a promise

15   that we won't collect private browsing information, that we

16   won't collect the data if you're in a private mode, it's

17   actually perfectly fine for us to collect it, use it to profit

18   to the tune of billions of dollars, as long as we promise that

19   we'll blur your face.  We won't link it to the other set of

20   data we have about you.

21       But that's not the promise at issue here.  The promise we

22   are alleging in the contracts is not that Google told its

23   users, "Hey, you understand we're collecting all your data in

24   private mode, but we promise we'll anonymize it.  We promise we

25   will pseudonymize it."  No, the promise, as the Court found was

1    a plausible interpretation, was not to collect it in the first

2    place.  And all of the arguments that we have heard from Google

3    today are ones that are common to the class.  They don't raise

4    individualized issues.

5        If Google's argument against injunctive relief is that

6    it's too hard or this conduct isn't so offensive, that's a

7    common argument.  Their argument that well, some class members

8    might have browsed in 2016 and we might have a better argument

9    on the form contract during that period, well, then, they will

10   bring a summary judgment motion, and it would bind the class

11   during that time period.  And at a proof of claim time after a

12   judgment, that can be dealt with.  That happens all the time.

13       What Google is really arguing here is that even though

14   they have a form contract with every single one of our class

15   members, even though that contract has been plausibly

16   construed -- plausibly construed to support our interpretation,

17   even though they've made a commitment in that form contract

18   throughout the class period that they will not reduce rights

19   without your explicit consent, that they can then come into

20   court, object to class certification, which we all know means

21   avoiding accountability, and say the contract's not worth the

22   paper it's printed on, that is effectively the argument Google

23   has made.

24       I would like to address a couple of other things that came

25   up in the argument, and I just want to make sure we make our

points.  One is there was a question about the survey evidence
and how many people may have misunderstood things under
Google's survey.

One thing I want to say is before we even get to the
question of a survey, we have objective manifestation theory of
contract and the promise of an explicit consent standard, so I
don't think we're ever even going to get there.  But even if we
do, it's a classic battle of the experts.  Google has their
expert who performed a survey, admittedly not of Google
accountholders, admittedly didn't ask about consent, admittedly
didn't ask about the specific conduct in this case, being in a
private mode on a non-Google website while signed out of your
account, and we have a survey expert, Mr. Keegan, who did a
rebuttal.  He accounted for those errors, and what his survey
demonstrates is that over 93 percent of respondents believed
they have not consented in that particular circumstance, and
that is over a hundred million Americans.  So each of these
issues is a common and classwide issue, even if we get there.

But at the end of the day what Google is effectively
saying is you have no choice.  You have no choice to have your
private browsing data not be collected by Google because even
if we promise not to collect it, even if we promise to rely on
explicit consent, if you ever try to bring us into court, we
are going to argue we can just collect it with impunity if we
de-anonymize it, and, hey, maybe you guessed that was the case

1   because you read some article generally about tracking that

2   doesn't even specifically address the contours of this case.

3      And that is why fundamentally this case should be

4   certified as a (b)(3) class.  Common issues predominate, and a

5   class action is clearly the superior method of adjudication

6   when there is a common form contract, common evidence of

7   Google's tracking and interception behavior, and an aggregate

8   damage model that's calculated from the top down using Google's

9   own internal records, Google's own calculations of profits.  If

10   ever there is a case, a consumer case that fits the criteria to

11   certify a class action, we respectfully submit that on our

12   claims and our record, that is it.

13      And let's consider the alternative.  If there were

14   individualized cases, the same evidence would be presented.  A

15   plaintiff like Mr. Brown would come to court and present the

16   form contract, the explicit consent provision, and would say,

17   "I browsed privately during this time period," and Google would

18   be precluded under the Court's prior order from contesting that

19   because its data hasn't been fully produced.

20      Thank you, Your Honor.

21         **THE COURT:**  Mr. Schapiro, five minutes.

22      **MR. SCHAPIRO:**  Your Honor, if a trial of a class

23   action were to proceed here, Google would face the very real

24   prospect of being found liable to tens of millions of people

25   who have not been wronged but with no way to show it.  And the

1    law is clear that regardless of the difficulties that someone

2    might face in an individual case, that a defendant has a right

3    to raise defenses that are individualized, and when those

4    individualized defenses predominate, class treatment is not

5    proper.

6         I would ask the Court, because this is one of those

7    instances in which there is some overlap between the merits

8    arguments and the class certification arguments -- I think

9    we've just heard some of them -- to read the disclosures that

10   are at issue.  I know Your Honor has.  But to look again at

11   them because the supposed promises do not appear in the form

12   that opposing counsel has described them.  And that's important

13   because it goes to the variability in terms of what people

14   understood, and it goes to the unworkability of class

15   treatment.

16        That is particularly so, strongest, I think, for the

17   contract case.  And we have laid this out in more detail in our

18   brief.  Mr. Broome touched on it.  But that is one area where

19   subclasses would be entirely unworkable, and I think we would

20   be on day two of a trial and the Court and the parties and the

21   lawyers would be saying what have we done here because this is

22   not a simple case where you would say oh, everybody before 2017

23   was subject to this contract and everyone after 2017 or 2018

24   was subject to that contract.  The matrix is a Rubik's Cube

25   essentially, and in each of the sides of that Rubik's Cube, we

1    have defenses that we are entitled to raise.  It's laid out in

2    our brief, and if we were required to try to argue against a

3    contract, which again here is not a specific statement anywhere

4    in one document but it is a series of inferences drawn from

5    multiple documents -- without our ability to point to the

6    specific documents at issue, we would be prejudiced unfairly

7    and in violation of the governing law.

8        Ms. Bonn referred to the surveys a moment ago, and surveys

9    of course are often used at the class certification stage here.

10   And even Mr. Keegan's surveys -- even Mr. Keegan's surveys show

11   that 35 percent of individuals were -- had knowledge and

12   awareness of what the plaintiffs claim was the improper

13   collection of their data here.

14       If you have a situation where both sides' survey experts

15   show that a substantial portion of the public understood

16   perfectly well what the question was but not everyone, that is

17   not a case that is suitable for class certification.  It's as

18   if you had a case where there was someone who was using a taxi

19   service and the agreement with that taxi service said we will

20   use electric vehicles, and repeatedly the vehicles show up, and

21   sometimes they're electric and sometimes they have combustion,

22   and people go on using.  It's quite evident that they are.  And

23   some people continue to use the taxi service; some people

24   don't.  That would not be suitable for class treatment.  You

25   would have implied consent, or if you don't want to call it

1  implied consent, waiver for some significant portion of the

2  class.

3      I believe that the Ninth Circuit in this case would not

4  approve of a certification that deprived Google of such

5  fundamental defenses.  We have laid out in our brief why the

6  damages model is inappropriate for class treatment as well here

7  and the standing problems that the plaintiffs face.

8      I guess I will close by saying I understand that the

9  allegations here might at times seem salacious or

10  extraordinary, and the plaintiffs at times in their statements,

11  I think, have tried to rely on sort of a gut feeling that

12  someone might have and say, "Oh, well if I wanted to be private

13  and I was not able to be private," that there is something that

14  screams out for a remedy here, and I would just again ask

15  Your Honor to look at what the actual promises are here, what

16  Incognito actually does, and I would respectfully suggest that

17  if there are some people, like some of the named plaintiffs

18  here, who had some different expectation, the world will not

19  end if they are required to bring their cases as individuals.

20      **THE COURT:**  Well, it might end for all of us in the

21  Northern District who would have to try those tens of millions

22  of cases.

23      Okay.  You're plaintiff.  Two minutes.

24      **MS. BONN:**  Thank you, Your Honor.

25      I think the arguments we just heard are merits arguments.

1    They're common to the class.

2          There is a form contract in this case, and if Google

3    thinks that the contract claim is a weak one during a

4    particular time period, I presume they'll file a summary

5    judgment motion, and if a class is certified and Google happens

6    to prevail, then that would bind the class, but it is not a

7    claim that varies on an individual-by-individual basis.  It is

8    not a reason to deny class certification under rule (b)(3).

9          And what it ultimately comes down to is that in this case,

10   we have calculated the aggregate damage on a whole, so the

11   arguments that have been made about well, maybe a contract

12   claim won't exist during this discrete time period, that may

13   result in a reduction of the aggregate damage award and then a

14   proof-of-claim issue.

15         The other thing I want to say is that there has been a

16   heavy emphasis on the notion of implied consent, but throughout

17   this hearing -- I mean, in their briefs, Google said one

18   sentence about the promise in the form contract throughout the

19   class period with every class member:  "We will not reduce your

20   rights without your explicit consent."  "Without your explicit

21   consent."

22         Google doesn't seem to have an argument why that issue

23   alone doesn't preclude them from raising an implied consent

24   defense and therefore resolve the entire issue in one stroke.

25   The only argument they made in their papers and the only

1   argument I've heard today is, "Well, you know, I don't think

2   that's really what we're doing here."

3       Google is arguing that class members' rights under the

4   contract not to have their private data collected should be

5   reduced because people implicitly consented if they read a news

6   article.  That is a common and classwide issue that will

7   resolve the issue of implied consent in one stroke, and this

8   Court and the jury will never even need to question what did

9   any person privately think in their mind if they read this

10  article because it doesn't matter.  It doesn't matter under the

11  law and it doesn't matter under the contract.

12      Thank you.

13          THE COURT:  Okay.

14          MR. SCHAPIRO:  Your Honor --

15          THE COURT:  This isn't a new argument.  It's all over

16  the briefs, so you don't need to respond.  They're the

17  plaintiffs.  They get to close.  That's the way it works in

18  trial.  That's the way it will work today.

19      I want to just compliment all the attorneys on both sides

20  with respect to your briefing and the clarity of your work.

21  It's a big issue and there's a big record, but it -- we do

22  notice when we get good briefs, and we really do appreciate

23  that.

24      So thanks for spending the time to come in.  This, in my

25  view, is so much better than anything that could happen on

1   Zoom.  I think we're all very wary of doing this kind of work

2   that way.  I certainly can't interrupt and give you hand

3   signals in the same way as I can in the courtroom.  And, you

4   know, it's nice to be back in the courtroom.  So thank you very

5   much.

6        And I'll take it under submission.

7             **MS. BONN:**  Thank you, Your Honor.

8             **MR. SCHAPIRO:**  Thank you, Your Honor.

9                 (Proceedings adjourned at 4:24 p.m.)

1

2

3                    CERTIFICATE OF REPORTER

4              I certify that the foregoing is a correct transcript

5      from the record of proceedings in the above-entitled matter.

6

7      DATE:   Thursday, October 13, 2022

8

9      *Pamela Batalo Hebel*

10     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
       U.S. Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25